IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, CHOLE MOORE, JOE TREVINO, and ANGEL GARCIA, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs | ) ) | NO.    1:11-cv-_____ |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, and JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

NOW COME the Plaintiffs, CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, CHOLE MOORE, JOE TREVINO, and ANGEL GARCIA by and through the undersigned attorneys, complaining of the Defendants state and allege as follows:

1.      This is a civil rights suit brought to protect the most sacred right in a democratic society -- the right to vote.  It seeks to invalidate the redistricting plan for election of members to the Illinois General Assembly (the "General Assembly"), approved by the General Assembly on May 27, 2011 and signed into law by the Governor on June 3, 2011, which sets forth the districts to be used to elect members of the General Assembly (the "Redistricting Plan").   The Redistricting Plan and the process by which it was created violate the First and Fourteenth Amendments to the United States Constitution, the federal Voting Rights Act and the Constitution of the State of Illinois.  The gross deprivation of these constitutional and statutory rights caused by the Redistricting Plan requires this Court to invalidate the Redistricting Plan, enjoin future elections under the Redistricting Plan and institute a new redistricting plan setting forth the districts used to elect members of the General Assembly consistent with all applicable constitutional and statutory requirements or order other appropriate corrective action.

**<u>PARTIES</u>**

2.      Plaintiff CHRISTINE RADOGNO is a state senator from the 41st Legislative District, a citizen of the United States and of the State of Illinois, and a duly registered voter residing in Cook County, Illinois.  Ms. Radogno is also the Minority Leader of the Illinois Senate, vested by Article IV, Section 6(c) of the Illinois Constitution of 1970 with the duty to promote and express the views, ideas and principles of the Senate Minority Republican caucus in the 97th General Assembly and of Republicans in every Representative and Legislative District throughout the state of Illinois.

3.      Plaintiff THOMAS CROSS is a state representative from the 84th Representative District, a citizen of the United States and of the State of Illinois and a duly registered voter residing in Kendall County, Illinois.  Mr. Cross is also the Minority Leader of the Illinois House

of Representatives, vested by Article IV, Section 6(c) of the Illinois Constitution of 1970 with the duty to promote and express the views, ideas and principles of the House Minority Republican caucus in the 97th General Assembly and of Republicans in every Legislative and Representative District throughout the state of Illinois.

4.      Plaintiff CHOLE MOORE is a citizen of African-American heritage residing in the State of Illinois in St. Clair County within the boundaries of Representative District 114 of the Redistricting Plan.

5.      Plaintiff VERONICA VERA is a citizen of Latina heritage residing in the State of Illinois in Cook County within the boundaries of Representative District 22 of the Redistricting Plan.

6.      Plaintiff ADAM BROWN is a state representative from the 101st Representative District and a duly registered voter and citizen residing in the State of Illinois in Macon County within the boundaries of Representative District 96 of the Redistricting Plan.

7.      Plaintiff JOE TREVINO is a citizen of Latino heritage residing in the State of Illinois in Cook County within the boundaries of Representative District 77 of the Redistricting Plan.

8.      Plaintiff ANGEL GARCIA is a citizen of Latino heritage residing in the State of Illinois in Cook County within the boundaries of Representative District 1.

9.      Defendant ILLINOIS STATE BOARD OF ELECTIONS is the entity responsible for overseeing and regulating public elections in Illinois as provided by Article III, Section 5 of the Illinois Constitution and 10 ILCS 5/1A-1, *et seq.* The Illinois State Board of Elections undertakes those acts and conducts its business under color of state law.

10. Defendant RUPERT BORGSMILLER is the Executive Director of the Illinois State Board of Elections and is sued only in his capacity as Executive Director of the Illinois State Board of Elections.

11. Defendant JUDITH C. RICE is a member of the Illinois State Board of Elections and is sued only in her capacity as a member of the Illinois State Board of Elections.

12. Defendant BRYAN A. SCHNEIDER is a member of the Illinois State Board of Elections and is sued only in his capacity as a member of the Illinois State Board of Elections.

13. Defendant HAROLD D. BYERS is a member of the Illinois State Board of Elections and is sued only in his capacity as a member of the Illinois State Board of Elections.

14. Defendant ERNEST C. GOWEN is a member of the Illinois State Board of Elections and is sued only in his capacity as a member of the Illinois State Board of Elections.

15. Defendant WILLIAM F. McGUFFAGE is a member of the Illinois State Board of Elections and is only sued in his capacity as a member of the Illinois State Board of Elections.

16. Defendant JESSE R. SMART is a member of the Illinois State Board of Elections and is sued only in his capacity as a member of the Illinois State Board of Elections.

17. Defendant BETTY J. COFFRIN is a member of the Illinois State Board of Elections and is only sued in her capacity as a member of the Illinois State Board of Elections.

18. Defendant CHARLES W. SCHOLZ is a member of the Illinois State Board of Elections and is sued only in his capacity as a member of the Illinois State Board of Elections.

## VENUE AND JURISDICTION

19. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs seek relief pursuant to 42 U.S.C. § 1983 based on violations of the First and Fourteenth

4

Amendments to the United States Constitution and 42 U.S.C. § 1973, the Voting Rights Act of 1965.

