# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, CHOLE MOORE, JOE TREVINO, ANGEL GARCIA, ELIDIA MARES, and EDWIN TOLENTINO, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| vs | ) No. 1:11-cv-04884 ) ) Judges Sykes, Bucklo and Simon |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, and JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, | ) (3-judge court convened pursuant to 28 ) U.S.C. § 2284) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

**TABLE OF CONTENTS**

Introduction.................................................................................................... 1

I. Counts 1 and 2 Should Be Dismissed For Lack of Standing Because the Amended Complaint Does Not Allege That Plaintiffs Are Registered Voters Residing in the Districts They Challenge Under Section 2 of the Voting Rights Act ............................................................................................2

II. Counts 1 and 2 Should Be Dismissed For Failure to State A Claim ...........................4

    A. Counts 1 and 2 Fail to Plead *Gingles* Prong 3, a Necessary Precondition to Any Challenge under Section 2 of the Voting Rights Act ..............................................................................4

    B. Counts 1 and 2 Fail To Give Notice As To Which Districts Plaintiffs Challenge Under Section 2........................................................7

III. Counts 3 and 4 Should Be Dismissed .......................................................8

    A. Plaintiffs' Use of Political Gerrymandering Claims to Challenge the Redistricting Plan Fails to State a Claim for Which Relief Can be Granted..........................................................................8

    B. Counts 3 and 4 Should Be Dismissed As Non-Justiciable Political Questions........................................................................11

IV. Count 5 Should Be Dismissed ...............................................................11

    A. The Facial Challenge To The Illinois Voting Rights Act Should Be Dismissed...........................................................................12

        1. The IVRA Prohibits Racial Considerations from Predominating.................................................................13

        2. To Sustain a Challenge Under *Shaw v. Reno*, Plaintiffs Must Show That The IVRA Requires Racial Considerations To Predominate Over All Other Redistricting Principles ...................................16

    B. Regardless of the Outcome of Count 5's Facial Challenge, The As-Applied Challenges Should Be Dismissed ........................................17

        1. Plaintiffs' As-Applied "Statewide" *Shaw* Claim Must Be Dismissed Because Neither These Plaintiffs, Nor Any Others, Have Standing To Raise Such A Claim...........................................19

i

      2. The Remaining As-Applied Challenge to "Certain" Districts
         Should Be Dismissed ...................................................................................20

V.   Count 6 Should Be Dismissed Under Rule 10(b) and Rule 12(b)(6) ...........................20

VI.  Counts 7 and 8 Should Be Dismissed Because The Eleventh
     Amendment Bars Litigation Of Plaintiffs' State Law Claims In Federal
     Court .........................................................................................................................22

VII. The Official Capacity Plaintiffs Should Be Dismissed Because They
     Lack Standing ..........................................................................................................23

VIII. The Eleventh Amendment Requires Dismissal Of Counts 3 Through
      8 Against The Illinois State Board Of Elections........................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. Wright,* 468 U.S. 737 (1984) ................................................................................... 2

*Anheuser-Busch, Inc. v. Schmoke,* 63 F.3d 1305 (4th Cir. 1995) ........................................ 15, FN 5

*Ashcroft v. Iqbal,* __ U.S. __, 129 S. Ct. 1937 (2009) ........................................ 4, 5, 7, 8, 13, 21

*Barnett v. Daley,* 32 F.3d 1196 (7th Cir. 1994) .................................................................. 16

*Bartlett v. Strickland,* 556 U.S. 1, 129 S. Ct. 1231 (2009) ................................................ 13, 17

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ........................................................ 4, 5, 7, 8, 21

*Benning v. Bd. of Regents of Regency Universities,* 928 F.2d 775(7th Cir. 1991) ...................... 22

*Brooks v. Ross,* 578 F.3d 574 (7th Cir. 2009) ....................................................................... 4, 7

*Bush v. Vera,* 517 U.S. 952 (1996) ............................................................... 16, 17, 18, 19

*City of Rome v. United States,* 446 U.S. 156 (1980) ............................................................ 25, FN 6

*Davis v. Bandemer,* 478 U.S. 109 (1986) ............................................................................. 9

*Dean Foods Co. v. Brancel,* 187 F.3d 609 (7th Cir. 1999) ..................................................... 12

*E.E.O.C. v. ConcentraHealth Services, Inc.,* 496 F.3d 773 (7th Cir. 2007) ............................... 8

*Easley v. Cromartie,* 532 U.S. 234 (2001) ...................................................................... 16, 18

*Edelman v. Jordan,* 415 U.S. 651 (1974) ............................................................................. 24

*Ex Parte Young,* 209 U.S. 123 (1908) ...................................................................... 22, 24, 25

*Froehlich v. Wisc. Dep't of Corrections,* 196 F.3d 800 (7th Cir. 1999) ................................... 22

*Gary A. v. New Trier High Sch. Dist. No. 203,* 796 F.2d 940 (7th Cir. 1986) ........................... 24

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074 (7th Cir. 1997) .......... 1, FN 1

*Georgia v. Ashcroft,* 539 U.S. 461 (2003) ........................................................................... 17

*Gossmeyer v. McDonald,* 128 F.3d 481 (7th Cir. 1997) ...................................................... 24

*Growe v. Emison*, 507 U.S. 25 (1993) ............................................................. 5, 6, 17

*Hall v. Virginia*, 276 F. Supp. 2d 528 (E.D. Va. 2003) ................................................ 3

*Henson v. CSC Credit Services*, 29 F.3d 280 (7th Cir. 1994)................................. 1, FN 1

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ................................................................. 19

*Illinois Legislative Redistricting Comm'n v. LaPaille*, 782 F. Supp. 1267 (N.D. Ill. 1991) ......... 3

*Illinois Legislative Redistricting Comm'n v. LaPaille*, 782 F.Supp. 1272 (N.D. Ill. 1992) .......... 9

*Int'l Primate Protection League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72 (1991)... 2

*Jenkins v. Red Clay Consol. Sch. Dist.*, 4 F.3d 1103 (3rd Cir. 1993) ............................. 6

*Johnson v. DeGrandy*, 512 U.S. 997 (1994)............................................................... 5

*Joseph v. Bd. of Regents of the Univ. of Wisc. Sys.*, 432 F.3d 746 (7th Cir. 2005) ...................... 25

*Kyle v. Morton High School*, 144 F.3d 448 (7th Cir. 1998) ......................................... 8

*La Porte County Republican Central Comm. v. Board of Comm'rs of County of La Porte*,
43 F.3d 1126 (7th Cir. 1994) ............................................................................. 9

*League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ............... 10, 11, 16, 18

*Lopez v. Merced County*, 473 F. Supp. 2d 1072 (E.D. Cal. 2007) ................................. 3

*Lucien v. Preiner*, 967 F.2d 1166 (7th Cir. 1992)................................................... 8

*McNeil v. Springfield Park Dist.*, 851 F.2d 937 (7th Cir. 1988)................................ 5

*Miller v. Johnson*, 515 U.S. 900 (1995)........................................................... 16, 19

*Mixon v. State of Ohio*, 193 F.3d 389 (6th Cir. 1999) ...................................... 25, FN 6

*Nelson v. LaCrosse County Dist. Attorney*, 301 F.3d 820 (7th Cir. 2002) .................. 24

