IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, CHOLE MOORE, JOE TREVINO, ANGEL GARCIA, ELIDIA MARES, and EDWIN TOLENTINO, <br><br>         Plaintiffs, <br><br>  vs <br><br>ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, and JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, <br><br>         Defendants. | No. 1:11-cv-04884 <br><br>Judges Sykes, Bucklo and Simon (3-judge court convened pursuant to 28 U.S.C. § 2284) |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

I.      **Counts 1 And 2 Should Be Dismissed.**

   A.      **Counts 1 And 2 Should Be Dismissed On Standing Grounds.**

Plaintiffs concede the Amended Complaint fails to allege standing to raise challenges under Section 2 of the Voting Rights Act. (Resp. at 3, n.1.) Plaintiffs "agree to amend their complaint to allege each is a registered voter in his/her respective district." (*Id.*) Because, however, Defendants have identified other bases for dismissal of Counts 1 and 2, and because Plaintiffs have indicated by their Response that they do *not* intend to cure those deficiencies, Defendants will address their remaining points as to Counts 1 and 2 below.

   B.      **Counts 1 And 2 Fail To Plead *Gingles* Prong 3, A Necessary Precondition To Any Challenge Under Section 2 Of The Voting Rights Act.**

Defendants have contended that Plaintiffs failed to allege the third *Gingles* prong, namely that, as to any challenged district, white voters vote sufficiently as a bloc to usually defeat the minority's preferred candidate. *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). Though Plaintiffs already intend to amend their allegations regarding the Voting Rights Act, they refuse to cure this defect, presumably because they cannot prove what they fail to allege.

As discussed in Defendants' supporting Memorandum at pages 4-6, the Amended Complaint, which alleges the other two *Gingles* factors sufficiently, and does so district-by-district, dances around the third *Gingles* prong with a vague statewide allegation: "Racial bloc voting is pervasive in Illinois, both among majority and minority groups." (Am. Complt., ¶ 106.) This allegation does not allege *polarization*—that whites vote as a bloc *against* the minority-preferred candidate—nor does it allege that polarized white-bloc voting is *usually successful* in defeating the minority's chosen candidate. Moreover, it does not plead the allegation of white-bloc polarization as to each district under challenge, as required. *Gingles*, 478 U.S. at 59 n.28 (third prong must be established as to each district challenged, each district being a "separate

1

vote dilution claim[]"); *see Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y. 2004), *aff'd*, 543 U.S. 997 (2004).  Notably, at no point in their Response do Plaintiffs deny that the third *Gingles* prong requires all of these facts.

Instead, Plaintiffs continue to tiptoe around the topic.  They claim that paragraph 106, "combined with the remaining allegations in the Amended Complaint regarding the *Gingles* factors (Am. Complt. ¶¶ 103-133), sufficiently states a Section 2 claim."  (Resp. at 3 (parentheses in original).)  That is no answer at all.  Plaintiffs do not even try to cite any allegations in their Amended Complaint where they pleaded racial polarization or that polarized white-bloc voting usually succeeds in defeating the minority-preferred candidate.  Nor do they attempt to suggest that they made any such allegations on a district-by-district basis.

Plaintiffs seem content to suggest that they do not have to plead the *Gingles* factors, notwithstanding that they are necessary elements to a Section 2 claim.  (Resp. at 4.)  They are mistaken on that score as well.  *See*, *e.g.*, *Hall v. Virginia*, 385 F.3d 421, 423, 432 (4th Cir. 2004) (affirming dismissal of Section 2 claim for failure to plead the first *Gingles* factor); *Guy v. State of Delaware*, CIV.A. 00-831-KAJ, 2003 WL 22005853 at * 2 (D. Del. 2003) (dismissing Section 2 claim for failure to allege prong three of *Gingles*).

This Court should question why, even in their Response, Plaintiffs refuse to articulate the necessary language for *Gingles* prong three in order to state a claim for a Voting Rights Act challenge. They spend two pages on this topic but never state the words affirmatively as to any challenged districts.  If Plaintiffs sincerely have a good-faith belief that they can satisfy *Gingles* prong three regarding each district they challenge, then they should have no trouble pleading those facts.  Otherwise, Plaintiffs should dismiss their challenges to districts where they know they cannot satisfy this prerequisite to a Section 2 claim.

