**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, CHLOE MOORE, JOE TREVINO, ANGEL GARCIA, ELIDIA MARES, EDWIN TOLENTINO, and THE ILLINOIS REPUBLICAN PARTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | NO. 1:11-cv-04884 |
| vs | ) ) ) | Judge Elaine E. Bucklo Judge Diane S. Sykes Judge Philip P. Simon |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, AFRICAN AMERICANS FOR LEGISLATIVE REDISTRICTING, and LATINO COALITION FOR FAIR REPRESENTATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Like a periodic comet, once every ten years this Court sees a challenge to the redistricting of Illinois's state legislative districts. The comet is back before us in the form of an Amended Complaint brought by a mix of citizen-voters, Republican state legislators, and interested parties who claim, for one reason or another, that the redistricting plan recently passed by the Illinois Legislature runs afoul of various state and federal laws. The Defendants – the Illinois State

Board of Elections and its members – have now filed a motion to dismiss [DE 28] which, for the reasons stated below, will be granted in part and denied in part.

## BACKGROUND

The federal Census occurs once every ten years, which provides states with new population data and an opportunity to redraw their legislative districts. In Illinois, the state Constitution provides that "in the year following each Federal decennial census year, the General Assembly by law shall redistrict the Legislative and the Representative Districts." Ill. Const., art. IV, § 3(b). Illinois has 59 Legislative (or "Senate") districts and 118 Representative (or "House") districts; each Senate district is composed of two House districts.

Illinois's 2011 redistricting process occurred throughout the spring and summer of this year. The Illinois Senate and House each formed redistricting committees. Those committees held public hearings throughout the state during March, April, and May. Plans for the new districts were proposed and amended throughout late May, and on June 3, 2011 the General Assembly Redistricting Act of 2011 was signed into law, which cemented the new map of 118 House districts and 59 Senate districts.

Plaintiffs Christine Radogno, Thomas Cross, Adam Brown, Veronica Vera, Chloe Moore, Joe Trevino, and Angel Garcia filed their complaint on July 20, 2011, and then filed an amended complaint on August 10, 2011. The Amended Complaint adds two more plaintiffs – Elidia Mares and Edwin Tolentino – and challenges the redistricting map in eight counts that raise, variously, the federal Voting Rights Act of 1965, the First and Fourteenth Amendments, the Illinois Voting Rights Act of 2011, and the Illinois Constitution. The Illinois Republican

Party was granted leave to intervene as a plaintiff in the case on August 20, 2011, and it has

adopted the Amended Complaint as its own.

## DISCUSSION

The Defendants raise a variety of arguments in favor of dismissal for each of the eight

counts in the Amended Complaint. Simplifying things somewhat, Plaintiffs agree that the

Illinois State Board of Elections should be dismissed as a defendant from Counts 3 through 8 and

that Counts 7 and 8 should be dismissed in their entirety. So Defendants' motion will be granted

as to that Defendant and those counts without further discussion. We will consider the

remaining six counts in detail below.

### Counts 1 and 2

The first two counts of the Amended Complaint allege that some of the House districts

dilute the voting power of African-Americans (Count 1) and Latinos (Count 2), in violation of

Section 2 of the federal Voting Rights Act. Count 1 focuses on House districts 7 and 114; Count

2 focuses on House districts 1, 2, 21, 22, 23, 60, 77 and 83, but also states that it is "not limited

to" these districts. [DE 21 at 18.]

Section 2 violations exist when minority plaintiffs prove that they have been denied an

equal opportunity to participate in the political process and to select candidates of their choice in

a particular representative district. 42 U.S.C. 1973(b). The Supreme Court in *Thornburg v.*

*Gingles*, 478 U.S. 30 (1986) established a three-prong framework for analyzing Section 2 claims:

> Plaintiffs must show three threshold conditions: first, the minority group "is
> sufficiently large and geographically compact to constitute a majority in a
> single-member district"; second, the minority group is "politically cohesive"; and
> third, the majority "votes sufficiently as a bloc to enable it . . . to defeat the
> minority's preferred candidate." Once plaintiffs establish these conditions, the
> court considers whether, "on the totality of circumstances," minorities have been

> denied an "equal opportunity" to "participate in the political process and to elect
> representatives of their choice." 42 U.S.C. § 1973(b).

*Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (quoting *Gingles*) (ellipsis in original; internal

citations omitted).

The first thing to note about Section 2 claims is that they are district-specific, which

means, among other things, that for plaintiffs to have standing to bring a claim in any given

district they must be registered voters residing in that district. *See United States v. Hays*, 515

U.S. 737, 745 (1995) (as a matter of standing, plaintiffs stating race-based equal protection

challenges to redistricting must be voters who actually reside in the districts they are

challenging); *Whitcomb v. Chavis*, 403 U.S. 124, 137 n. 17 (1971) (in electoral districting cases,

the plaintiff must be a resident of the challenged district to have standing to sue). As Defendants

rightly point out, with respect to districts 1, 22, 23, 77, 83, and 114, the Amended Complaint

alleges that one of the Plaintiffs resides in the district, but it fails to make the additional

allegation that the resident-plaintiff is also registered to vote in that district. Moreover, with

respect to districts 2, 7, 21, and 60, the Amended Complaint does not identify any registered

voter residing in the district. Therefore, Plaintiffs have not adequately alleged standing for any

of the specifically identified districts that they seek to challenge. Plaintiffs now acknowledge

this oversight and have proposed that they be given leave to file a Second Amended Complaint

in order to insert the necessary allegations. That request will be granted.

There are, however, additional defects in Counts 1 and 2 that also need to be corrected if

those counts are to go forward. First, while Plaintiffs have specifically pointed to some of the

challenged districts, the Amended Complaint also states that the counts are "not limited to" these

districts. Since *Gingles* claims are district-specific, this qualifier is unacceptable. Plaintiffs must

4

specifically identify each district they are challenging and demonstrate that at least one of them has standing to challenge that district.

Moreover, Plaintiffs have failed to sufficiently allege the third *Gingles* prong – i.e., that in each of the challenged districts the majority "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. The closest they ever get to this prong is in Paragraph 106 of the Amended Complaint, where they allege that "racial bloc voting is pervasive in Illinois, both among majority and minority groups." [DE 21 at 15.] But this allegation is entirely too broad: it is not specific to any of the challenged districts, nor does it actually allege that the purported racial bloc voting is sufficient to defeat the minority's preferred candidate in each of those districts.

Plaintiffs counter by saying that fact-pleading of every element is not required in federal court. That's true, but "[e]ven notice pleading requires pleading the elements" of a claim, *Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 574 (7th Cir. 2009), and Plaintiffs' Amended Complaint doesn't come close to sufficiently pleading the third *Gingles* element. In fact, we are skeptical as to whether the Amended Complaint even sufficiently pleads the first *Gingles* element – whether the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district" – for each challenged district. *Gingles*, 478 U.S. at 50. Plaintiffs only make the allegation that districts 7, 23, 60, and 114 are "sufficiently large and geographically compact," but never make this allegation with respect to districts 1, 2, 21, 22, 77, and 83.

Therefore, in amending Counts 1 and 2 of their Amended Complaint, Plaintiffs must include allegations for *each* challenged district sufficient to indicate that at least one of the

5

plaintiffs has standing to challenge that district and that it satisfies *each* of the three *Gingles* prongs for *each* of the districts they believe violates Section 2 of the federal Voting Rights Act.

## Counts 3 and 4

Counts 3 and 4 bring claims for political gerrymandering under the First and Fourteenth Amendments, respectively.

We'll first address the standing issue raised by these two counts before turning to the murky world of the merits of political gerrymandering claims. Plaintiff Radogno is the Minority Leader of the Illinois Senate and brings her claims only in her official capacity. Plaintiff Cross is the Minority Leader of the Illinois House and also brings his claims only in his official capacity. Plaintiff Brown is a state representative from what is currently the 101st Representative District. His claims are alleged in both his official capacity and individually as a registered voter and citizen living in what would be District 96, if the new redistricting plan is upheld. (Brown's individual standing to challenge District 96 – the subject of Count 6 – is discussed below.)

Plaintiffs' Response brief did not address the challenge to the official-capacity standing of Brown. Plaintiffs did respond to the challenges to Radogno and Cross, though they are not particularly specific as to which counts they believe Radogno and Cross have standing to assert. Nevertheless, all of their arguments on this issue really revolve around the political gerrymandering claims, so it makes sense to address the challenge to the standing of Radogno and Cross here. [*See* DE 40 at 12 ("[T]he Redistricting Plan . . . systematically and unequally burdens the ability of Leaders Cross and Radogno to carry out their constitutionally prescribed duty of representing the interests of their caucuses and Republican voters throughout the State.").]