20. This Court has supplemental jurisdiction over the state law claims pleaded herein pursuant to 28 U.S.C. § 1367(a).

21. Venue is proper in this District under 28 U.S.C. § 1391(b) because relevant and substantial acts occurred and will continue to occur within the Northern District of Illinois.

## THREE-JUDGE COURT

22. Convening of a district court of three (3) judges is required in this action pursuant to 28 U.S.C. § 2284(a) because the action challenges the constitutionality of the statewide apportionment of districts for the election of members of the Illinois Senate and Illinois House of Representatives.

## FACTS

### The Redistricting Process

23. In 2010, the United States Census Bureau conducted its federal decennial census.

24. The Illinois Constitution provides that "in the year following each Federal decennial census year, the General Assembly by law shall redistrict the Legislative and the Representative Districts." IL CONST., Art. IV, Sec. 3(b).

25. Throughout the 2011 redistricting process, the General Assembly acted under the color of state law.

26. During the entire redistricting process, Democrats held a majority of the seats in the Illinois Senate and Illinois House of Representatives, and the Illinois Governor was a Democrat.

27. Democrats exercised exclusive majority control over the entire process of enacting the Redistricting Plan at the legislative and executive branch levels of Illinois state government.

28. It is the duty of the State of Illinois ("State") to enact a redistricting plan so that the political process is equally open to meaningful participation by African-American voters in Illinois.

29. It is the State's duty to enact a redistricting plan such that the members of Illinois' African-American community have the same opportunity as other members of the electorate to participate in the political process and to elect representatives of their choice.

30. It is the State's duty to enact a redistricting plan so that the political process is equally open to meaningful participation by Latino voters in Illinois.

31. It is the State's duty to enact a redistricting plan such that Latinos in Illinois have the same opportunity as do other members of the electorate to participate in the political process and to elect representatives of their choice.

32. It is the State's duty to avoid infringing upon Illinois voters' First Amendment right to engage in protected political expression, including the right to meaningful participation in the political process.

33. It is the State's duty to enact and follow a redistricting plan that does not unfairly burden or penalize voters because of their political views.

### The "Public Hearings"

34. During the 97th General Assembly, the Illinois Senate formed the Senate Redistricting Committee ("SRC") which was composed of 17 state senators: 11 from the Democratic majority and six from the Republican minority.

35.     During the 97th General Assembly, the Illinois House of Representatives formed the House Redistricting Committee ("HRC") which was composed of 11 state representatives: six from the Democratic majority and five from the Republican minority.

36.     In March, April and May, 2011, the SRC and HRC held public hearings throughout Illinois (the "Public Hearings").

37.     The committees held the public hearings purportedly to seek public input into the redistricting process.

38.     A consistent and repeated request from the public at the Public Hearings was that the General Assembly make available to the public the proposed redistricting plan to be voted on by the General Assembly in sufficient time before the vote on the map to allow the public to review, analyze and comment upon the proposed redistricting plan.

39.     At the aforementioned Public Hearings before the SRC and HRC, virtually every member of the public who testified requested that the committee provide an explanation for the rationale behind each district of any proposed plan brought before the committee for a vote so that the public would have time for review, analysis and comment prior to a committee vote.

40.     On information and belief, from May 1, 2011 to May 27, 2011, the Senate Democratic Caucus prevented members of the public from using the public access computer and software located in Chicago offered to members of the public as a means to analyze and develop redistricting plans to be submitted for consideration.

### Unveiling of the Proposed Redistricting Plans

41.     On May 18, 2011 during the evening hours, the SRC first disclosed, as Senate Amendment #1 to Senate Bill 1175, a picture of a proposed redistricting plan to the public-at-large for review and comment.

42.     In order to view a picture of Senate Amendment #1 to Senate Bill 1175, members of the public had a brief period of time to access the Internet and download computer applications such as Google Earth! and Adobe Acrobat.

43.     On information and belief, the SRC never made paper or electronic copies of Senate Amendment #1 to Senate Bill 1175 available to the public for comment or analysis.

44.     On May 18, 2011, the SRC announced that it would accept public testimony on Senate Amendment #1 to Senate Bill 1175 at a hearing scheduled for noon on Saturday, May 21, 2011 in Chicago, Illinois.

45.     On May 19, 2011 during the evening hours, the HRC disclosed a picture of a proposed redistricting plan for representative districts, filed as House Amendment #1 to House Bill 3760.

46.     In order to view a picture of House Amendment #1 to House Bill 3760, members of the public had to access the Internet and download computer applications such as Google Earth! and Adobe Acrobat.

47.     On information and belief, the HRC did not make the supporting demographic data available to the general public unless a request was submitted in writing.

48.     On May 20, 2011, the HRC announced that it would accept public testimony on House Amendment #1 to House Bill 3760 at a hearing scheduled for 2:00 p.m. on Sunday, May 22, 2011 in Chicago.

49.     On May 21, 2011, the SRC accepted public testimony on Senate Amendment #1 to Senate Bill 1175.

50.     Senate Amendment #1 to Senate Bill 1175 and House Amendment #1 to House Bill 3760 both stated: "For purposes of legislative intent, the General Assembly adopts and

incorporates herein, as if fully set forth, the provisions of House Resolution 385 of the Ninety-Seventh General Assembly and Senate Resolution 249 of the Ninety-Seventh General Assembly."