*Nevada Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343 (2011) ................................ 23

*Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681 (7th Cir. 2007) . 24

*Pennhurst v. State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ........................... 22

*Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 343 (E.D. Va. 2009) ............................ 3

*Quern v. Jordan*, 440 U.S. 332 (1976) ............................................................................... 25

*Quilter v. Voinovich*, 981 F. Supp. 1032 (N.D. Ohio 1997) ........................................ 23, 24

*Raines v. Byrd*, 521 U.S. 811 (1997) .............................................................. 2, 23, 24

*Rodriguez v. Pataki*, 308 F. Supp. 2d 346 (S.D. N.Y. 2004) ........................................... 6

*Session v. Perry*, 298 F. Supp. 2d 451 (E.D. Tex. 2004) ............................................... 10

*Shaw v. Hunt*, 517 U.S. 899 (1996) .................................................................................. 19

*Shaw v. Reno*, 509 U.S. 630 (1993) ................................... 12, 14, 16, 17, 18, 19, 20

*Shegog v. Bd. of Educ. of City of Chicago*, 194 F.3d 836 (7ᵗʰ Cir. 1999) ..................... 22

*Sinkfield v. Kelley*, 531 U.S. 28 (2000) ............................................................................ 19

*Smith v. Boyle*, 144 F.3d 1060 (7ᵗʰ Cir. 1998) ................................................................ 9

*Stacks v. Chicago Police Dept.*, 1992 WL 233910 (N.D. Ill) ........................................ 21

*Stevenson v. State Bd. of Elec.*, 794 F.2d 1176 (7ᵗʰ Cir. 1986) ..................................... 25

*Territory of Alaska v. Am. Can Co.*, 358 U.S. 224 (1959) .................................... 1, FN 1

*Thompson v. Smith*, 52 F. Supp. 2d 1364 (M.D. Ala. 1999) ........................................ 19

*Thornburg v. Gingles*, 478 U.S. 30 (1986). ......................................................... 4, 5, 6

*Three Departments, Inc. v. Kmart Corp.*, 670 F. Supp. 1404 (N.D. Ill. 1987) ........... 21

*U.S. v. Hays*, 515 U.S. 737 (1995) .................................................................................. 19

*U.S. v. Salerno*, 481 U.S. 739 (1987) .............................................................................. 17

*Valley Forge Christian College v. Americans United for Separation of Church & State*,
454 U.S. 464 (1982) ........................................................................................................... 2

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ................................................................ 9, 10, 11

*Voinovich v. Quilter*, 507 U.S. 146 (1993) .............................................................. 6, 17

*Watkins v. Blinzinger*, 789 F.2d 474 (7ᵗʰ Cir. 1986) ................................................... 22

*Williams v. State Bd of Elections*, 718 F. Supp. 1324 (N.D. Ill. 1989) ...................... 5, 6

v

*Winstead v. Stodola,* 2007 WL 2710096 (E.D. Ark. 2007) ............................................... 3

*Wright v. Dougherty County,* 358 F.3d 1352 (11th Cir. 2004) ....................................... 3

## CONSTITUTIONAL AUTHORITIES

Ill. Const. 1970, Art. IV, § 3 .................................................................................. 1, 14

Ill. Const. 1970, Art. III, § 5 ...................................................................................... 24

## RULES OF EVIDENCE AND PROCEDURE

Federal Rule of Civil Procedure 8 ................................................................................ 4

Federal Rule of Civil Procedure 10(b) ....................................................................... 21

Federal Rule of Civil Procedure 12(b)(1) ..................................................................... 4

Federal Rule of Civil Procedure 12(b)(6) .................................................. 1, FN1, 20

## STATUTES

42 U.S.C. § 1973 ....................................................................... 3, 4, 5, 25, FN 6

10 ILCS 120/5-1 ........................................................................................................ 11

10 ILCS 120/5-5 ............................................................................................ 13, 14, 18

10 ILCS 5/1A-1 ......................................................................................................... 24

745 ILCS 5/1 ......................................................................................................... 24-25

## LEGISLATIVE MEASURES AND TRANSCRIPTS

Tr. of Proceedings, Ill. House of Representatives, 96th Gen. Assembly, January 4, 2011 ......... 15

Tr. of Proceedings, Ill. Senate, 96th Gen. Assembly, December 1, 2010 ................... 15

House Resolution 385 ...................................................................................... 1, FN 1, 18

Senate Resolution 249 ............................................................................................ 1, FN 1

Senate Bill 1177, House Amendment 1, 97th Ill. Gen. Assembly, § 85 ....................... 12

**Introduction**

This lawsuit arises from the decennial redistricting in Illinois, in which the Illinois

Constitution calls for the drawing of 59 legislative (Senate) districts and 118 representative

(House) districts. *See* Ill. Const. 1970, Art. IV, § 3. Each Senate district consists of two nested

House districts. *Id.* The Amended Complaint challenges only the validity of House districts.

The General Assembly Redistricting Act of 2011, Public Act 97-0006 (the "Illinois

Redistricting Plan" or the "Illinois Plan"), was signed into law on June 3, 2011. (Am. Complt. ¶

98.) At the time of passage, both the Illinois House and Senate also passed resolutions that

explained in detail how the House and Senate districts were drawn, as well as many of the

reasons for the manner in which they were drawn. These resolutions, House Resolution 385

("HR 385") and Senate Resolution 249 ("SR 249"), were expressly incorporated into Public Act

97-0006. (Am. Complt. ¶¶ 90, 96.)[1] Defendants are aware of no redistricting legislation in the

country's history that provided as much information about how and why boundary lines were

drawn as did HR 385 and SR 249, including references to political subdivision boundary lines,

partisan balance, fidelity to the core of the previous district, population equality, relevant

communities of interest, and even racial demography in the districts.[2]

The Amended Complaint attempts to allege that the Illinois Plan violates several

constitutional provisions and the federal Voting Rights Act. On the one hand, Plaintiffs claim

that the Illinois Redistricting Plan fails to give sufficient voting power to African-Americans and

Latinos (Counts 1 and 2). On the other, they claim that the Illinois Plan is a racial gerrymander

---

[1] This court may judicially notice legislation of the Illinois General Assembly. *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27 (1959). The district court in resolving a motion to dismiss under F.R.Civ.Proc. 12(b)(6) may also judicially notice uncontested matters of public record, such as the above-referenced resolutions, without converting a 12(b)(6) motion into a motion for summary judgment. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997); *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994).
[2] HR 385 and SR 249 are submitted herewith as Exhibits A and B in the Appendix to Defendants' Motion to Dismiss.

*in favor of* African-Americans and Latinos and adverse to white voters (Count 5). Adam Brown, a white Republican state representative, alleges that House District 96 is both a racial and political gerrymander, notwithstanding that District 96 is majority-Republican and over 70% white in voting-age population (Counts 5, 6). After spending most of the first 90-plus paragraphs of the Amended Complaint alleging entirely superfluous claims of political unfairness in the legislative process that resulted in the challenged map, Plaintiffs attempt to assert political gerrymander claims (Count 3 and 4) that have been rejected by every Court that has ever heard them, and conclude with claims arising under the Illinois Constitution that may not, as a matter of law, be resolved by a federal court under the Eleventh Amendment of the Constitution (Counts 7 and 8). For the reasons given below, all counts should be dismissed.