### C. Counts 1 and 2 Fail To Give Notice As To Which Districts Plaintiffs Challenge Under Section 2 of the Voting Rights Act.

The Amended Complaint does not identify or otherwise give Defendants notice of the specific districts Plaintiffs claim are in violation of Section 2. Plaintiffs do not dispute this failure. They simply say they have no such obligation, contending that Defendants and this Court will have to wait until October 21, when they produce their expert's report. (Resp. at 4.)

As recited in Defendant's supporting Memorandum at pp. 7-8, Counts I and II allege no more than that the "Redistricting Plan violates Section 2 . . . ." (Am. Complt., pp. 21-22.) As Defendants acknowledged previously, Plaintiffs do specify certain districts in the general allegations of the Amended Complaint. But the problem is that in listing those few districts, Plaintiffs employ a qualifier, "including but not limited to," by which they apparently attempt to reserve the right to specify additional districts in the future. (Am. Complt., ¶ 133.)

Defendants obviously must prepare a defense, and it must begin before October 21. Fact witnesses must be disclosed by September 16. Fact discovery closes on October 14. If Defendants do not even know which districts are being challenged under Section 2, how can they disclose witnesses and pursue oral and written discovery in a meaningful, thorough and timely manner? Defendants previously cited *Kyle v. Morton High School*, 144 F.3d 448, 455 (7th Cir. 1998), involving a claim of wrongful termination in violation of the First Amendment, where the Seventh Circuit affirmed the dismissal of the claim because plaintiff did not specify in his complaint the protected speech that led to his termination. The court's reasoning is apt here:

> the defendants' ability to even investigate Kyle's claim is frustrated by this complaint. For example, the Morton School Board cannot ask its board members if they were aware of the speech, conduct, or political association engaged in by Kyle—because none is alleged. How can the School Board determine whether the speech engaged in by the plaintiff was not protected, when they have no idea to what speech, if any, Kyle is referring? "There must be sufficient facts pleaded to allow the court and the defendants to understand the gravamen of the plaintiff's complaint."

3

*Id*. (quoting *Doherty v. City of Chicago,* 75 F.3d 318, 326 (7th Cir.1996)).

The map at issue was signed into law on June 3. (Am. Complt., ¶ 97.) Plaintiffs have had over three months to evaluate every House and Senate district and confer with their experts. Plaintiff should either be limited to the few districts identified in the Amended Complaint or be required, without further delay, to specifically identify each district which they claim does not comply with the requirements of Section 2 of the Voting Rights Act.

**II.     Counts 3 and 4, Which Attempt to Assert Political Gerrymander Claims, Must be Dismissed under *Vieth v. Jubelirer*.**

Plaintiffs' purported defense of Counts 3 and 4, their political gerrymander claims, effectively concedes why these counts should be dismissed. Plaintiffs' Response relies solely on the premise that while a four-member plurality of the Supreme Court has held that political gerrymander claims are non-justiciable, a majority of the Court has yet to do so. Thus, Plaintiffs cling to the hope, first, that some standard may eventually be formulated to define the elements of a viable political gerrymander claim and, second, that the allegations of the Amended Complaint in this case are somehow sufficient to meet that yet-to-be-formulated standard.

As Justice Scalia's plurality opinion in *Vieth* makes clear, political gerrymander claims have all failed because "no judicially discernable and manageable standards for adjudicating political gerrymandering claims have emerged." *Vieth v. Jubelirer*, 541 U.S. 267, 281 (2004). The Court in *Vieth* considered and rejected many attempted standards for political gerrymander claims. For example, the Court rejected a "totality of the circumstances" test, *id*. at 291, as well as a "predominant intent" standard. *Id*. at 284. The Court also rejected the two-pronged (intent and effect) standard set forth in *Davis v. Bandemer*, 478 U.S. 109 (1986), measuring plaintiffs' "direct or indirect influence on the elections of the state legislature as whole." *Id*. at 282. The plurality rejected Justice Stevens' proposed use of racial gerrymandering analysis, *id*. at 293-294,

4

a Title VII-based standard proffered by Justice Souter, *id*. at 295, and Justice Breyer's proposed "unjustified entrenchment" standard. *Id*. at 299. The Court has also subsequently rejected both a "sole intent" test and a proposed "symmetry standard." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 418-420 (2006) ("*LULAC*").