6

The standing analysis for political gerrymandering claims is complicated by the largely unresolved status of political gerrymandering claims in general. That is, even if such claims are theoretically viable – which we discuss more below – it is not particularly clear who would have standing to bring them. In *Vieth v. Jubelirer*, 541 U.S. 267 (2004), for example, Justice Stevens suggested that the standing analysis for racial and political gerrymander claims should be the same, which would require that plaintiffs bringing political gerrymander claims be registered voters who reside in the challenged districts. *Vieth*, 541 U.S. at 328 (Stevens, J., dissenting). Justices Souter and Ginsburg proposed the same analysis. *Vieth*, 541 U.S. at 347 (Souter, J., dissenting).

Moreover, the standing analysis for Radogno and Cross to bring these claims is further complicated by the limited circumstances under which legislators have standing in their official capacity. Under the standard set in *Raines v. Byrd*, 521 U.S. 811 (1997), a legislator-plaintiff only has official-capacity standing when actions "deprive individual legislators of something to which they are personally entitled . . . [like] the 'effectiveness of their votes.'" *Alaska Legislative Council v. Babbitt*, 181 F.3d 1333, 1337 (D.C. Cir. 1999) (citing *Raines*). But when a legislator only alleges an "abstract dilution of institutional legislative power," that is insufficient to confer any official-capacity standing. *Raines*, 521 U.S. at 826.

In this case, Plaintiffs allege that the redistricting plan burdens their ability "to carry out their constitutionally prescribed duty of representing the interests of their caucuses and Republican voters throughout the State." This allegation seems more like an "abstract dilution of institutional legislative power" that would not confer any official-capacity standing under *Raines*. However, given the unsettled question of who has standing to bring a political

7

gerrymandering claims, and giving Plaintiffs the benefit of the doubt under notice pleading, we find their allegations sufficient to meet the *Raines*-standard solely for the political gerrymandering counts.

Now on to the merits of the political gerrymandering claims. For reasons of expediency and simplicity, we'll start with Count 4 of Plaintiff's Amended Complaint, which claims that the redistricting map passed by Democrats is an unconstitutional political gerrymander in violation of Republicans' equal protection rights under the Fourteenth Amendment. The caselaw addressing political gerrymandering claims under the Equal Protection Clause is foggy at best. The two most recent decisions on the issue from the Supreme Court – *Vieth* and *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006) – are cobbled-together plurality opinions that place district courts in the untenable position of evaluating political gerrymandering claims without any definitive standards. *See LULAC*, 548 U.S. at 512 (Scalia, J., concurring in part and dissenting in part) (the Court's political gerrymandering jurisprudence "provides no guidance to lower court judges and perpetuates a cause of action with no discernible content").

The two critical questions raised – and left basically unanswered – by *Vieth* and *LULAC* are: 1) Are political gerrymandering claims justiciable as equal protection claims under the Fourteenth Amendment? 2) If so, is there a manageable and reliable standard of fairness by which to evaluate these claims?

In *Vieth*, a district court sitting with a three-judge panel granted a motion to dismiss the plaintiffs' political gerrymandering claims. On direct appeal to the Supreme Court, a four-justice plurality opinion affirmed this dismissal, concluding that political gerrymandering claims

are nonjusticiable political questions because no judicially discernible and manageable standard for adjudicating such claims exists. *Vieth*, 541 U.S. at 305-06 (plurality). Justice Kennedy concurred with the plurality in so much as he agreed that plaintiffs' political gerrymandering claims had to be dismissed, but he would not "foreclose all possibility of judicial relief if some limited and precise rationale were found to" decide political gerrymandering claims in the future. *Vieth*, 541 U.S. at 306 (Kennedy, J., concurring).

The plurality judgment of the Court in *Vieth* thus appears to be that political gerrymandering claims are justiciable, but subject to dismissal because no definitive standard yet exists to judge them. This leaves lower courts evaluating political gerrymandering claims in a difficult position. Justice Scalia invited lower courts to treat Justice Kennedy's opinion "as a reluctant fifth vote against justiciability at district and statewide levels – a vote that may change in some future case but that holds, for the time being, that this matter is nonjusticiable." *Vieth*, 541 U.S. at 305 (plurality).