51. Neither House Resolution 385 nor Senate Resolution 249 was filed or made available to the public or the Republican members of the SRC or HRC for review prior to the hearings scheduled for the weekend of May 21-22, 2011.

**"Public Hearings" During the Weekend of May 21-22, 2011**

52. At the SRC hearing on May 21, 2011, a majority of the members of the public who testified requested more time to review, analyze and comment on Senate Amendment #1 to Senate Bill 1175.

53. At the HRC hearing on May 22, 2011, a majority of the members of the public requested more time to review, analyze and comment on House Amendment #1 to House Bill 3760.

54. At the HRC hearing on May 22, 2011, members of the public testified that they were unaware that the demographic data supporting House Amendment #1 to House Bill 3760 could be made available if one made a request in writing.

55. On information and belief, the Democratic members of the Rules Committee of the Illinois House of Representatives ("Rules Committee") convened at approximately noon on May 22, 2011 and approved House Amendment #1 to House Bill 3760 for consideration before the HRC at the May 22, 2011 hearing which was scheduled to begin at 2:00 p.m.

56. The Democratic members of the Rules Committee did not provide the Republican members of the Rules Committee with notice of the May 22, 2011 Rules Committee hearing.

57.     The Democratic members of the HRC and their support staff did not notify the Republican members of the HRC and their support staff or the general public that House Amendment #1 to House Bill 3760 would be considered at the May 22, 2011 hearing or that the sponsor of the measure would be available for questioning.

58.     On Sunday, May 22, 2011, the Illinois Senate passed Senate Bill 1177 by a vote of 30-14.

59.     Senate Bill 1177 did not contain substantive changes to the Illinois Compiled Statutes.

60.     On Monday, May 23, 2011, the Democratic majority of the Illinois House of Representatives voted to suspend the posting requirements for Senate Bill 1177.

### "Public Hearing" on House and Senate Amendments

61.     On Tuesday, May 24, 2011, the HRC and SRC convened a contemporaneous hearing to consider Senate Amendment #1 to Senate Bill 1175 and House Amendment #1 to House Bill 3760.

62.     At the contemporaneous hearing on May 24, 2011, the Democratic majority called Dr. Allan Lichtman as a witness on Senate Amendment #1 to Senate Bill 1175 and House Amendment #1 to House Bill 3760.

63.     At the contemporaneous hearing on May 24, 2011, Dr. Lichtman testified that the Democratic Caucuses in the Illinois House of Representatives and Illinois Senate had retained him to advise Democratic attorneys and staffers about providing African-Americans and Latino residents in Illinois with opportunities to elect candidates of their choice in any redistricting plan.

64. At the contemporaneous hearing on May 24, 2011, Dr. Lichtman provided testimony regarding his opinion on Senate Amendment #1 to Senate Bill 1175 and House Amendment #1 to House Bill 3760.

65. Neither the Republican members of the HRC and SRC and their support staff nor the general public were provided with advance notice of Dr. Lichtman's testimony or a copy of his opinions in order to prepare for questioning.

66. The Democratic Caucuses did not present an expert witness to opine on whether or not Senate Amendment #1 to Senate Bill 1175 or House Amendment #1 to House Bill 3760 met the requirement of the Illinois Constitution of 1970 that districts be "compact."

### The Fair Map

67. On May 25, 2011, the Republican Caucuses of the Illinois Senate and the Illinois House of Representatives unveiled a redistricting plan for the Representative and Legislative Districts called the Fair Map.

68. The Republican Caucuses made the Fair Map available to the public on a public website in an interactive format that provided demographic data for each of the districts proposed.

69. The Republican Caucuses also made the Fair Map and demographic data available on their websites in a downloadable format.

70. The Republican Caucuses' proposal was filed on May 26, 2011 as House Amendment #1 to Senate Bill 1177.

**Unveiling of House Amendment #2 to SB 1177**

71. On May 26, 2011, during the evening hours, State Representative Barbara Flynn Currie filed House Amendment #2 to Senate Bill 1177 which purported to be a new redistricting plan for the Legislative and Representative Districts.

72. On May 26, 2011, during the evening hours, the HRC disclosed a picture of a proposed redistricting plan for Legislative and Representative Districts, House Amendment #2 to Senate Bill 1177.

73. In order to view a picture of House Amendment #2 to Senate Bill 1177, members of the public had to access the Internet and download computer applications such as Google Earth! and Adobe Acrobat.

74. On information and belief, the HRC did not make the supporting demographic data available to the general public unless a request was submitted in writing.

75. House Amendment #2 to Senate Bill 1177 stated: "For purposes of legislative intent, the General Assembly adopts and incorporates herein, as if fully set forth, the provisions of House Resolution 385 of the Ninety-Seventh General Assembly and Senate Resolution 249 of the Ninety-Seventh General Assembly."