I.   **Counts 1 and 2 Should Be Dismissed For Lack of Standing Because the Amended Complaint Does Not Allege That Plaintiffs Are Registered Voters Residing in the Districts They Challenge Under Section 2 of the Voting Rights Act.**

Under Article III, § 2 of the Constitution, federal courts have jurisdiction over a dispute only if it is a "case" or "controversy." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks omitted). "This is a 'bedrock requirement.'" *Id.* (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1982)). And among its components is standing, which requires a plaintiff to "'allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Id.* at 818-19 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (emphasis in original; *see also id.* at 818 (plaintiff bears burden of establishing standing).

The analysis of Article III standing is further refined by the claim raised, be it constitutional, statutory, or common law in origin. *Int'l Primate Protection League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). Here, Counts 1 and 2 allege

2

violations of the Voting Rights Act, which permits "aggrieved persons" to enforce the requirements of the Act. 42 U.S.C. § 1973a.

An "aggrieved person," suffering a cognizable injury in the form of a dilution of her right to vote, must be registered to vote in the jurisdiction where the dilution allegedly occurs. *Illinois Legislative Redistricting Comm'n v. LaPaille*, 782 F. Supp. 1267, 1271 (N.D. Ill. 1991) (finding that parties not suing in their capacity as registered voters lack standing in 1991 redistricting litigation); *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 362-64 (E.D. Va. 2009) (dismissing plaintiff's claim of vote dilution under Section 2 for failure to plead she was registered voter in subject jurisdiction). The residency requirement limits standing to individuals who actually suffer vote dilution in the allegedly underrepresented district. *Wright v. Dougherty County*, 358 F.3d 1352, 1355 (11th Cir. 2004) (registered voters who did not reside in challenged voting district lacked standing under Section 2); *Lopez v. Merced County*, 473 F. Supp. 2d 1072, 1080 (E.D. Cal. 2007) (three-judge court) (voters residing in Los Banos, California lacked standing to challenge elections in other municipalities under Voting Rights Act).

A Section 2 claim raised against a district in which plaintiff is not a registered voter is merely a generalized grievance insufficient to confer standing. *Hall v. Virginia*, 276 F. Supp. 2d 528, 531 (E.D. Va. 2003), *aff'd*, 385 F.3d 421 (4th Cir. 2004) (dismissing plaintiffs who resided in the old congressional district, but not in the district as redrawn); *Winstead v. Stodola*, 2007 WL 2710096 at *2 (E.D. Ark. 2007) (dismissing on standing grounds a Voting Rights Act challenge to a new election system that allegedly diminished power of city directors elected from minority wards, where plaintiff voters did not reside in minority wards).

The Amended Complaint attempts to allege that two House districts violate the Section 2 rights of African-Americans (Districts 7 and 114) and eight House districts violate the Section 2

rights of Latino voters (Districts 1, 2, 21, 22, 23, 60, 77, and 83). (Am. Complt. ¶¶ 116, 118, 128, 133.) Yet no Plaintiffs allege that they are registered to vote in any of those districts. (*See* Am. Complt. ¶¶ 2-10.) In fact, other than the legislator Plaintiffs, the Amended Complaint does not allege that any of the Plaintiffs are registered to vote, period. And despite Plaintiffs' request to file an Amended Complaint to add more plaintiffs for standing purposes, it still lacks anyone who even resides in four of the challenged districts (2, 7, 21, 60), much less is registered to vote there. Accordingly, Counts 1 and 2 should be dismissed under Rule 12(b)(1).

## II.  Counts 1 and 2 Should Be Dismissed For Failure to State A Claim.

To state a claim under Rule 8 of the Federal Rules of Civil Procedure, the Amended Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the complaint pleads factual content that allows the court to draw a reasonable inference that defendants are liable for the misconduct alleged. *Id.* at 1949. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Plaintiffs "who merely parrot the statutory language of the claims that they are pleading (something that anyone could do, regardless of what may be prompting the lawsuit) ... have not provided the 'showing' under Rule 8." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (parentheses in original).

### A.  Counts 1 and 2 Fail to Plead *Gingles* Prong 3, a Necessary Precondition to Any Challenge under Section 2 of the Voting Rights Act.

Counts 1 and 2 are brought under Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. A violation of Section 2 occurs only if plaintiffs allege and prove that, through some election procedure, practice, or standard, they have been denied an equal opportunity to

participate in the political process and to elect candidates of their choice in a particular representative district. 42 U.S.C. § 1973(b); *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986).

Before reaching the ultimate question of equal opportunity under Section 2 in any particular district, Plaintiffs must allege and prove three facts—known as the *Gingles* factors. Plaintiffs must establish that (1) the minority group is sufficiently large and geographically compact to constitute a majority in a district; (2) this minority group is politically cohesive; and (3) whites usually vote sufficiently as a bloc to defeat the minority's preferred candidate in that district. *Gingles*, 478 U.S. at 49-51. The failure to allege and prove any prong is fatal to a Section 2 claim. *Johnson v. DeGrandy*, 512 U.S. 997, 1011-13 (1994); *Growe v. Emison*, 507 U.S. 25, 40-41 (1993); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 942 (7th Cir. 1988).

The Amended Complaint does not plead the third *Gingles* prong—that white voters usually vote sufficiently as a bloc to defeat the minority's preferred candidate. At best, paragraph 106 tiptoes around this factor, alleging that "[r]acial bloc voting is pervasive in Illinois, both among majority and minority groups." That allegation is a "'formulaic recitation of the elements'" of a claim (albeit an incomplete one) that need not be accepted as true at the pleading stage. *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).

But even if it were accepted as true, the mere allegation that whites vote as a bloc falls short of meeting *Gingles* prong three. Alleging that whites vote as a bloc, without more, is different than pleading that whites vote as a bloc *and usually defeat the minority's candidate of choice*. Plaintiffs have not alleged that whites vote in a racially polarized manner, much less that they do so with such sufficiency and frequency that they usually defeat the minority's candidate. Plaintiffs could not prevail under Section 2 if they merely proved the allegations of Paragraph 106. *Williams v. State Bd of Elections*, 718 F. Supp. 1324, 1331 (N.D. Ill. 1989) (granting

summary judgment where plaintiffs could not establish that white-bloc voting usually defeated minority-preferred candidates for judgeships in Cook County); *Jenkins v. Red Clay Consol. Sch. Dist.*, 4 F.3d 1103, 1123 (3rd Cir. 1993) (correct question under *Gingles* prong three is whether "the usual result of the bloc voting ... is the defeat of the minority-preferred candidate").

If Plaintiffs cannot show that whites usually vote together to defeat the minority's chosen candidate in a particular district, "it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (quoting *Gingles*, 478 U.S. at 49 n.15). Simply put, without alleging and proving that white voters, as a bloc, usually deny minorities their candidate of choice, "there neither has been a wrong nor can there be a remedy" under the Voting Rights Act. *Growe*, 507 U.S. at 41.