Knowing all of this, Plaintiffs do not even try to articulate a standard. Instead, they land precisely where every other political gerrymander plaintiff has landed and simply claim that the Redistricting Plan is *unfair* to them. (Resp. at 8 ("the Redistricting Plan…will *unfairly* result in a substantial Democratic majority" (emphasis supplied).) Counts 3 and 4 should be dismissed because this is precisely where *Vieth* has cautioned plaintiffs cannot go in search of a standard. *Vieth*, 541 U.S. at 291 ("'Fairness' does not seem to us a judicially manageable standard" because "some criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking.").

Plaintiffs also predictably grab onto Justice Kennedy's concurring opinion in *Vieth* for the proposition that political gerrymander claims remain justiciable, but that is no help to them. First, Justice Kennedy specifically agreed with the plurality that the *Vieth* political gerrymander claims "must be dismissed." *Id*. at 306 (Kennedy, J., concurring). Second, and more importantly, Justice Kennedy further agreed that the *Vieth* plaintiffs failed to allege an adequate standard against which to measure their political gerrymander claim. *Id*. at 311 ("no such standard has emerged in this case…"). Although Justice Kennedy did not go as far as the plurality, noting that "in another case a standard might emerge," *id.* at 312, at most his separate concurrence allowed only for the possibility that a plaintiff may be able to do what no other plaintiff has ever

5

done—plead and prove an adequate standard for measuring political gerrymandering claims. As noted above, Plaintiffs have not even tried to come up with such a standard.

Indeed, as recently as two weeks ago, a three-judge court rejected the notion that Justice Kennedy's concurrence in *Vieth* did anything more than leave open the mere possibility that some new standard might emerge for a future political gerrymander claim. *See Perez v. Texas*, No. 11-CA-360-OLG-JES-XR, Order of September 2, 2011, at pp. 21-22 (attached as Exhibit A). The court in *Perez* dismissed a political gerrymander claim, noting that plaintiffs' failure to articulate a manageable standard was found by a *majority* of the Court in *Vieth* (Justice Kennedy included) to require dismissal under Rule 12(b)(6). *Id*.

Where, as here, Plaintiffs' claims fail "to give shape to a reliable standard for identifying unconstitutional political gerrymanders," they must be dismissed because "they state no claim on which relief may be granted for their statewide challenge." *LULAC*, 548 U.S. at 423. Here, Counts 3 and 4, and for that matter Plaintiffs' Response Memorandum, fail to allege any standard, much less a reliable one. Like the political gerrymander claims in *Vieth* and *LULAC*, Counts 3 and 4 fail to state a claim.

**III.    Count 5 Should Be Dismissed.**

    **A.    Count 5's Facial Challenge Should Be Dismissed.**

While attempting to justify their facial challenge to the Illinois Voting Rights Act (the "IVRA"), Plaintiffs do not (and cannot) deny the bedrock principle that the drafters of a redistricting map may take race into consideration, as long as it is not the predominant consideration. *Easley v. Cromartie*, 532 U.S. 234, 241 (2001); *Bush v. Vera*, 517 U.S. 952, 958 (1996); *Barnett v. Daley*, 32 F.3d 1196, 1199 (7th Cir. 1994). Plaintiffs' concession in this regard defeats their facial challenge to the IVRA. If a redistricting map can take race into

6

account as long as race does not predominate, then legislation concerning how that map is drawn, which does nothing more than provide for that same limited consideration of race in specific circumstances, must also be constitutional. At a bare minimum, it surely cannot be said that "no set of circumstances exists under which [the IVRA] would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987).