Two years later, *LULAC* did little to clarify the issues for lower courts. In another plurality opinion, the Court punted on the question of justiciability – finding that the issue was not before it – but held that plaintiffs' claims must nevertheless be dismissed because of "the absence of any workable test for judging partisan gerrymanders." *LULAC*, 548 at 420 (plurality). As summarized by Justice Kennedy, writing for the plurality: "a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must . . . show a burden, *as measured by a reliable standard*, on the complainants' representational rights." *LULAC*, 548 at 418 (plurality) (emphasis added). *See also Vieth*, 541 at 307-08 (Kennedy, J., concurring) (concurring in dismissal of political gerrymandering claims because "there are yet no agreed

upon substantive principles of fairness in districting, we have no basis on which to define clear, manageable, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights").

In the wake of these two cases, some courts have read *Vieth* to mean that political gerrymandering claims are simply not justiciable. *Lulac of Texas v. Texas Democratic Party*, 651 F. Supp. 2d 700, 712 (W.D. Tex. 2009) (*Vieth* held "political gerrymandering to be non-justiciable"); *Miller v. Cunningham*, 512 F.3d 98, 102 (4th Cir. 2007) (same); *Meza v. Galvin*, 322 F. Supp. 2d 52, 58 (D. Mass. 2004) (*Vieth* concluded "that political gerrymandering cases are nonjusticiable").

Other courts and commentators have reached the conclusion that "partisan gerrymanders are justiciable yet unsolvable." David Schultz, *The Party's Over: Partisan Gerrymandering and the First Amendment*, 36 Cap. U. L. Rev. 1, 1 (Fall 2007). *See*, *e.g.*, *Kidd v. Cox*, 2006 WL 1341302, at *15 (N.D. Ga. 2006) ("[T]he Court cannot ascertain from the materials submitted what manageable or politically-neutral standards might exist in this case that would make a political gerrymandering dispute based on the Equal Protection Clause justiciable."); *Shapiro v. Berger*, 328 F. Supp. 2d 496, 504 (S.D.N.Y. 2004) (dismissing political gerrymandering claim because Plaintiff had "not suggested any manageable standard under which I could evaluate such a claim if one had been advanced").

On our reading of *Vieth* and *LULAC*, political gerrymandering claims are justiciable *in principle*, but also currently unsolvable. This means that Plaintiffs' political gerrymandering claim based on the Equal Protection Clause may be justiciable, but only if they articulate a workable standard of fairness by which to assess that claim and make allegations sufficient to

give rise to a plausible inference that the redistricting plan violates the standard. Plaintiffs have

not stated any such standard in their Amended Complaint. Indeed, since the Supreme Court was

unable on two occasions to agree on any standard, it may be an exercise in futility. Nevertheless,

Plaintiffs will be given leave to amend Count 4 of their Amended Complaint in order to attempt

to provide a "workable test" or a "reliable standard" for judging partisan gerrymanders under the

Equal Protection Clause of the Fourteenth Amendment.

As noted, the preceding substantive analysis all applies to political gerrymandering

claims brought under the Equal Protection Clause of the Fourteenth Amendment. But in Count

3, Plaintiffs also allege a political gerrymandering claim under the First Amendment, a claim that

grows out of a theory offered by Justice Kennedy in his *Vieth* concurrence. He wrote:

> The First Amendment may be the more relevant constitutional provision in future
> cases that allege unconstitutional partisan gerrymandering. After all, these
> allegations involve the First Amendment interest of not burdening or penalizing
> citizens because of their participation in the electoral process, their voting history,
> their association with a political party, or their expression of political views.
> Under general First Amendment principles those burdens in other contexts are
> unconstitutional absent a compelling government interest. . . . First Amendment
> concerns arise where a State enacts a law that has the purpose and effect of
> subjecting a group of voters or their party to disfavored treatment by reason of
> their views. In the context of partisan gerrymandering, that means that First
> Amendment concerns arise where an apportionment has the purpose and effect of
> burdening a group of voters' representational rights.

*Vieth*, 541 U.S. at 314 (Kennedy, J., concurring) (citations omitted).