76. On May 26, 2011, approximately two hours before the scheduled session of the Illinois House of Representatives, the Democratic majority of the Rules Committee voted by a margin of 3-1 to send House Amendment #2 to Senate Bill 1177 to the full Illinois House of Representatives for consideration.

77. House Amendment #2 to Senate Bill 1177 never received a hearing before the HRC.

78. On May 27, 2011, approximately two hours before the scheduled session of the Illinois House of Representatives, State Representative Barbara Flynn Currie filed House Resolution 385.

79. On May 27, 2011, approximately two hours before the scheduled session of the Illinois House of Representatives, the Democratic majority of the Rules Committee of the House of Representatives voted 3-1 to send House Resolution 385 directly to the full Illinois House of Representatives for consideration.

80. House Resolution 385 never received a hearing before the HRC.

**Enactment of the Redistricting Plan**

81. On May 27, 2011, State Representative Roger Eddy filed a motion to discharge the Fair Map from the Rules Committee for consideration.

82. State Representative Currie objected to the motion to discharge the Fair Map from the Rules Committee for consideration.

83. The Fair Map never received consideration before the HRC, the Illinois House of Representatives, the SRC or the Illinois Senate.

84. On May 27, 2011, during the mid-morning hours, House Amendment #2 to Senate Bill 1177 was called for a vote before the full Illinois House of Representatives.

85. During the Illinois House floor debate on House Amendment #2 to Senate Bill 1177, State Representative Currie stated that Dr. Lichtman did not review the districts contained in the new amendment.

86. On May 27, 2011, during the mid-morning hours, the Democratic majority in a vote along party lines in the Illinois House of Representatives passed House Amendment #2 to Senate Bill 1177 by a vote of 64-52.

87. After the passage of House Amendment #2 to Senate Bill 1177, House Resolution 385 was called for a vote before the Illinois House of Representatives.

88. The Democratic majority in the Illinois House of Representatives passed House Resolution 385 by a vote of 64-52.

89. On May 27, 2011 at approximately 2:00 p.m., State Senator Kwame Raoul filed Senate Amendment #1 to Senate Resolution 249.

90. On May 27, 2011 at approximately 3:00 p.m., the Democratic majority in the SRC voted to concur on House Amendment #2 to Senate Bill 1177.

91. During the SRC debate on House Amendment #2 to Senate Bill 1177, the sponsor, State Senator Kwame Raoul, stated that Dr. Lichtman had not reviewed House Amendment #2 to Senate Bill 1177.

92. After the debate on House Amendment #2 to Senate Bill 1177, the Democratic majority in the SRC voted to adopt Senate Amendment #1 to Senate Resolution 249 over the objection of the Republican members of the SRC.

93. On May 27, 2011 at approximately 5:30 p.m., the Democratic majority in the Illinois Senate voted along party lines to concur with House Amendment #2 to Senate Bill 1177 by a margin of 35-22.

94. Shortly after passage of the House Amendment #2 to Senate Bill 1177, the Democratic majority adopted Senate Amendment #1 to Senate Resolution 249 by a vote of 35-22.

95. On June 3, 2011, Governor Patrick J. Quinn signed House Amendment #2 to Senate Bill 1177 into law as Public Act 97-0006.

96. Public Act 97-0006 became effective on June 3, 2011 (the "Redistricting Plan").

**Characteristics of the Redistricting Plan**

97.     The General Assembly comprises senators elected from 59 Legislative Districts and representatives elected from 118 Representative Districts.

98.     According to the 2010 census, the total population in Illinois is 12,830,632.

99.     Pursuant to the 2010 census and the United States Constitution, each Legislative District shall contain 217,468 total people.

100.     Pursuant to the 2010 census and the United States Constitution, each Representative District shall contain 108,734 total people.

101.     The Redistricting Plan is less compact than the map of Legislative and Representative Districts for the General Assembly enacted in 2001.

102.     The Fair Map achieves compactness scores significantly higher than the Redistricting Plan.

103.     The Redistricting Plan contains more splits of counties and municipalities in Illinois than does the Fair Map.

104.     Racial bloc voting is pervasive in Illinois, both among majority and minority groups.

105.     African-American voters comprise a sufficiently large and geographically compact group to constitute a majority of the voting-age population ("VAP") in at least 18 Representative Districts.

106.     The Redistricting Plan creates only 16 Representative Districts where a majority of the VAP is African-Americans.

107.     Representative District 7's VAP is 45.08 percent African-American.

15

108.    The African-American VAP in the area around Representative District 7 is sufficiently large and geographically compact such that Representative District 7 could have African-American VAP in excess of 50 percent.

109.    Representative District 114's VAP is 42.04 percent African-American.

110.    The African-American VAP in the area of Representative District 114 is sufficiently large and geographically compact such that Representative District 114 could have African-American VAP in excess of 50 percent.

111.    African-American voters in the areas of Representative Districts 7 and 114 are politically cohesive.

112.    Representative Districts comprised of a majority of African-Americans of VAP in the areas of Representative Districts 7 and 114 can be drawn without violating constitutional requirements.

113.    Failure to create Representative Districts 7 and 114 with VAP in excess of 50 percent African-Americans violates the Fourteenth Amendment to the United States Constitution.