Moreover, Paragraph 106 is stated in statewide terms. Vote-dilution claims under Section 2 are district-specific claims, and the *Gingles* factors must be satisfied on a district-by-district basis. "When considering several separate vote dilution claims in a single case, courts must not rely on data aggregated from all the challenged districts in concluding that racially polarized voting exists in each district." *Gingles*, 478 U.S. at 59 n.28 (emphasis in original); *see Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y. 2004), *aff'd*, 543 U.S. 997 (2004). Recognizing that the *Gingles* factors cannot be alleged on a statewide basis, Plaintiffs have pled *Gingles* prongs 1 and 2 in district-specific allegations. (*See, e.g.*, Am. Complt. ¶¶ 110, 112, 113, 122, 124, 125.) Plaintiffs' failure to do so as to the third *Gingles* prong warrants dismissal of those counts.

If Plaintiffs truly have a good-faith basis to properly allege the *Gingles* third prong, they should have pleaded it. As they currently stand, Counts 1 and 2 do not plead that white-bloc voting usually defeats the minority's preferred candidate as to any particular district within this

state, and thus fail to plead a necessary precondition for a Section 2 challenge. Counts 1 and 2

fail to state a claim under Section 2 of the Voting Rights Act and should be dismissed.

**B.      Counts 1 and 2 Fail To Give Notice As To Which Districts
         Plaintiffs Challenge Under Section 2.**

The Amended Complaint does not give Defendants notice of every district Plaintiffs

claim is in violation of Section 2. Counts 1 and 2 themselves do not specify any particular

districts, merely stating that "[t]he Redistricting Plan violates Section 2 of the Voting Rights Act

. . . ." (Am. Complt. ¶¶ 157, 161.) These conclusory and boilerplate allegations do not suffice.

*See Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 555; *Brooks*, 578 F.3d at 581.

It is true that Counts 1 and 2 incorporate the general allegations by reference. But those

general allegations do not allege facts sufficient to identify the districts challenged. Paragraph

133 merely alleges that the map fails to give Latinos a fair opportunity to elect representatives of

their choice "in Representative Districts *including, but not limited to,* 1, 2, 21, 22, 77, and 83" in

violation of Section 2. (Am. Complt. ¶ 133 (emphasis supplied).) This allegation, again, runs

counter to the dictates of *Iqbal* and *Twombly*. As to these as-yet unspecified districts, this

allegation does not state a claim for relief that is "plausible on its face." *Iqbal*, 129 S. Ct. at

1949. Moreover, "[i]t is no answer to say that a claim just shy of a plausible entitlement to relief

can, if groundless, be weeded out early in the discovery process through careful case

management . . . ." *Id.* at 1953 (quoting *Twombly*, 550 U.S. at 559). Rule 8 "does not unlock the

doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. Here,

Defendants are not even given conclusions, just a promise of things to come.

Indeed, this allegation would not survive under the more liberal notice pleading standards

prior to *Twombly* and *Iqbal*. A school teacher claiming wrongful termination for exercising his

First Amendment rights was required to at least plead the speech or conduct that was protected

and which led to his termination. *Kyle v. Morton High School*, 144 F.3d 448, 457 (7th Cir. 1998). A Section 1983 plaintiff was required to plead what specific lies were contained in the letter sent by defendant prosecutor to the Prisoner Review Board. *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir. 1992). And in a case decided between *Twombly* and *Iqbal*, a plaintiff claiming Title VII retaliation was at least required to allege what conduct the defendant engaged in that violated the law. *E.E.O.C. v. ConcentraHealth Services, Inc.*, 496 F.3d 773, 781 (7th Cir. 2007).

If, pre-*Twombly/Iqbal*, the "failure to allege anything more than that the defendant lied in her letter, without even stating what those lies are," constituted a failure to state a claim, *Lucien*, 967 F.2d at 1168, then the Amended Complaint's failure to allege anything more than some unknown, unnamed representative districts violate the Voting Rights Act, without even stating which districts they are, likewise fails to state a claim. Counts 1 and 2 should be dismissed.

## III.    Counts 3 and 4 Should Be Dismissed.

### A.    Plaintiffs' Use of Political Gerrymandering Claims to Challenge the Redistricting Plan Fails to State a Claim for Which Relief Can Be Granted.

Counts 3 and 4 of the Amended Complaint both claim the Illinois Plan is an unconstitutional political gerrymander. Count 3 claims that the Plan violates the First Amendment Rights of Republican voters, while Count 4 attempts to assert a violation of equal protection. Count 3 merely makes the conclusory statement that the Plan "systematically and intentionally unfairly burdens the rights to political expression and expressive association" without stating how the Plan allegedly does that or against what standard the Plan should be measured to show that it is unfair. (Am. Complt. ¶ 162.) Similarly, Count 4 only alleges that the Plan was "conceived" in an "arbitrary and discriminatory manner with the purpose and effect of denying Plaintiffs equal protection..." (*Id.* ¶ 165.) Plaintiffs' unsuccessful attempt to claim a violation of their right to equal protection fails to specify, or even hint, as to how the Plan

8

violates their rights. Indeed, aside from the two Republican office holders (Radogno and Cross), none of the plaintiffs even claims to be a Republican.

Both political gerrymandering counts should be dismissed because the Plaintiffs' generic claim that the Plan is "unfair" to Republican voters (Am. Complt. ¶¶ 148-151, 153) has been rejected by the Supreme Court as a basis upon which a political gerrymandering claim can be sustained. *Vieth v. Jubelirer*, 541 U.S. 267, 291 (2004). Plaintiffs' failure to allege a viable political gerrymandering claim is not unique to Plaintiffs, nor is their dismissal. In fact, although political gerrymandering claims have been around since the founding of the country, *Vieth*, 541 U.S. at 274, and were first considered by the Supreme Court 25 years ago, *see Davis v. Bandemer*, 478 U.S. 109 (1986), no court anywhere in the country has ever invalidated a legislative redistricting plan as a political gerrymander, under either a First Amendment or an equal protection claim—or for that matter, on any ground.

After *Davis*, over a dozen cases have rejected political gerrymander claims,[3] including several in this Circuit. *See Smith v. Boyle*, 144 F.3d 1060 (7th Cir. 1998) (affirming dismissal of political claim against Illinois's Supreme Court election districts); *La Porte County Republican Central Comm. v. Board of Comm'rs of County of La Porte*, 43 F.3d 1126, 1128 (7th Cir. 1994) (affirming dismissal of a political gerrymander claim); *Illinois Legislative Redistricting Comm'n v. LaPaille*, 782 F.Supp. 1272, 1276 (N.D. Ill. 1992) (dismissing claim).

The Supreme Court revisited the issue of political gerrymander claims in 2004 in *Vieth*, 541 U.S. 267. Justice Scalia's plurality decision (joined by Chief Justice Rehnquist and Justices O'Connor and Thomas), affirming the dismissal of the political gerrymander claims, concluded that the political gerrymander claim had produced "[e]ighteen years of judicial effort with virtually nothing to show for it"…"except for the incurring of attorney's fees…" *Id.* at 281, 279.

---

[3] A list of these cases is attached at Exhibit C to the Appendix to Defendants' Motion to Dismiss.