As discussed in greater detail in Defendant's supporting Memorandum at pp. 13-15, the IVRA contains two separate provisions mandating that mapmakers may not prioritize the non-fracturing of minorities over the demands of the U.S. Constitution, federal Voting Rights Act, or State Constitution. 10 ILCS 120/5-5(a), (d). If the only way to prevent the splitting of a sizeable minority group is to draw districts that do not otherwise comply with constitutional or statutory law, drafters are explicitly prohibited from doing so. If the only way to avoid the fracturing of minority voters is to subordinate all other redistricting principles to that goal, then the Illinois General Assembly may not do so—the IVRA expressly forbids it.

Plaintiffs casually dismiss the portions of the IVRA that expressly forbid using race as the predominant factor in redistricting as "perfunctory" language. (Resp. at 10.) They cannot have it both ways. They cannot seize on certain language in the IVRA that suits their purpose but then ignore explicit prohibitory language that defeats their claim. The IVRA's provision that it may not be "construed, applied, or implemented in a way that imposes any requirement or obligation that conflicts with the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, or the Illinois Constitution," is a direct mandate that the state legislature must follow, every bit as much as it must follow the *subordinate* provision that forms the basis of Plaintiffs' claim. 10 ILCS 120/5-5(d). Under any plain reading of the IVRA, the

language of subsection (d), and the language in subsection (a) subordinating the IVRA to these federal and constitutional dictates, *trumps* the language Plaintiffs cite as the basis for their claim.

Plaintiffs cite to cases where race was made a factor in college admissions, school assignments, and contracting set-asides. (Resp. at 9-10.) *See Gratz v. Bollinger*, 539 U.S. 244 (2003); *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989). But those cases are inapposite because they did not involve redistricting, where race *may* constitutionally be considered in drawing legislative districts. Simply put, as the case that established the *Shaw* doctrine explained, redistricting is different: "redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines . . . ." *Shaw v. Reno*, 509 U.S. 630, 646 (1993). Those words were never truer than in the context of the IVRA. The challenged language of the IVRA only applies in the very limited context where it would be almost impossible to ignore the factor of race—where a group of cohesive minority voters residing in a geographic area comprises less than a voting-age majority of a district, yet is sufficient in size that it can achieve electoral relevance with assistance from white voters or other minorities, or simply by exerting some influence in the outcome of an election. 10 ILCS 120/5-5(b). When presented with such a sizeable group of minority voters, it would be literally impossible to pretend they do not exist. The IVRA simply provides that these minorities not be fractured into different districts at the expense of their ability, otherwise, to influence the outcome of an election—if, of course, such a goal can be accomplished without conflicting with constitutional requirements such as the *Shaw* doctrine. Indeed, the IVRA reflects as a redistricting principle what the Supreme Court observed in *Miller v. Johnson*: "'[W]hen members of a racial group live together in one community a reapportionment plan that

8

concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes.'" 515 U.S. 900, 920 (1995) (quoting *Shaw*, 509 U.S. at 646).

It is well-established under controlling case law that States may consider race to a limited extent in redistricting. What are known as "majority-minority districts" may lawfully be drawn, even beyond what the federal Voting Rights Act requires, as long as race does not predominate. *Voinovich*, 507 U.S. 146, 155-56 (1993); *Bush*, 517 U.S. at 993 (O'Connor, J., concurring). And States have the right to draw crossover, coalition, or influence districts, provided racial considerations do not predominate. *Georgia v. Ashcroft*, 539 U.S. 461, 480-83 (2003); *Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 1248-49 (2009). The IVRA goes no further than what the Supreme Court has already upheld as entirely lawful.