The four-justice plurality opinion in *Vieth* rejected the idea that the First Amendment

could be used to bring political gerrymandering claims because "a First Amendment claim, if it

were sustained, would render unlawful *all* consideration of political affiliation in districting, just

as it renders unlawful *all* consideration of political affiliation in hiring for non-policy-level

government jobs." *Vieth*, 541 U.S. at 294 (plurality). Nevertheless, Plaintiffs read Justice

11

Kennedy's concurrence as an opening for political gerrymandering claims under the First Amendment, and they thus allege in Count 3 that the redistricting plan "systematically and intentionally unfairly burdens the rights to political expression and expressive association of voters who vote Republican because of their political views" and that this is done without a "compelling reason." [DE 21 at 22.]

So from Plaintiffs' viewpoint, because the redistricting plan means that Republican voters in some districts are less likely to be successful in electing their preferred candidate, these voters' First Amendment rights of expression and association have been violated. Even assuming that this claim is justiciable – something of a big assumption, as the previous section demonstrates – we find it unpersuasive.

It is of course true that the First Amendment protects political expression and political association, particularly in the context of campaigns for political office. *Citizens United v. Fed. Election Comm'n*, __ U.S. __, 130 S.Ct. 876, 898 (2010) ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.") (internal quotations omitted). But what is the connection between the alleged burden imposed on Plaintiffs' ability to elect their preferred candidate and a restriction on their freedom of political expression? There is none. As another court rejecting these sorts of claims explained: "Plaintiffs are every bit as free under the new [redistricting] plan to run for office, express their political views, endorse and campaign for their favorite candidates, vote, or otherwise influence the political process through their expression." *Kidd*, 2006 WL 1341302, at *17. Plaintiffs' freedom of expression is simply not burdened by the redistricting plan. It may very well be that Plaintiffs' ability to *successfully elect* their preferred candidate is burdened by the redistricting

12

plan, but that has nothing to do with their First Amendment rights.  *See*, *e.g.*, *Washington v. Finlay*, 664 F.2d 913, 927-28 (4th Cir. 1981) ("The first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate do not also include entitlement to success in those endeavors.").

Nor does the redistricting plan inhibit Plaintiffs' freedom of association.  It is true that fielding candidates for political office and participating in campaigns are acts of political association and thus receive First Amendment protection.  *See Eu v. S.F. County Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) (noting freedom of association includes the freedom "to select a standard bearer who best represents the party's ideologies and preferences") (internal quotations omitted).  But the redistricting plan at issue here "has no effect on Plaintiffs' ability to field candidates for office, participate in campaigns, vote for their preferred candidate, or otherwise associate with others for the advancement of common political beliefs."  *Kidd*, 2006 WL 1341302, at *17.  It thus does not restrict in any way Plaintiffs' freedom of association under the First Amendment.

In the end, the Amended Complaint does not allege a cognizable claim for political gerrymandering under the First Amendment.  We entirely endorse the conclusion reached by *Kidd*:

> [B]ased on our review of First Amendment jurisprudence in the election context, we find the deleterious effects of political gerrymandering on the ability of a political party and its voters to elect a member of the party to a seat in the state legislature implicates no recognized First Amendment right.  The party and its voters remain free to associate with whom they please, field candidates of their choice, campaign, vote, and express their political views.  What Plaintiffs demand is the right to have their views represented in state government by the representative of their choice.  We decline to recognize such a right under the First Amendment.

*Kidd*, 2006 WL 1341302, at *19. Count 3 of Plaintiffs' Amended Complaint will therefore be dismissed with prejudice.

## Count 5

Plaintiffs' fifth count challenges the constitutionality of the Illinois Voting Rights Act of 2011 ("IVRA"), both facially and as-applied.

The IVRA is a concise piece of legislation – barely 400 words in total – focused entirely on the redistricting process. It is intended to prevent what is commonly known as the "fracturing" of minority voting districts – i.e., it is intended to preserve a cluster of minority voters within a given legislative district if they are of a size and cohesion that could exert collective electoral power. 10 ILCS 120/5-5. The IVRA thus explicitly directs that "racial minorities or language minorities" be taken into account in the redistricting process. 10 ILCS 120/5-5(b).