114.    Failure to create Representative Districts 7 and 114 with VAP in excess of 50 percent African-Americans violates Section 2 of the federal Voting Rights Act of 1965, 42 U.S.C. § 1973.

115.    Representative Districts 7 and 114 deny Plaintiffs equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

116.    Representative Districts 7 and 114 violate the federal Voting Rights Act of 1965.

16

117. The Redistricting Plan fractures African-American voters causing the dilution of their votes in violation of Section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973, and the Fourteenth Amendment to the United States Constitution.

118. The fracturing of African-American voters affords those voters less opportunity than other voters to elect representatives of their choice in violation of Section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973.

119. The Latino VAP in Representative District 23 is 46.27 percent.

120. The Latino VAP in the area near and around Representative District 23 is sufficiently large and geographically compact such that Representative District 23 could have Latino VAP in excess of 50 percent.

121. The Latino VAP in Representative District 60 is 46.64 percent.

122. The Latino VAP in the area of Representative District 60 is sufficiently large and geographically compact such that Representative District 60 could have Latino VAP in excess of 50 percent.

123. Latino voters in the areas of Representative Districts 23 and 60 are politically cohesive.

124. Representative Districts comprised of a majority of Latinos of VAP in the areas of Representative Districts 23 and 60 can be drawn without violating constitutional requirements.

125. Representative Districts 23 and 60 deny plaintiffs equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

126. Representative Districts 23 and 60 violate the federal Voting Rights Act.

127.    Numerous Representative Districts created by the Redistricting Plan fail to contain Latino VAP sufficient to provide Latinos with a fair opportunity to elect representatives of their choice including, but not limited to, Representative Districts 1, 2, 21, 22, 77 and 83.

128.    Latino voters in the areas of Representative Districts 1, 2, 21, 22, 77 and 83 are politically cohesive.

129.    Representative Districts including, but not limited to, 1, 2, 21, 22, 77 and 83 could be drawn to include Latino VAP sufficient to provide Latino voters a fair opportunity to elect representatives of their choice without violating constitutional requirements.

130.    The Redistricting Plan's failure to provide Latino voters a fair opportunity to elect representatives of their choice in Representative Districts including, but not limited to, 1, 2, 21, 22, 77 and 83 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

131.    The Redistricting Plan's failure to provide Latino voters a fair opportunity to elect representatives of their choice in Representative Districts including, but not limited to, 1, 2, 21, 22, 77 and 83 violates Section 2 of the federal Voting Rights Act of 1965, 42 U.S.C. § 1973.

132.    The following Representative Districts fail to meet the constitutional mandate within the Illinois Constitution of 1970 that all districts be "compact":  1, 3, 4, 5, 6, 8, 9, 10, 15, 18, 20, 21, 23, 24, 25, 26, 27, 28, 29, 31, 32, 33, 35, 36, 39, 45, 57, 59, 64, 67, 72, 80, 113, and 114.

133.    No sufficient or neutral justification exists for the bizarre shape of the Representative Districts listed in paragraph 132.

134.    Certain of the districts in the Redistricting Plan including, but not limited to, Representative District 96, are of a shape so bizarre on their face that the shape can only

rationally be understood to be an effort to separate voters into different districts on the basis of race.

135. No sufficient or neutral justification exists for the bizarre shape of Representative District 96.

136. The shape of Representative District 96 can only rationally be understood as an effort to separate voters into districts on the basis of race.

137. The Redistricting Plan pits 25 incumbent Republican members of the General Assembly against one another while pitting only eight incumbent Democrat members of the General Assembly against one another, without any neutral justification for this partisan discrepancy.

138. The Redistricting Plan's pitting significantly more incumbent Republicans against one another than incumbent Democrats is a deliberate attempt to enhance Democrats' prospects for reelection and targets Republicans to prevent their reelection.

139. The bizarre shapes of several districts listed in paragraph 132 and the Redistricting Plan's overall lack of compactness is in furtherance of a deliberate attempt to enhance Democrats' prospects for reelection and target Republicans to prevent their reelection.

140. Additionally, many of these bizarrely-shaped districts are clearly intended to slither across traditional lines in order to place multiple incumbent Republicans into one district.

141. The Democratic majority of the General Assembly ignored the Fair Map despite the fact that the Fair Map is more compact.

142. The Fair Map is significantly and consistently more compact than the Redistricting Plan, as required by the Illinois Constitution.

143. The Redistricting Plan splits 46 counties, 214 townships and 336 municipalities.

19

144. The Redistricting Plan's excessive splitting of counties and municipalities is in furtherance of a deliberate attempt to enhance Democrats' prospects for reelection and targets Republicans to prevent their reelection.

145. The Redistricting Plan systematically and intentionally dilutes the votes of Republicans in favor of Democrats in furtherance of a deliberate attempt to enhance Democrats' prospects for reelection and targets Republicans to prevent their reelection.

146. The Redistricting Plan constitutes an intentional, systematic and unfair political gerrymander in order to protect Democrat members of the General Assembly and to prevent reelection of a Republican majority of members of the General Assembly.

147. The Redistricting Plan systematically and intentionally unfairly burdens Republican voters' rights of political expression and expressive association because of their political views.