The plurality decision concluded that political gerrymander claims are non-justiciable political

questions because every suggested standard equates to "proportional representation" but "the

Constitution contains no such principle. It guarantees equal protection of the law to persons, not

equal representation in government to equivalently sized groups. It nowhere says that farmers or

urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded

political strength proportionate to their numbers." *Id.* at 288.[4]

    In *Vieth*, the Supreme Court expressly rejected a "fairness test"—functionally identical to

the one raised here by Plaintiffs—as a judicially manageable standard:

> "Fairness" does not seem to us a judicially manageable standard. Fairness is
> compatible with noncontiguous districts, it is compatible with districts that
> straddle political subdivisions, and it is compatible with a party's not winning the
> number of seats that mirrors the proportion of its vote. Some criterion more solid
> and more demonstrably met than that seems to us necessary to enable the state
> legislatures to discern the limits of their districting discretion, to meaningfully
> constrain the discretion of the courts, and to win public acceptance for the courts'
> intrusion into a process that is the very foundation of democratic decisionmaking.

*Vieth*, 541 U.S. at 291.

    The Supreme Court took up the political gerrymander issue most recently in *League of*

*United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ("LULAC"), an action brought

against the mid-decade redrawing of Texas' congressional districts. The lower court concluded

that the mid-decade redistricting was done "'solely for the purpose of seizing between five and

seven seats from Democratic incumbents,'" and accepted testimony that "political gain for the

Republicans was 110% of the motivation for the Plan, that it was 'the entire motivation.'"

*Session v. Perry*, 298 F. Supp. 2d 451, 472-473 (E.D. Tex. 2004) (per curiam). Nonetheless, the

---

[4] Justice Kennedy's concurring opinion agreed that there is no known standard by which political gerrymander
claims can be measured, but declined to rule such claims non-justiciable, because the fact that "a workable standard
for measuring a gerrymander's burden on representational rights has not yet emerged does not mean that none will
emerge in the future." *Id.* at 270.

District Court rejected the political gerrymander claim because "[w]e have no hesitation in concluding that, under current law, this court cannot strike down [the] Plan on the basis that it is an illegal partisan gerrymander." *Id.* at 474.

The Supreme Court affirmed the District Court's dismissal of the political gerrymandering claim, again concluding that the political gerrymander claims "state no claim on which relief may be granted for their statewide challenge." *LULAC*, 548 U.S. at 423. Similar to the decision in *LULAC*, the Plaintiffs' claim that the Plan constitutes "unfair" political gerrymandering in favor of Democrats fails to state a claim upon which relief may be granted.

### B. Counts 3 and 4 Should Be Dismissed As Non-Justiciable Political Questions.

In the alternative, Counts 3 and 4 should be dismissed because claims of political gerrymandering present non-justiciable political questions. A plurality of the Supreme Court in *Vieth* so concluded. *Vieth,* 541 U.S. at 288. (The argument was not put before the Court in *LULAC.* 548 U.S at 493 (Roberts, J. concurring)). In the seven years since *Vieth,* no one has offered a standard any more manageable than all those the Court rejected over the previous 25 years. Plaintiffs here do not even try to offer one. This Court should declare political gerrymander claims non-justiciable political questions.

### IV. Count 5 Should Be Dismissed.

Count 5 appears to raise three separate claims: (i) a facial challenge to the Illinois Voting Rights Act (the "IVRA"), 10 ILCS 120/5-1 *et seq.*; (ii) an as-applied statewide racial gerrymander claim; and (iii) an as-applied racial gerrymander claim to "certain" unspecified districts. Each claim should be dismissed.

A.    **The Facial Challenge To The Illinois Voting Rights Act Should Be Dismissed.**

First, Count 5 challenges the constitutionality of the IVRA on its face. Plaintiffs

repeatedly (and incorrectly) allege that the IVRA mandates that race must be the predominant

factor in the drawing of every House and Senate district, referring to *Shaw v. Reno*'s prohibition

on using race as the predominant criteria in redistricting. (Am. Complt. ¶¶ 170, 173, 175.) *See*

509 U.S. 630 (1993). Count 5 cites only one district (District 96) that it alleges was drawn using

race as the predominant factor. (*Id.*, ¶ 176.) Then Count 5 reaches its conclusion: "The creation

of Representative District 96 as mandated by the Illinois Voting Rights Act of 2011 violates the

Plaintiffs' rights to equal protection under the Fourteenth Amendment to the United States

Constitution on its face and as applied." (*Id.*, ¶ 177.) Though this allegation could be read as

challenging "the creation of Representative District 96" on its face and as applied, Defendants

assume that Plaintiffs are also raising facial and as-applied challenges to the IVRA itself.

Notably, Plaintiffs' proposed alternative map, the so-called "Fair Map" (Am. Complt. ¶¶

69-72), contains the identical language that Plaintiffs claim dooms the Illinois Plan. (Am.

Complt. ¶ 169.) The "Fair Map" legislation, like the Illinois Plan, states that it "complies with

all of the requirements of [the IVRA]." Senate Bill 1177, House Amendment 1, 97th Ill. Gen.

Assembly, § 85 (found at http://www.ilga.gov/legislation/97/SB/09700SB1177ham001.htm.)

Presumably, the Plaintiffs do not believe that the mere inclusion of that language in their plan

automatically renders it a racial gerrymander; nor should its inclusion do so with respect to the

Illinois Plan.

The Court should interpret the IVRA to uphold its constitutionality if reasonable to do so.

*Dean Foods Co. v. Brancel*, 187 F.3d 609, 614 (7th Cir. 1999). The premise of Count 5 is its

legal conclusion that the IVRA mandates race as the predominant factor in Illinois redistricting

plans. This Court need not accept that legal conclusion as true. *Iqbal*, 129 S. Ct. at 1949. In fact, the specific language of the Act itself shows that legal conclusion to be incorrect—as discussed, *infra*, the IVRA expressly *prohibits* race as the predominant consideration in redistricting.

### 1.     The IVRA Prohibits Racial Considerations from Predominating.

The IVRA is an anti-fracturing law. Its purpose is to preserve, where possible, a cluster of minority voters in a given area if they are of a size and cohesion that they could exert collective electoral power, be it as a "crossover," "coalition," or "influence" district. 10 ILCS 120/5-5(b). "Crossover" districts are those where a minority group lacks a voting-age majority of a district but is sufficient in size that, with the help of white "crossover" votes, the minority may elect its candidate of choice. A "coalition" district is one where two or more minority groups unite to elect their preferred candidate. An "influence" district is one where the size of the minority group is insufficient to elect its candidate of choice but sufficient to exert some influence in the election. *Id.* The definitions of these long-recognized terms are verbatim from the plurality opinion in *Bartlett v. Strickland*, 556 U.S. 1 (2009).

Under certain circumstances, the IVRA seeks to avoid fracturing a minority group into multiple districts, thereby diluting its voting strength. But, quite explicitly, this anti-fracturing principle is not without limitation. The IVRA makes clear, *by stating the point twice*, that the desire to prevent fracturing a minority group is subordinate to, and may not conflict with, the dictates of the Equal Protection Clause, the U.S. Voting Rights Act, and the Illinois Constitution. Subsection (a) of Section 5-5 states:

> (a) In any redistricting plan pursuant to Article IV, Section 3 of the Illinois Constitution, Legislative Districts and Representative Districts shall be drawn, subject to subsection (d) of this Section, to create crossover districts, coalition districts, or influence districts. **The requirements imposed by this Article are**

13

**in addition and subordinate to any requirements or obligations imposed by the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, and the Illinois Constitution**.