    **B.**    **Plaintiffs' As-Applied "Statewide" *Shaw* Claim Must Be Dismissed For Lack Of Standing And Failure To State A Claim.**

In Count 5, Plaintiffs also allege that P.A. 97-6, *as a whole*, constitutes a racial gerrymander. (Am. Complt. ¶ 175.) This syllogism, unprecedented among *Shaw*'s progeny, seems to be as follows: the IVRA mandates race as the predominant factor in district drawing (a demonstrably false statement); the IVRA's provisions influence the geographic dimensions of every single district in Illinois (a gross overstatement); since the IVRA's provisions were considered in drawing every single district, it *automatically* follows that the *only* factor map drawers considered in every single district was race (a wildly speculative, as well as false, proposition); therefore, every single district is a racial gerrymander *as a matter of law*. There is no need for individualized district-by-district proof under Plaintiffs' theory; the Court can not only jettison the "presumption of good faith that must be accorded to legislative enactments," *Miller*, 515 U.S. at 916, but also ignore its duty to "exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race." *Easley*, 532 U.S. at

9

242 (emphasis in original) (quoting *Miller*, 515 U.S. at 916). In Plaintiffs' view, if a state law that, at most, would theoretically apply to a handful of districts is facially invalid, P.A. 97-6 falls in its entirety without further consideration.

First, Defendants demonstrated above that the IVRA goes to great lengths to ensure that race will not predominate in the drawing of any district lines. Second, as Defendants have also explained *supra*, and in their supporting Memorandum at p. 18, on its face the IVRA only applies in a very unique scenario where a cluster of minority voters has less than a voting-age majority of a district, but is sizeable enough to exert some electoral impact. Plaintiffs, whose counsel were closely involved in Illinois's redistricting process in 2011, know full well that the vast majority of the 118 House districts come nowhere close to falling into this discrete category. Even a cursory review of House Resolution 385, which among other things outlined the demographics of each House district, confirms this fact without any doubt. *See* H. Res. 385, 97th Ill. Gen. Assembly. Third, the mere fact that a cluster of minorities were kept in a single district does not necessarily mean that the only factor map drawers considered was race. The preservation of such a minority group could have been the result of adherence to many other redistricting principles: they could have been included together for partisan reasons; they could have shared socioeconomic, religious or other interests; they might be located in the core of the existing district; they might all be constituents of the same incumbent who wanted to preserve those relationships; they could all be located within a certain political boundary; these are but a few examples. The fact that the inclusion of minorities in one district *happened* to comply with the IVRA does not mean that they were preserved as a group *solely because of* the IVRA. And it certainly would not automatically mean that racial considerations predominated over all else.

Plaintiff's unprecedented statewide *Shaw* challenge should be dismissed for a more fundamental reason as well: there is no such thing as a statewide *Shaw* claim. A *Shaw* challenge is a district-specific claim. *Thompson v. Smith*, 52 F. Supp. 2d 1364, 1371 (M.D. Ala. 1999) (three-judge court). The Supreme Court has never recognized a statewide *Shaw* claim and has effectively foreclosed it by limiting standing to raise a *Shaw* claim to voters residing in the challenged district. *U.S. v. Hays*, 515 U.S. 737, 744-45 (1995); *Bush*, 517 U.S. at 957-58; *Shaw v. Hunt*, 517 U.S. 899, 903-04 (1996); *Miller v. Johnson*, 515 U.S. 900, 909 (1995). Even a voter residing in a neighboring district, whose boundaries were affected by the alleged gerrymander next door, lacks standing to challenge that alleged gerrymander. *Sinkfield v. Kelley*, 531 U.S. 28, 30-31 (2000). Thus, while Plaintiffs are correct that Plaintiff Adam Brown theoretically may raise a *Shaw* challenge to Representative District 96 where he resides—even though Mr. Brown and 71% of his fellow District 96 residents are Caucasian—he cannot challenge the other 117 districts in the map. Such a result would run directly contrary to *Hays* and subsequent case law. Either based on lack of standing or failure to state a claim, the "statewide" *Shaw* challenge must be dismissed.[1]

### C. The As-Applied Challenge To Unnamed Districts Should Be Dismissed.

In their supporting Memorandum on page 20 (*see* Argument IV-B-2), Defendants moved to dismiss the remainder of the as-applied *Shaw* challenge in Count 5, embodied in paragraph 136 of the Amended Complaint, alleging that "[c]ertain of the districts in the Redistricting Plan *including*, *but not limited to*, Representative District 96, are of a shape so bizarre on their face