Plaintiffs first argue that, by explicitly taking race into account, the IVRA is facially unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. Thus, Plaintiffs believe that "redistricting laws that use racial classifications, such as those contained in the text of IVRA, are expressly prohibited under the Equal Protection Clause, even those that appear neutral on their face." [DE 40 at 9.] But Plaintiffs' position is simply not the law in redistricting cases. Rather, as the Supreme Court recognized in *Shaw v. Reno*, 509 U.S. 630 (1993), "redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines." *Shaw*, 509 U.S. at 646 (emphasis in original). Thus, unlike in many other contexts, redistricting laws *can* take race into consideration.

14

It is true that redistricting laws cannot elevate race to be the *predominant* factor in the way a district is drawn. *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (for a district to violate equal protection, "[r]ace must not simply have been *a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision") (italics in original; internal citations and quotations omitted). But the IVRA expends a large percentage of its words ensuring that it complies with this rule. Subsection 5(a) of the IVRA states: "The requirements imposed by this Article are in addition and subordinate to any requirements or obligations imposed by the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, and the Illinois Constitution." 10 ILCS 120/5-5(a). Subsection 5(d) reiterates the point: "Nothing in this Act shall be construed, applied, or implemented in a way that imposes any requirement or obligation that conflicts with the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, or the Illinois Constitution." 10 ILCS 120/5-5(d). The IVRA is thus not unconstitutional on its face.

Count 5 also raises an as-applied constitutional challenge to the IVRA. The Amended Complaint is less than entirely clear exactly which districts this challenge applies to – other than District 96, which in Plaintiffs' view demonstrates that "the Illinois Voting Rights Act of 2011 violates the Plaintiffs' rights to equal protection under the Fourteenth Amendment to the United States Constitution on its face and as applied." [DE 21 at 25.] Plaintiffs may have intended this as-applied challenge to apply to other districts, but in responding to Defendants' motion to dismiss, Plaintiffs only pursued the argument with respect to District 96, thus waiving a

15

challenge to any of the other districts. *Lekas v. Briley*, 405 F.3d 602, 614-15 (7th Cir. 2005) (a plaintiff waives an argument by failing to raise it in response to a motion to dismiss).

Count 5 thus remains as only a constitutional challenge to the IVRA as it is applied to District 96. That claim amounts to nothing more than a *Shaw* challenge – i.e., that race was the *predominate* factor in the creation of District 96 – and is, as we will see, identical to the claim brought in Count 6. Since the only remaining part of Count 5 is thus duplicative, it will be dismissed with prejudice.

**Count 6**

The Amended Complaint's sixth count is a straightforward *Shaw* challenge: Plaintiffs claim that District 96 was drawn in such a way that race was the *predominant* factor. Defendants originally sought to dismiss this count because it was unclear whether it was a racial gerrymandering challenge or a political gerrymandering challenge. Plaintiffs clarified that Count 6 was a race-based *Shaw* challenge, however, and Defendants subsequently dropped their challenge to this count in their reply brief. Defendants' Motion to Dismiss will therefore be denied with respect to Count 6 of Plaintiffs' Amended Complaint.

As for the standing for Count 6, Adam Brown is a registered voter and citizen living in what would be District 96. Therefore, he has standing to challenge the drawing of District 96. *Hays*, 515 U.S. at 745.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss Amended Complaint [DE 28] is **GRANTED** in part and **DENIED** in part. Counts 3, 5, 7 and 8 of Plaintiffs' Amended

Complaint are **DISMISSED WITH PREJUDICE**. Counts 1, 2 and 4 of Plaintiffs' Amended

Complaint are **DISMISSED WITH LEAVE TO REPLEAD**, and any newly amended

complaint repleading these counts must be filed within 7 days of the date of this Order.

Defendants' Motion is **DENIED** with respect to Count 6 of Plaintiffs' Amended Complaint.

Defendant Illinois State Board of Elections is **DISMISSED WITH PREJUDICE** from Counts 3

though 8 of Plaintiffs' Amended Complaint.

      **SO ORDERED.**

      ENTERED: October 21, 2011

                        s/ Elaine E. Bucklo
                        ELAINE E. BUCKLO, JUDGE
                        UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS

                        s/ Diane S. Sykes
                        DIANE S. SYKES, JUDGE
                        UNITED STATES COURT OF APPEALS
                        SEVENTH CIRCUIT

                        s/ Philip P. Simon
                        PHILIP P. SIMON, CHIEF JUDGE
                        UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF INDIANA