148. No compelling reason or neutral justification exists for the Redistricting Plan to unfairly burden Republican voters because of their political views.

149. The Redistricting Plan constitutes an intentional, systematic and unfair infringement of Plaintiffs' right to protected political expression and expressive association in violation of the First Amendment to the United States Constitution.

150. The Redistricting Plan will create a substantial Democratic majority in both Houses of the Illinois General Assembly for at least the next decade.

151. The Redistricting Plan will likely create an unfair substantial majority for the Democrats in both houses of the General Assembly for at least the next decade, a clear case of political gerrymandering in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT 1
### (Violation of Section 2 of the Federal Voting Rights Act of 1965)

1-151. Plaintiffs adopt, reaffirm and incorporate by reference the allegations in paragraphs 1 through 151 above as if once again fully set forth herein.

152.    Section 2 of the federal Voting Rights Act of 1965, 42 U.S.C. § 1973, is applicable to the State of Illinois.

153.    Under the Redistricting Plan, African-Americans have less opportunity than other members of the electorate to participate in the political process and to elect candidates of their choice, thereby diluting their votes.

154.    It is possible to create a redistricting plan which will provide African-Americans a more equal opportunity to elect candidates of their choice.

155.    The Redistricting Plan violates Section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973.

## COUNT 2
### (Violation of Section 2 of the Federal Voting Rights Act of 1965)

1-155. Plaintiffs adopt, reaffirm and incorporate by reference the allegations in paragraphs 1 through 155 of Count 1 as if once again fully set forth herein.

156.    Section 2 of the federal Voting Rights Act of 1965, 42 U.S.C. § 1973, is applicable to the State of Illinois.

157.    Under the Redistricting Plan, Latinos have less opportunity than other members of the electorate to participate in the political process and to elect candidates of their choice, thereby diluting their votes.

158.    It is possible to create a redistricting plan which will provide Latinos a more equal opportunity to elect candidates of their choice.

21

159.     The Redistricting Plan violates Section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973.

## COUNT 3
### (Violation of Rights Protected by the First Amendment to the United States Constitution)

1-159. Plaintiffs adopt, reaffirm and incorporate by reference the allegations in paragraphs 1 through 159 of Count 2 as if once again fully set forth herein.

160.     The Redistricting Plan systematically and intentionally unfairly burdens the rights to political expression and expressive association of voters who vote Republican because of their political views in violation of the First Amendment.

161.     No compelling reason exits to unfairly burden voters who vote Republican because of their political views.

162.     The Democratic Caucuses' actions as described herein violate the First Amendment to the United States Constitution as made applicable to the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## COUNT 4
### (Equal Protection – Redistricting Plan)

1-162. Plaintiffs adopt, reaffirm and incorporate by reference the allegations in paragraphs 1 through 162 of Count 3 as if once again fully set forth herein.

163.     The Redistricting Plan was conceived and enacted by the majority party in an arbitrary and discriminatory manner with the purpose and effect of denying the Plaintiffs equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

**COUNT 5**
**(Equal Protection - Illinois Voting Rights Act of 2011)**

1-163. Plaintiffs adopt, reaffirm and incorporate by reference the allegations in paragraphs 1 through 163 of Count 4 as if once again fully set forth herein.

164.     At all times relevant there was in full force and effect in the State of Illinois a statute titled the Illinois Voting Rights Act of 2011 which stated in part:

(a)     In any redistricting plan pursuant to Article IV, Section 3 of the Illinois Constitution, Legislative Districts and Representative Districts shall be drawn, subject to subsection (d) of this Section, to create crossover districts, coalition districts, or influence districts. The requirements imposed by this Article are in addition and subordinate to any requirements or obligations imposed by the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, and the Illinois Constitution.

(b)     The phrase "crossover district" means a district where a racial minority or language minority constitutes less than a majority of the voting-age population but where this minority, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate. The phrase "coalition district" means a district where more than one group of racial minorities or language minorities may form a coalition to elect the candidate of the coalition's choice. The phrase "influence district" means a district where a racial minority or language minority can influence the outcome of an election even if its preferred candidate cannot be elected.

(c)     For purposes of this Act, the phrase "racial minorities or language minorities", in either the singular or the plural, means the same class of voters who are members of a race, color, or language minority group receiving protection under the federal Voting Rights Act, 42 U.S.C. § 1973; 42 U.S.C. § 1973b(f)(2); 42 U.S.C. § 1973aa-1a(e).

165. At all times relevant there was in full force and effect the federal Voting Rights Act which states in part:

> No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . . 42 U.S.C. 1973.
>
> For purposes of this section, the term "language minorities" or "language minority group" means persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage. 42 U.S.C. 1973aa-1a.

166. Public Act 97-0006 states that "each of the Districts contained in the General Assembly Act of 2011 was drawn to be consistent with the Illinois Voting Rights Act of 2011, where applicable."

167. Public Act 97-0006 also amended the Illinois Voting Rights Act of 2011 to state that "The General Assembly Redistricting Act of 2011 complies with all requirements of this Act."

168. The Illinois Voting Rights Act of 2011 mandates that race and color be the predominant factor in the consideration of each and every Representative and Legislative District within the Redistricting Plan.