10 ILCS 120/5-5(a) (emphasis supplied).  Subsection (d), which the Amended Complaint omitted, similarly reads:

> (d) Nothing in this Act shall be construed, applied, or implemented in a way that imposes any requirement or obligation that conflicts with the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, or the Illinois Constitution.

10 ILCS 120/5-5(d).  The IVRA's anti-fracturing principle is thus expressly subordinate to the federal Voting Rights Act, the Illinois constitutional requirements that districts be compact, contiguous, and substantially equal in population (*see* Ill. Const. 1970, Art. IV, § 3)—and first and foremost to the Equal Protection Clause, including *Shaw*'s prohibition against allowing race to predominate over all other redistricting factors.  509 U.S. 630.  No attempt to preserve a minority group may be implemented if it "conflicts" with any of those superior requirements.  10 ILCS 120/5-5(d).  Thus, pursuant to the IVRA's plain language, Illinois map drawers may *not* preserve a cluster of minorities within a single district if the only way to accomplish this is to subordinate all other redistricting principles to racial considerations.  10 ILCS 120/5-5(a), (d).

If the IVRA were ambiguous on this point (and clearly it is not), the legislative history confirms that the bill sponsors specifically intended that the anti-fracturing principle be limited by the *Shaw* doctrine and that race could not predominate over other redistricting principles.  In the House, Majority Leader Barbara Flynn Currie discussed *Shaw* in debate with Representative Jim Durkin, one of the House Republican floor leaders:

> Durkin:       Is … next question, is race the dominant [and] controlling rationale [in] drawing crossover, coalition, and influence districts?

14

| | |
|---|---|
| Currie: | No. And in fact, under various court decrees it can't be . . . . |

***

| | |
|---|---|
| Durkin: | Okay. Does this legislation mandate any type of racial classifications above other traditional redistricting criteria? |
| Currie: | No, in fact, I said ... I've been saying through most of this discussion that you start with the Federal Constitution which says one person one vote and says you may not discriminate against people based on race. |

Tr. of Proceedings, Ill. House of Representatives, 96th Gen. Assembly, January 4, 2011, at pp.

30-31. Leader Currie repeatedly stated her intent that the IVRA be subordinate to the Equal

Protection Clause, *id.* at 25, and summarized her intent:

> to make sure that after the other requirements have been met in ...
> redistricting, population equality[,] one person, one vote, an end to racial
> discrimination[,] compliance with the Voting Rights Act, making sure
> that districts are of equal size, contiguous and compact, then the next ...
> the next responsibility will be to draw, if it's possible, minority
> influence, crossover, and ... and coalition districts.

*Id.* at 44-45. The Senate sponsor, Senator Kwame Raoul, likewise stated his intent to "protect

minority voting rights" through this anti-fracturing law but noted that "we understand that a State

statute is subordinate to a requirement in either the U.S. or Illinois Constitution and ... any

federal statute." Tr. of Proceedings, Ill. Senate, 96th Gen. Assembly, December 1, 2010, at p.

40. Senator Raoul stated that the IVRA's call to preserve minority voting strength was triggered

"only after the mapmaker has complied with these other mandates." *Id.* at 41.[5]

The Amended Complaint's legal conclusion that the IVRA mandates race as the

predominant factor in Illinois redistricting (Am. Complt. ¶ 170) is thus demonstrably false.

---

[5] The Court can consider legislative history in connection with a facial challenge to a statute. *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995). Copies of the above-referenced General Assembly floor debates relating to the IVRA are attached respectively at Exhibits D and E of Defendants' Appendix.

### 2. To Sustain a Challenge Under *Shaw v. Reno*, Plaintiffs Must Show That The IVRA Requires Racial Considerations To Predominate Over All Other Redistricting Principles.

Though their premise is mistaken, Plaintiffs correctly identify the necessary showing—race as the predominant factor—to challenge the constitutionality of the IVRA. (Am. Complt. ¶¶ 173-74.) A legion of cases recognize that race inevitably plays a role in redistricting, and the mere consideration of race does not trigger strict scrutiny under *Shaw*, 509 U.S. 630. "Strict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Bush v. Vera*, 517 U.S. 952, 958 (1996). Race can be "*a* motivation for the drawing" of a district but not the "*predominant* factor motivating the districting decision." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (emphasis in original). "[R]ace may be a motivation in redistricting as long as it is not the *predominant* one." *LULAC*, 548 U.S. at 517 (Scalia, J. concurring in part and dissenting in part). "[A]wareness of race cannot be banished from the redistricting process or thought to establish, without more, a denial of equal protection." *Barnett v. Daley*, 32 F.3d 1196, 1199 (7th Cir. 1994).

Indeed, *Shaw* itself explained that "redistricting differs from other kinds of state decisionmaking in that the legislature always *is aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors." 509 U.S. at 646 (emphasis in original). It is for this reason that a *Shaw* claim "requires courts to exercise extraordinary caution in adjudicating claims that a state has drawn district lines on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). A *Shaw* plaintiff "must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.*

States, in fact, are free to draw whatever districts they please, and as long as those districts do not contravene federal constitutional and statutory requirements, federal courts are barred from intervening. *Voinovich*, 507 U.S. at 156; *Growe*, 507 U.S. at 34. Thus, so long as race is not the predominant factor in redistricting, states may even take racial considerations into account such that they intentionally draw majority-minority districts beyond what is required by the federal Voting Rights Act. *Voinovich*, 507 U.S. at 155-56; *Bush*, 517 U.S. at 993 (O'Connor, J., concurring). And notably, they may also draw crossover, coalition, or influence districts, provided racial considerations do not predominate. *Georgia v. Ashcroft*, 539 U.S. 461, 480-83 (2003); *Bartlett*, 129 S. Ct. at 1248-49. This last example is precisely what the IVRA addresses as a redistricting principle: the drawing of crossover, coalition, and influence districts when it can be accomplished without considering race as the predominant factor.

Because the IVRA, by its own terms, goes to great lengths to *prohibit* race as the predominant factor in drawing House and Senate districts in Illinois, Plaintiffs are incorrect that either the statute or the challenged plan is unconstitutional under *Shaw*. (Am. Complt. ¶¶ 173-74.) And Plaintiffs have not carried their burden of proving that "no set of circumstances exists under which [the challenged law] would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge is "the most difficult challenge to mount successfully"). *Any* set of circumstances in which the Illinois mapmakers followed the IVRA to the letter—and thereby did not allow racial considerations to predominate—would be an example of a constitutional application of the IVRA. Count 5's facial challenge fails to state a claim.

### B. Regardless of the Outcome of Count 5's Facial Challenge, The As-Applied Challenges Should Be Dismissed.

Plaintiffs' legal conclusion that a finding of facial invalidity as to the IVRA would lead to the invalidation of the entire Illinois Redistricting Plan (Am. Complt. ¶ 175) is mistaken. If this

17

Court were to find the IVRA unconstitutional on its face, it would not affect the validity of even a single district in the Illinois Plan. The IVRA does not even apply to most of the districts in the Illinois Plan. It only applies where a cluster of cohesive minority voters exists in an area that is sufficiently *small* in size to be less than a voting-age majority of a district, but sufficiently *large* that it can achieve electoral relevance with assistance from white voters or other minorities, or simply by exerting some influence in the outcome of an election. 10 ILCS 120/5-5(b). As noted in HR 385, the vast majority of districts in Illinois are not even governed by the IVRA because the minority population is low and dispersed or because the minority population is located in voting-age majority districts. *See* H. Res. 385, 97th Ill. Gen. Assembly.