---

[1] Plaintiffs cite to *Baker v. Carr*, 369 U.S. 186 (1962) as an example of a "statewide" claim. (Resp. at p. 10.) In *Baker*, Tennessee had not redrawn its districts in 60 years, and plaintiffs filed a class action representing voters in counties whose population had grown such that they were vastly underrepresented in the state legislature proportionate to their population. *Id*. at 204-05. That one-person, one-vote cause of action necessarily implicated the entire state; the injury was caused by one part of the state having undue dominance in the legislature over the other because of population disparities. That is wholly different from a *Shaw* challenge, which does not compare one voter's treatment to the other, but simply focuses on the predominant use of race to draw a voter's district.

11

that the shape can only rationally be understood to be an effort to separate voters into different districts on the basis of race." (Am. Complt. ¶ 136 (emphasis supplied).) Plaintiffs have not responded to this portion of Defendants' argument and therefore should be deemed to have conceded dismissal. *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999); *Jacobeit v. Rich Twp. High Sch. Dist. 227*, 673 F. Supp. 2d 653, 659 (N.D. Ill. 2009).

Regardless of Plaintiffs' waiver, this portion of Count 5 should be dismissed for the same reasons articulated above with regard to those Voting Rights Act claims that similarly contained "including but not limited to" language. With witness disclosures due within a week of this filing and discovery deadlines around the corner, Defendants have absolutely no idea what districts are subject to a *Shaw* challenge and are prejudiced in their ability to prepare a defense. The only district identified in paragraph 136 is District 96, which is the subject of a *Shaw* challenge in a separate count (Count 6). Thus, removing District 96 from that sentence, Count 5 *does not identify a single district* that supposedly violates *Shaw*. Plaintiffs cannot possibly argue that this is notice of any kind whatsoever, which is presumably why they have not responded to this portion of the motion to dismiss. What is particularly noteworthy is that this allegation is based solely on the "shapes" of the districts, which Plaintiffs have been able to view since at least June 3. If Plaintiffs cannot identify any other "bizarre shapes" by now, they will not ever do so. And if they can, one wonders why they have chosen not to say so. The as-applied *Shaw* challenge should be dismissed.

**IV.  Plaintiffs Radogno, Cross and Brown Cannot Sue In Their Official Capacities.**

Plaintiffs argue that Thomas Cross and Christine Radogno have standing to sue in their official capacity "as Minority Leaders in the Illinois House of Representatives and the Illinois Senate" (Resp. at 11), implicitly conceding that Adam Brown, in his official capacity as a state

legislator, should be dismissed. *See Kirksey*, 168 F.3d at 1041. But Cross and Radogno's official-capacity suit is incompatible with establishing the "*personal injury*" standing requires. *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (emphasis in original) (internal quotations omitted).

As injury, Plaintiffs claim that the Redistricting Plan interferes with Cross and Radogno's ability to "represent[] the interests of their caucuses and Republican voters throughout the state." (Resp. at 12.) But Plaintiffs have not established that such "representation" is among Cross and Radogno's official duties—Article IV, § 6(c) of the Illinois Constitution, on which plaintiffs rely (Resp. at 12), recognizes Minority Leaders "[f]or purposes of powers of appointment conferred by this Constitution" only. Either way, Cross and Radogno's claimed injury is not personal to them: if they "were to retire tomorrow, [they] would no longer have a claim; the claim would be possessed by [their] successor[]s instead." *Raines*, 521 U.S. at 821. Thus, in *Raines*, the Supreme Court distinguished a challenge brought an elected Congressman, Adam Clayton Powell, to his exclusion from the House of Representatives; the Court explained that Powell had standing because he had "been deprived of something to which he personally was entitled"—his seat (and accompanying salary) after his constituents had elected him. *Id.* (internal quotations omitted) (discussing *Powell v. McCormack*, 395 U.S. 486 (1969)). Because the Redistricting Plan does not prohibit Cross and Radogno personally from assuming their elected role as Minority Leaders, they cannot establish standing.