169. On information and belief, the Illinois Voting Rights Act of 2011 is the only statute of its kind in the United States of America.

170. The Illinois Voting Rights Act of 2011 denies Plaintiffs and other similarly-situated voters within the State of Illinois equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

24

171.    No compelling interest exists for mandating the use of race as the predominant factor in creating the boundaries of Representative Districts and Legislative Districts within the Redistricting Plan.

172.    The mandate within the Illinois Voting Rights Act of 2011 for the use of race as the predominant factor in creating the boundaries of Representative Districts and Legislative Districts within the Redistricting Plan was not the least restrictive means of achieving a compelling state interest.

173.    In furtherance of the racial mandate of the Illinois Voting Rights Act, the Redistricting Plan constitutes a racial gerrymander in violation of Plaintiffs' right to equal protection under the Fourteenth Amendment to the United States Constitution.

174.    For example, the Redistricting Plan created Representative District 96 by using race as the predominant factor above traditional redistricting principles such as compactness, maintenance of the core of previous representative districts, protection of incumbent-constituent relationships, and preservation of existing county and municipal boundaries.

175.    The creation of Representative District 96 as mandated by the Illinois Voting Rights Act of 2011 violates the Plaintiffs' rights to equal protection under the Fourteenth Amendment to the United States Constitution on its face and as applied.

**COUNT 6**
**(Equal Protection – Representative District 96)**

1-175. Plaintiffs adopt, reaffirm and incorporate by reference the allegations in paragraphs 1 through 175 of Count 5 as if once again fully set forth herein.

176.    The Redistricting Plan created Representative District 96.

177.    Representative District 96 was formed to join areas within the cities of Decatur and Springfield that have high percentages of African-Americans.

178. Representative District 96 severs the core of five different representative districts that existed under the previous map.

179. Representative District 96 does not meet the constitutional requirement that all districts be "compact."

180. Representative District 96 lowers the partisan advantage of the Republican voters within the district.

181. Representative District 96 also lowers the partisan advantage of Republican voters in adjoining districts.

182. Representative District 96 severs the boundary lines of Christian, Macon and Sangamon Counties.

183. Representative District 96 does not preserve the existing incumbent-constituent relationship.

184. Representative District 96 joins urban and rural communities with dissimilar interests.

185. The Democratic Caucuses used the ethnicity of the African-American communities in Springfield and Decatur as the predominant factor over all other constitutional and traditional redistricting principles in drawing Representative District 96.

186. The Democratic Caucuses have provided no neutral or compelling justification for joining urban and rural communities with dissimilar interests; severing counties and the core of the previous districts; not preserving incumbent-constituent relationships; not keeping Representative District 96 compact; and lowering the partisan advantage of the Republican minority in Representative District 96 and adjoining districts.

187.    The drawing of Representative District 96 denies the Plaintiffs and other similarly situated voters within the State of Illinois equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

## COUNT 7
### (Declaratory Judgment – Compactness – Illinois State Law Claim)

1-187. Plaintiffs adopt, reaffirm and incorporate by reference the allegations in paragraphs 1 through 187 of Count 6 as if once again fully set forth herein.

188.    The Illinois Constitution of 1970 requires that the districts contained within any redistricting plan pursuant to Article IV, Section 3 must be "compact."

189.    The Redistricting Plan is significantly less compact than the previous map.

190.    The Redistricting Plan is significantly less compact than the Fair Map.

191.    The following Representative Districts fail to meet the constitutional mandate within the Illinois Constitution of 1970 that all districts be "compact":  1, 3, 4, 5, 6, 8, 9, 10, 15, 18, 20, 21, 23, 24, 25, 26, 27, 28, 29, 31, 32, 33, 35, 36, 39, 45, 57, 59, 64, 67, 72, 80, 113, and 114.

192.    The Democratic majority failed to provide a neutral justification for the irregular districts within the Redistricting Plan prior to consideration before the General Assembly.

193.    The lack of compactness throughout the Redistricting Plan is so pervasive as to render the entire Act invalid.

## COUNT 8
### (Declaratory Judgment –Process – Illinois State Law Claim)

1-193. Plaintiffs adopt, reaffirm and incorporate by reference the allegations in paragraphs 1 through 193 of Count 7 as if once again fully set forth herein.

194. Pursuant to the Illinois Constitution of 1970, the process by which any redistricting plan is created under Article IV, Section 3 of the Illinois Constitution must provide the deciding body with sufficient information to determine if the redistricting plan meets constitutional requirements.

195. The Democratic Caucuses did not provide the public with a meaningful opportunity to analyze and comment on Senate Amendment #1 to Senate Bill 1175 and House Amendment #1 to House Bill 3760.

196. The Democratic Caucuses did not provide the public with sufficient supporting data and explanations which would enable the public to provide the General Assembly with meaningful public criticism of Senate Amendment #1 to Senate Bill 1175 and House Amendment #1 to House Bill 3760.

197. The Democratic Caucuses did not provide the public or the members of the Republican minority with any advance notice of the testimony of Dr. Allan Lichtman.