And even for districts to which the IVRA arguably applied, the mere fact that a particular district happened to preserve a cluster of minorities within its boundaries—thereby "complying" with the IVRA—would not necessarily mean that race predominated in the drawing of that district over all other redistricting principles. A district-specific inquiry would be necessary, wherein Plaintiffs would have to prove not the *result*, but the *intent*—that mapmakers subordinated all other redistricting principles to racial considerations. *Easley*, 532 U.S. at 241 (district boundaries drawn along racial lines did not violate *Shaw* because racial identity was directly correlated with political affiliation, and politics was the primary factor); *Bush*, 517 U.S. at 968 ("if district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify").

"The ultimate inquiry [in a *Shaw* challenge], as in all cases under the Equal Protection Clause, goes to the State's purpose, not simply to the effect of state action." *LULAC*, 548 U.S. at 517 (Scalia, J., concurring in part and dissenting in part). "Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens

18

that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (emphasis in original). Thus, the fact that map drawers preserved a group of minority voters within a particular district, without more, proves nothing. Plaintiffs still must prove that racial criteria predominated.

### 1. Plaintiffs' As-Applied "Statewide" *Shaw* Claim Must Be Dismissed Because Neither These Plaintiffs, Nor Any Others, Have Standing To Raise Such A Claim.

In Count 5, among other things, Plaintiffs allege the Illinois Plan, *as a whole*, constitutes a racial gerrymander. (Am. Complt. ¶ 175.) This claim should be dismissed because a claim that racial considerations predominated in drawing district lines—a *Shaw* claim—is a district-specific claim that cannot be raised as a statewide challenge. The representational harm caused by a *Shaw* violation is specific to voters within the particular district, who suffer a distinct injury as a result of the racial classification within that district. This is why standing to raise a *Shaw* claim is limited to voters residing within the district where the alleged racial gerrymandering occurred, and is denied to non-resident plaintiffs. *U.S. v. Hays*, 515 U.S. 737, 744-45 (1995); *Bush*, 517 U.S. at 957-58; *Shaw v. Hunt*, 517 U.S. 899, 903-04 (1996); *Miller*, 515 U.S. at 909. Even voters living in a district bordering an alleged gerrymander, who claim injury because the shapes of their districts were affected by the gerrymander, lack standing to challenge the gerrymander. *Sinkfield v. Kelley*, 531 U.S. 28, 30-31 (2000).

Simply put, there is no such thing as a statewide *Shaw* claim. "[T]he evidence that would be required to establish a race-based gerrymandering claim is necessarily district-specific." *Thompson v. Smith*, 52 F. Supp. 2d 1364, 1371 (M.D. Ala. 1999) (three-judge court).

The statewide claim should be dismissed for lack of standing under Rule 12(b)(1) because neither these Plaintiffs nor *any* plaintiffs could raise a *Shaw* claim against districts in

which they do not reside. As an alternate basis for dismissal, the claim should be dismissed under Rule 12(b)(6) because Plaintiffs cannot state a statewide *Shaw* claim.

### 2. The Remaining As-Applied Challenge to "Certain" Districts Should Be Dismissed.

It appears, based on the language of paragraph 177, that Plaintiffs are also raising an as-applied challenge district-by-district based on *Shaw*. (Am. Complt. ¶ 177.) Yet Count 5 incorporates all general allegations, among them an allegation that "[c]ertain of the districts in the Redistricting Plan including, ***but not limited to***, Representative District 96, are of a shape so bizarre on their face that the shape can only rationally be understood to be an effort to separate voters into different districts on the basis of race." (Am. Complt. ¶ 136 (emphasis supplied).) As discussed more fully in Argument II-B, *supra*, pp. 6-8, the reference to unspecified districts does not provide sufficient facts to state a facially plausible claim and fails to give Defendants notice of the claims against them.

## V. Count 6 Should Be Dismissed Under Rule 10(b) and Rule 12(b)(6).

Count 6 of the Amended Complaint is an equal protection claim in search of a rationale. It pertains exclusively to House District 96, which was allegedly "formed to join areas within the cities of Decatur and Springfield that have high percentages of African-Americans." (¶ 179). Without alleging any specific facts to support its legal conclusions, Count 6 merely asserts that District 96 "severs the core" of five existing districts (¶ 180), in some unspecified fashion does not "meet the constitutional requirement" that all districts be "compact" (¶ 180), severs the boundary lines of three existing counties (Christian, Macon and Sagamon) (¶ 184), and "joins urban and rural communities with dissimilar interests" (¶ 186). Count 6 then concludes that the drafters "used the ethnicity of the African-American communities in Springfield and Decatur as the predominant factor over all other constitutional and traditional redistricting principles in

drawing Representative District 96." (¶187). From these allegations, one might conclude (although the general allegations do not satisfy the Rule 8 requirements set forth in *Twombly, Iqbal* and their progeny) that Count 6 is an attempt to state a racial gerrymander claim.

At the same time, however, Count 6 alleges that District 96 "lowers the partisan advantage of the Republican voters within the district" (¶ 182), "lowers the partisan advantage in Republican voters in adjoining districts" (¶ 183), and "does not preserve the existing incumbent-constituent relationship" (¶ 185). On this basis, Count 6 concludes that the "Democratic Caucuses" drew a map that resulted in "lowering the partisan advantage of the Republican minority in representative District 96 and adjoining districts" (¶ 188). Read together, the various paragraphs that comprise Count 6 leave Defendants and the Court to figure out whether Plaintiffs are attempting to allege an equal protection claim based upon racial gerrymandering or political gerrymandering or both.

If Count 6 stands as an effort to assert a claim based on political gerrymandering, it fails for all of the reasons discussed previously. But beyond that, since Count 6 appears to be attempting to assert two separate equal protection claims, it must be stricken because under Federal Rule of Civil Procedure 10(b), each constitutional claim must be pled in separate counts. *Stacks v. Chicago Police Dept.*, 1992 WL 233910 at *1 (N.D. Ill) (excusing the deficiencies for *pro se* plaintiffs). The Court has the inherent power to dismiss a complaint that fails to comply with this rule. *Three Departments, Inc. v. Kmart Corp.*, 670 F. Supp. 1404, 1409 (N.D. Ill. 1987). And, since Defendants and the Court are left to guess which claim is actually being asserted, the pleading rules announced in *Twombly* and *Iqbal* require that the count be dismissed. Plaintiffs must decide and disclose the nature of the equal protection claim they are asserting,

and must plead it with sufficient specificity in order to give Defendants proper notice of Plaintiffs' claims. As pled, Count 6 should be dismissed.

## VI. Counts 7 and 8 Should Be Dismissed Because The Eleventh Amendment Bars Litigation Of Plaintiffs' State Law Claims In Federal Court.