Plaintiffs' cases resolving First Amendment claims by political groups (Resp. at 13), none of which address standing, do not compel a different result. "It is common ground that . . . organizations can assert the standing of their members." *Summers v. Earth Island Institute*, 129 S. Ct. 1142, 1149 (2009). "An association has standing to sue or defend in such capacity, however, only if its members would have standing in their own right." *Arizonans for Official*

13

*English v. Arizona*, 520 U.S. 43, 65 (1997).  Thus, an organization's members may confer standing on the organization, but the converse is not true: even if the Illinois Republican Party has standing to challenge the Redistricting Plan, Cross and Radogno do not have standing simply because they share common interests with the IRP (as Plaintiffs assert, *see* Resp. at 12-13).

Nor is Defendants' reliance on *Raines*, *Nevada Commission on Ethics v. Carrigan*, 131 S. Ct. 2343 (2011), and *Quilter v. Voinovich*, 981 F. Supp. 1032 (N.D. Ohio 1997), "misplaced," as Plaintiffs claim.  (Resp. at 13-14.)  Plaintiffs selectively quote from *Raines*, which recognized only one type of "discriminatory," "institutional injury" that might confer standing on legislators suing in their official capacity: a claim "that their vote was denied or nullified in a discriminatory manner (in the sense that their vote was denied its full validity in relation to the votes of their colleagues)." 521 U.S. at 821 & n.7.  Cross and Radogno have no claim that their vote was or will be "nullified" or even that they are less able than their Democratic counterparts to serve as legislative Leaders; thus, they do not fit within the narrow exception identified in *Raines*.  By contrast, the legislator plaintiff in *Carrigan* falls squarely within the *Raines* rule: state law denied him, but not other legislators, a vote on certain matters.  *See* 131 S. Ct. at 2346-47.  Finally, there is no material difference between this case and *Quilter*.  There, as here, "plaintiffs' alleged injury . . . resulted from the majority's decision to choose a course of action that the outnumbered members thought to be unconstitutional." 981 F. Supp. at 1038.  But neither the plaintiffs' legislative defeat nor their "relationship" to "the voters of Ohio" sufficed to establish standing. *Id.*  Plaintiffs Cross, Radogno and Brown should be dismissed in their official capacities.

**V.     As Plaintiffs Concede, Counts 7 and 8 Should Be Dismissed, And The State Board Of Elections Should Be Dismissed As To Counts 3 Through 8.**

Plaintiffs concede that Counts 7 and 8 are barred by the Eleventh Amendment, and that the Defendant State Board of Elections is not subject to suit under Counts 3 through 8 for the same reason. (Resp. at 3 n.1.) Dismissal is therefore proper in both instances.

WHEREFORE, Defendants respectfully pray that this Honorable Court dismiss the Amended Complaint in its entirety.

Respectfully submitted,

By: /s/ Richard J. Prendergast, Esq.
One of the Attorneys for Defendants Illinois State Board of Elections, its Executive Director, and individual members

| | |
|---|---|
| Brent D. Stratton<br>Chief Deputy Attorney General<br>Office of the Illinois Attorney General<br>100 W. Randolph, 12th Floor<br>Chicago, IL 60601<br>(312) 814-4499 | Richard J. Prendergast<br>Michael T. Layden<br>Special Asst. Attorneys General<br>Richard J. Prendergast, Ltd.<br>111 W. Washington St., Suite 1100<br>Chicago, Illinois 60602<br>(312) 641-0881 |

| | | |
|---|---|---|
| David W. Ellis<br>Special Asst. Attorney General<br>402 State House<br>Springfield, IL 62706<br>(217) 782-3392 | Eric M. Madiar<br>Special Asst. Attorney General<br>605 State House<br>Springfield, IL 62706<br>(217) 782-2156 | Michael J. Kasper<br>Special Asst. Attorney General<br>222 N. LaSalle St., Suite 300<br>Chicago, IL 60601-1013<br>(312) 405-3292 |