198. The Democratic Caucuses repeatedly suspended the procedural rules governing the Illinois House of Representatives and the Illinois Senate in an effort to prevent the public and the Republican minority from providing meaningful input regarding all proposed redistricting plans.

199. The Democratic Caucuses gave the public and the Republican minority less than 24 hours to analyze and comment on House Amendment #2 to Senate Bill 1177.

200. The Democratic Caucuses filed Senate Resolution 249 and House Resolution 385 less than two hours prior to their consideration.

28

201. The Democratic Caucuses refused to debate Senate Resolution 249 and House Resolution 385, which purported to contain the legislative intent for each and every district, prior to voting on House Amendment #2 to Senate Bill 1177.

202. The Democratic Caucuses did not provide the public with a meaningful opportunity to analyze and comment on Senate Resolution 249 and House Resolution 385.

203. The Democratic Caucus in the Illinois House of Representatives prevented the Fair Map from ever receiving a public hearing or consideration for a vote.

204. The Democratic Caucuses never presented expert testimony on the Redistricting Plan regarding its adherence to the mandate of the Illinois Constitution of 1970 that all districts be "compact."

205. The Democratic Caucuses' actions as described herein violate Article IV, Section 3 and Article III, Section 3 of the Illinois Constitution of 1970.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court will:

A. declare that the Redistricting Plan violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, the First Amendment to the United States Constitution as made applicable to the states through the Due Process Clause of the Fourteenth Amendment, and Article III, Section 3 and Article IV, Section 3(b) of the Illinois Constitution;

B. declare that the Redistricting Plan violates the Voting Rights Act, 42 U.S.C. § 1973;

C. declare that the Illinois Voting Rights Act of 2011 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

29

D. declare that Representative District 96 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

E. declare that the Redistricting Plan violates the compactness requirement of the Illinois Constitution;

F. permanently enjoin Defendants from certifying petitions or conducting future elections for the Illinois General Assembly under the Redistricting Plan;

G. draw and establish a map for the Illinois General Assembly Legislative and Representative Districts that comports with the federal Voting Rights Act as well as all other relevant constitutional and statutory requirements, or, alternatively, adopt reasonable alternatives presented to this Court including but, not limited to, ordering corrective action by the General Assembly or other responsible agencies of the state of Illinois;

H. award attorneys' fees as provided by 42 U.S.C. §§ 1983 and 1988; and

I. grant such other and further relief as this Court deems equitable and just.

/s/--------Phillip A. Luetkehans----------------------
One of the Attorneys for Plaintiffs Christine
Radogno and Veronica Vera

/s/ --------Andrew Sperry------------------------------
One of the Attorneys for Plaintiffs Thomas Cross,
Adam Brown, Chole Moore, Joe Trevino, Angel
Garcia

/s/--------Thomas M. Leinenweber-------------------
One of the Attorneys for Plaintiffs Thomas Cross,
Adam Brown, Chole Moore, Joe Trevino, Angel
Garcia

E-filed: July 20, 2011

30

Phillip A. Luetkehans, 06198315
pluetkehans@slg-atty.com
Brian J. Armstrong, 06236639
barmstrong@slg-atty.com
Stephanie J. Luetkehans, 06297066
sluetkehans@slg-atty.com
SCHIROTT, LUETKEHANS & GARNER, P.C.
105 East Irving Park Road
Itasca, IL 60143
630-773-8500

Thomas M. Leinenweber, 6208096
thomas@ilesq.com
Peter Baroni, 6236668
peter@ilesq.com
Leinenweber Baroni & Daffada LLC
203 N. LaSalle St., Suite 1620
Chicago, IL 60601
(866) 786-3705

Andrew Sperry, 6288613
asperry@laroseboscolaw.com
LaRose & Bosco, Ltd.
200 N. LaSalle St., Suite 2810
Chicago, IL 60601
(312) 642-4414

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July, 2011, I electronically filed the Complaint (Civil Cover Sheet, Appearances of Phillip A. Luetkehans, Brian J. Armstrong, Stephanie J. Luetkehans, Thomas M. Leinenweber, Peter Baroni and Andrew Sperry, Summonses to Defendants) with the Clerk of the U.S. District Court, Northern District of Illinois, Eastern Division using the CM/ECF system.

/s/--------Phillip A. Luetkehans-------------------
One of the Attorneys for Plaintiffs
RADOGNO and VERA

Phillip A. Luetkehans, 06198315
pluetkehans@slg-atty.com
Brian J. Armstrong, 06236639
barmstrong@slg-atty.com
Stephanie J. Luetkehans, 06297066
sluetkehans@slg-atty.com
SCHIROTT, LUETKEHANS & GARNER, P.C.
105 East Irving Park Road
Itasca, IL 60143
630-773-8500

Thomas M. Leinenweber
Peter G. Baroni
Leinenweber Baroni & Daffada LLC
203 N. LaSalle St., Suite 1620
Chicago, IL 60601
(866) 786-3705
thomas@ilesq.com
peter@ilesq.com

Andrew Sperry, 6288613
LaRose & Bosco, Ltd.
200 N. LaSalle St., Suite 2810
Chicago, IL 60601
(312) 642-4414
asperry@laroseboscolaw.com