Although *Ex Parte Young*, 209 U.S. 123 (1908), permits plaintiffs to seek prospective equitable relief against the Board members for violations of federal law, this exception to Eleventh Amendment immunity does not extend to claims alleging violations of state law. *See Pennhurst v. State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). Under *Pennhurst*, federal courts "do not have authority to enjoin state officials from violating state law." *Froehlich v. Wisc. Dep't of Corrections*, 196 F.3d 800, 802 (7th Cir. 1999). "People who contend that a state actor has violated state law...must present their claims to state court." *Shegog v. Bd. of Educ. of City of Chicago*, 194 F.3d 836, 838 (7th Cir. 1999). Thus, the Eleventh Amendment requires dismissal of Counts 7 and 8 (asserting that the Redistricting Plan violates Illinois state law, *see* Am. Complt. at ¶¶ 27-29).

Plaintiffs' request for declaratory rather than injunctive relief does not compel a different result, because *Pennhurst*'s command that federal courts may not enjoin state officials from violating state law extends equally to the issuance of a federal declaratory judgment. *See Benning v. Bd. of Regents of Regency Universities*, 928 F.2d 775, 778 (7th Cir. 1991); *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir. 1986). "[T]he only advantage" plaintiffs could obtain from this court's issuance of a judgment declaring that the Redistricting Plan violates Illinois law "would be to present [that judgment] . . . as *res judicata*" on the issue of the Plan's validity. *Benning*, 928 F.2d at 778. A declaratory judgment thus "would operate as an end-run around *Pennhurst*" and is equally "forbidden by the Eleventh Amendment." *Id.*

## VII.   The Official Capacity Plaintiffs Should Be Dismissed Because They Lack Standing.

Three Plaintiffs (Christine Radogno, Thomas Cross, and Adam Brown) have sued in their

official capacity as Illinois state legislators. (Am. Complt. at 1.)  These Plaintiffs lack standing.

In *Raines*, the Supreme Court held that when legislators sue in their official capacities,

they do not "claim that they have been deprived of something to which they *personally* are

entitled."  521 U.S. at 821.  Rather, their claimed injury runs with their seat:  if they "were to

retire tomorrow, [they] would no longer have a claim; the claim would be possessed by [their]

successor[s] instead."  *Id.*; *see also Nevada Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343,

2350 (2011) ("the legislator casts his vote 'as trustee for his constituents, not as a prerogative of

personal power'") (quoting *Raines*, 521 U.S. at 821).  Thus, individual Members of Congress

("purporting to 'sue in their official capacities'") lacked standing to challenge the Line Item Veto

Act.  *Raines*, 521 U.S. at 821.  The Members' claim was "based on a loss of political power, not

loss of any private right," and was insufficient to establish standing.  *Id.*  And while the Court

acknowledged that legislators may have standing to challenge a specific legislative act in

instances where their vote has been "completely nullified," the same is not true where, as here,

their votes were "given full effect" but "[t]hey simply lost."  *Id.* at 823-24.

Following *Raines*, the three-judge panel in *Quilter v. Voinovich*, 981 F. Supp. 1032 (N.D.

Ohio 1997), held that the Democratic members of Ohio's Republican-dominated Apportionment

Board lacked standing to challenge the Board's redistricting plan.  *See id.* at 1035, 1037-38.

That court explained that "the precedent of granting plaintiffs standing in this context would

invite any legislator who was outvoted on a particular measure to bring a constitutional challenge

to that measure merely because he or she had not prevailed."  *Id.* at 1038.  The same result

should obtain here.  The substance of the official capacity Plaintiffs' claimed injury is

23

indistinguishable from *Raines* and *Quilter*: they are not complaining about the loss of any personal right and thus lack standing to sue.

## VIII. The Eleventh Amendment Requires Dismissal Of Counts 3 Through 8 Against The Illinois State Board Of Elections.

Under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). Thus, the Eleventh Amendment generally bars actions in federal court against a state, state agencies, and state officials acting in their official capacities. *See Nelson v. LaCrosse County Dist. Attorney*, 301 F.3d 820, 827 & n.7 (7th Cir. 2002); *Gossmeyer v. McDonald*, 128 F.3d 481, 487 (7th Cir. 1997). This rule is subject to only three exceptions: (1) a State may waive its immunity by consenting to suit in federal court; (2) Congress may abrogate the State's immunity through a valid exercise of its powers; or (3) a plaintiff may file suit against a state official in his official capacity for prospective equitable relief from an ongoing violation of federal law under *Ex Parte Young*, 209 U.S. 123. *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007); *Gary A. v. New Trier High Sch. Dist. No. 203*, 796 F.2d 940, 943 (7th Cir. 1986).

The Illinois State Board of Elections is a state agency, *see* Ill. Const. 1970, Art. III, § 5; 10 ILCS 5/1A-1 (2010), and thus shares the State's Eleventh Amendment immunity. And none of the exceptions to that immunity apply to Plaintiffs' claims against the Board in Counts 3 through 8, which allege violations of the United States Constitution and Illinois law. (*See* Am. Compl. ¶¶ 22-29). First, exercising its authority under Article XIII, § 4 of the Illinois Constitution to define the scope of the State's sovereign immunity, the Illinois General Assembly enacted the State Lawsuit Immunity Act, which provides that "the State of Illinois shall not be made a defendant or party in any court" (with certain exceptions not relevant here). 745 ILCS

5/1 (2010). Thus, Illinois has not waived its immunity to suit in federal court on Plaintiffs'

claims. Second, "[t]he Supreme Court has expressly held that Congress has not abrogated the

states' immunity in § 1983 suits," like Plaintiffs' here. *Joseph v. Bd. of Regents of the Univ. of*

*Wisc. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005) (citing *Quern v. Jordan*, 440 U.S. 332, 341-45

(1976)). Finally, the *Ex Parte Young* exception applies to state officials, not agencies. Thus, the

Seventh Circuit has held that the proper defendants to a suit challenging the constitutionality of

an Illinois election statute are the individual members of the Board, not the Board itself. *See*

*Stevenson v. State Bd. of Elec.*, 794 F.2d 1176, 1177 (7th Cir. 1986). Accordingly, the Board

should be dismissed as a defendant to Plaintiffs' claims 3 through 8.[6]

WHEREFORE, Defendants respectfully pray that this Honorable Court dismiss the

Amended Complaint in its entirety.

Respectfully submitted,
By: /s/ Richard J. Prendergast, Esq.
One of the Attorneys for Defendants Illinois State
Board of Elections, its Executive Director, and
individual members

Brent D. Stratton
Chief Deputy Attorney General
Office of the Illinois Attorney General
100 W. Randolph, 12th Floor
Chicago, IL 60601
(312) 814-4499

Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(312) 641-0881

David W. Ellis
Special Asst. Attorney General
402 State House
Springfield, IL 62706
(217) 782-3392

Eric M. Madiar
Special Asst. Attorney General
605 State House
Springfield, IL 62706
(217) 782-2156

Michael J. Kasper
Special Asst. Attorney General
222 N. LaSalle St., Suite 300
Chicago, IL 60601-1013
(312) 405-3292

---

[6] Congress abrogated the States' immunity against claims alleging violations of § 2 of the Voting Rights Act, 42 U.S.C. § 1973. *See Mixon v. State of Ohio*, 193 F.3d 389, 398-99 (6th Cir. 1999) (citing *City of Rome v. United States*, 446 U.S. 156, 179-80 (1980)). Thus, we do not seek dismissal of the Board as a defendant as to Counts I and II (which allege § 2 violations) on Eleventh Amendment grounds.