## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, ANGEL GARCIA, ELIDIA MARES, and EDWIN TOLENTINO, and THE ILLINOIS REPUBLICAN PARTY (Intervening Plaintiff), | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) No. 1:11-cv-04884 |
| | ) |
| vs | ) Judges Sykes, Bucklo and Simon ) (3-judge court convened pursuant to 28 |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, and JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, AFRICAN AMERICANS FOR LEGISLATIVE REDISTRICTING (Intervening Defendant), UNITED NEIGHBORHOOD ORGANIZATION (Intervening Defendant), COLOMBIANOS UNIDOS PARA UNA LABOR ACTIVE (Intervening Defendant), HISPANIC AMERICAN CONSTRUCTION INDUSTRY ASSOCIATION (Intervening Defendant, and FEDERACION JALISCIENSE DEL MEDIO OESTE DE LOS ESTADOS UNIDOS (Intervening Defendant). | ) U.S.C. § 2284) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## DEFENDANTS' MEMORANDUM OF LAW IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

There are 177 Senate and House legislative districts in Illinois. With the exception of

Plaintiffs' attempts to fashion a political gerrymander claim (Counts 2 through 4 of the Second

Amended Complaint)—separately addressed in Defendants' Motion to Dismiss and filed

contemporaneously herewith—Plaintiffs' attack on the Illinois state redistricting map has now

been reduced to two House Districts: an equal protection claim under *Shaw v. Reno*, 509 U.S. 630

(1993) with respect to Representative District 96 and a claim under Section 2 of the Voting Rights

Act challenging Representative District 23.

## Representative District 96

In Count 5 of the Second Amended Complaint, Plaintiffs claim that Representative District

96 ("RD 96") of the Illinois State Redistricting Map (the "Illinois Map") was drawn

predominantly on the basis of race in violation of *Shaw v. Reno*. Parroting *Shaw*, they complain of

RD 96's supposedly "bizarre" shape (Second Am. Complt., ¶ 127) and allege the drafters of RD

96 "used the ethnicity of the African-American communities in Springfield and Decatur as the

predominant factor" in drawing RD 96. (*Id.*, ¶ 198.)

Putting aside that this claim runs directly contrary to the claim in Count 2 that *partisan*

*advantage* was the "predominant factor" in drawing the Illinois Map (*id.*, ¶ 167), Count 5 is

unprecedented given the racial make-up of RD 96. It is undisputed that RD 96 contains an

African-American voting-age population ("VAP") of only 24.87%, and a White VAP of 71.3%,

making RD 96 not only a majority-white district but a supermajority-white district. *See*

Defendants' 56.1 Statement of Facts ("SOF"), ¶ 16. Plaintiffs ask this Court to be the first ever to

find an African-American racial gerrymander in a district where African-Americans do not make

up a majority (or even a quarter) of the district's VAP.

Combining this fact with the undisputed fact that the General Assembly passed House and

Senate Resolutions specifically detailing several non-racial reasons as part of the legislative intent

1

for the drawing of RD 96 (SOF ¶¶ 24-25), together with the rather ordinary shape of RD 96 (SOF ¶¶ 32-44), and it becomes readily apparent that Plaintiffs cannot possibly carry their heavy burden of showing that racial considerations predominated over all other factors in drawing RD 96. Accordingly, summary judgment on Count 5 should be granted in Defendants' favor.

## Statement of Facts

In its 2011 Spring session, the Illinois General Assembly re-drew its state House and Senate districts following the 2010 dicennial census. *See* SOF ¶ 7. Public Act 97-6 passed both chambers of the Illinois General Assembly on May 27, 2011. *Id.* For purposes of legislative intent, P.A. 97-6 adopted and incorporated by reference resolutions passed that same day by the Illinois House of Representatives and the Illinois Senate—House Resolution 385 ("HR 385") and Senate Resolution 249 ("SR 249"). *Id.* at ¶¶ 9-11. In unprecedented fashion, these resolutions provided narrative explanations of each House and Senate district, including many of the reasons they were drawn as they were. *Id.* at ¶¶ 24-25. In addition, the House and Senate, separately and jointly, held hearings around the State prior to drafting and passing P.A. 97-6, in an effort to let interested parties present their views as to the formulation of Senate and House district boundaries. *Id.* at ¶ 8.

### *The 2011 Illinois Map in General*

Onc Person, Onc Vote. The first, and perhaps most important undisputed fact about the Illinois Map is that every single House district is identical in population—the Map is *precisely* compliant with the constitutional requirement of one person, one vote. Every single one of the 118 House districts consists of either 108,734 or 108,735 residents. *See* SOF ¶¶ 12 and 24.

Partisan Composition. In addition, the General Assembly considered partisan composition with regard to each and every district, as more particularly set forth in the narratives that comprise HR 385 and SR 249. *Id.* at ¶ 13. Indeed, a "Democratic Index" was created to measure partisan

preference (based on past elections for 2010 Governor, 2010 U.S. Senate, 2006 Governor, and 2006 Treasurer) at the precinct level, which even allowed for estimated partisanship calculations at the census-block level, to demarcate areas as "Republican" or "Democrat" and further defining them by the degree of party affiliation. *Id.* at ¶¶ 46-48; Exh. K.

### *Evidence Considered By The General Assembly Regarding Representative District 96*

The concept of joining the downstate urban centers of Springfield and Decatur was first proposed by the African-Americans for Legislative Redistricting ("AALR"), a defendant-intervenor in this action. *See* SOF ¶ 17. Lawrence Hill testified that he believed communities of interest existed between voters in the urban (eastern) part of Springfield and with Decatur. Mr. Hill testified that these communities shared the following interests:

> Poor education outcomes, poor economic outcomes for the citizens. There is a stream of commerce between those two along I-72 [Interstate Highway 72]. They advertise in those same communities, the print media does and the radio. They worship along those communities. And when I say that, I say that there are people who are from Springfield who go to Decatur and vice versa for services.

*Id.* at ¶ 17. Mr. Hill testified that he sought input from individuals such as Reverend Eric Jackson, a pastor in Decatur, who told him that some of his parishioners travelled from Springfield for services. *Id.* at ¶ 18. He also discussed the idea of joining the urban centers of Springfield and Decatur with former Springfield Alderman Frank McNeil, a community activist who was also the lead plaintiff in *McNeil v. City of Springfield*, 851 F.2d 937 (7ᵗʰ Cir. 1988), where he challenged Springfield's at-large system of voting for park and school boards. Mr. McNeil told Mr. Hill that he favored the inclusion of those two urban centers in a single district. *Id.* at ¶ 19.

Ultimately, the AALR proposed to the General Assembly a House District that joined the two urban centers in Decatur and Springfield. *See* SOF ¶ 23. Democratic staff for the House and Senate drafted a district that, while not identical to the proposal, joined those urban centers. *See* SOF, Exh. D at p. 86.

3

Current Springfield Alderman Doris Turner testified to a joint House-Senate hearing in favor of joining "the eastern parts of Springfield, communities along Interstate 72, and western Decatur." *See* SOF ¶ 20, Exh. F at p. 124. She testified as follows:

> Currently both of these communities are urban areas that continue to be represented by individuals with a very rural perspective. This dilemma speaks to our most fundamental right, appropriate representation by our government. \*\*\* When concerns are not understood and appropriately addressed, it leads to the disenfranchisement of an entire community. And I believe that's the situation currently being experienced by the individuals residing in Springfield and Decatur.

> I think it should also be brought to your attention that currently these two cities are joined by media markets and co-sponsor events and a lot of other things that join them together in a very real way throughout the entire year.

> \*\*\* We, the people residing within this community, want our voices to be heard and stand wholeheartedly in support of the new 96th House District. This House District will bring a new focus and attention to the many issues that continue to plague this community, among them an increase in violence and declining educational outcomes, and increase voter participation in the election process.

*Id.* Alderman Turner said the common issues these urban centers faced included inner-city violence, declining educational outcomes, and "the types of jobs that need to be brought into both of these communities." *Id.* at ¶ 21. She had served on the Sangamon County Board and represented both inner-city Springfield and the outlying rural area, "but their issues were …very different." *Id.* Turner stated that her constituents in inner-city Springfield did not feel as if they were adequately represented by the current state representative, whom she saw as more responsive to rural issues than to the unique issues facing urban Springfield. *Id.* at ¶ 22.

### *Legislative Intent as Expressed in HR 385 and SR 249*

The General Assembly outlined its legislative intent regarding the drafting of RD 96 in HR 385 and in SR 249's discussion of Senate District 48 (which contains RD 96):

• RD 96 contains the equal-population target of 108,734 residents. *See* SOF ¶ 24.

• RD 96 contains a white VAP of 71.3 percent; an African-American VAP of 24.87 percent; a Latino VAP of 1.73 percent; and an Asian VAP of 1.01 percent. *Id.* at ¶ 16.

• The boundaries of RD 96 generally adhere to township boundaries or follow major roadways, such as Route 48, or natural boundaries like the Sangamon River. *Id.* at ¶ 24.

• RD 96 contains a strong community of interest of government employees, both state, county, and municipal. State employees work at the state capital in Springfield and at the state prison in Decatur, and many Decatur residents travel along Interstate 72 to work at the state capital. As Springfield is the county seat of Sangamon County and Decatur is the county seat of Macon County, these two cities are home to many county as well as municipal employees. *See* SOF, Exh. C at 281; Exh. D at 85. Government employees at all levels generally have similar income levels and have shared interests in political issues such as controversial legislation in Illinois (as in other states) concerning reform of government employee pensions, as well as facility closings and employee layoffs caused by budgetary constraints in state, county, and local governments.

• The majority of the portions of Springfield and Decatur included in RD 96 have median household incomes of less than $45,000 and require greater social services than the rural communities surrounding them. Both communities are central Illinois, urban population centers with a high population of African-Americans. "Under the current [2001] map, both of these communities are isolated and surrounded by rural farm communities with few minorities and have little in common with their neighbors." These communities are linked by Interstate 72, and "many African-American residents of one community have links to the other either through family, churches, or their employment." *See* SOF, Exh. C at 281-82.

• RD 96 was drawn to include, in Springfield, all of the Mid-Illinois Medical District (only the second medical district in Illinois), including the state-of-the-art medical facilities Southern Illinois School of Medicine, the Simmons Cancer Institute, Memorial Medical Center, and St. John's Hospital, and in Decatur, the Decatur Memorial Hospital and St. Mary's Hospital. These facilities provide vital health care services to numerous residents of RD 96 and Senate District 48. *See* SOF, Exh. D at 86; Exh. C at 278. Health-care professionals generally have common interests (along with the health-care facilities themselves) with political issues such as health-care reform, medical-malpractice reform, and laws concerning health insurance.

• Springfield, Decatur and southern parts of the district share media markets including television stations WICS (ABC), WAND (NBC), WCIA (CBS), and WRSP-TV (Fox) and radio stations WSMI (AM and FM), WTAX (AM), and WSOY (AM). *See* SOF, Exh. D at 86.

The House and Senate resolutions described the specific boundary lines forming the

outline of RD 96 as follows:

• <u>Northern Border</u>: To maintain a continuous district from east to west, many township lines and the Christian County border are utilized as the majority of the northern border of RD 96. Rochester Township and Rochester are split for equal-population purposes so that the Mid-Illinois Medical District in Springfield can remain intact. *See* SOF, Exh. C at 277, 278. The northern border also follows precinct lines. *See* SOF, Exh. D at 84.

• <u>Southern Border</u>: The southern border of proposed RD 96 goes east to west along the Pleasant View Township border and then follows Illinois Route 48 diagonally south. Further west, the southern border splits Taylorville Township to allow the vast majority of the non-rural parts of the city of Taylorville to remain in neighboring RD 95, as they were in the 2001 map, and cuts across southern South Fork Township where it meets the western border of RD 96. In part because the boundaries of RD 96 are predominantly along county and township boundaries, much of the southern boundary of RD 96 is drawn in order to satisfy equal population. *See* SOF, Exh. C at 277.

• <u>Western Border</u>: The western border of proposed RD 96 runs along the borders of South Fork and Cotton Hill townships and then moves into the city of Springfield and takes in the low-income areas of the city. *See* SOF, Exh. C at 280.

• <u>Northwest/Springfield</u>: The boundaries within Springfield follow precinct lines and are largely based on socioeconomic status. *See* SOF, Exh. D at 84; Exh. C at 276-82. The Springfield area of RD 96 is located east of MacArthur Boulevard, a major thoroughfare and recognizable east-west boundary to Springfield residents. Using this boundary, the villages of Jerome and Southern View and the city of Leland Grove are excluded from RD 96. Those municipalities share more in common with the west, north, and south sides of Springfield in that they have a much lower percentage of minorities and a higher median income than the east side of Springfield. RD 96's boundary in Springfield also roughly follows the line that divides Springfield Wards 2, 3, and 5 from Wards 6, 7, and 8. As stated previously, parts of Rochester and Rochester Township are split so that the Mid-Illinois Medical District could be entirely included in RD 96.

• <u>Northeast/Decatur</u>: The boundaries in Decatur are to a large extent based upon major roadways and Decaturs municipal borders. RD 96 does not contain the more affluent areas of Decatur on the east and south sides of Lake Decatur. *See* SOF, Exh. C at 279.

    <u>The Correlation Between Race and Partisanship</u>. There was considerable evidence before the General Assembly on the correlation between African-Americans and their preference for Democratic candidates. *See* SOF ¶ 45. In its legislative intent, the General Assembly recognized this correlation, often noting that the partisan composition of a particular district "reflects the high affiliation and correlation of African-American ... voters that identify with the Democratic Party based on committee hearing testimony." *See* SOF, Exh. D at 10.

## STANDARD OF REVIEW

    When considering summary judgment on a claim of racial gerrymandering, the court's review "must be understood in the context of the courts' traditional reluctance to interfere with the delicate and politically charged area of legislative redistricting." *Chen v. City of Houston*, 206

F.3d 502, 505 (5th Cir. 2000). Plaintiffs ultimately bear the burden of persuasion at trial that the consideration of race was not merely "*a motivation for the drawing*" of a district but the "predominant factor." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (emphasis in original). Thus, a legislature's "presentation of valid evidence of nonracial intent, which transforms the case into one of mixed motives, advances rather than hinders its case for summary judgment." *Chen*, 206 F.3d at 507. This Court, in considering summary judgment, should "take into account both the presumption in favor of a legislature's good faith and a plaintiff's burden of proof." *Id. See also Miller v. Johnson*, 515 U.S. 900, 916-17 (1995) (in racial gerrymander challenge, at both the pleading and summary judgment stage, plaintiff's heavy burden of proof, the presumption of good-faith attached to legislative actions, and the intrusive nature of judicial inquiry into the legislative arena should be taken into account).

## ARGUMENT

### I.  Plaintiffs Cannot Prove A *Shaw* Violation In RD 96 As A Matter Of Law.

Plaintiffs' *Shaw* challenge must fail as a matter of law. First, finding an African-American racial gerrymander in a district where the African-American VAP does not even amount to a *quarter* of the district's total VAP (which is overwhelmingly white) would be unprecedented in *Shaw* jurisprudence (where no district below 50% African American VAP has ever been invalidated as a racial gerrymander), and inconsistent with the Supreme Court's decision in *Lawyer v. Department of Justice*, 521 U.S. 567 (1997). Second, the notion that the General Assembly tried to maximize African-American population in RD 96 is directly contradicted by two *indisputable* facts: (i) the mapmakers' precise adherence to the one-person, one-vote doctrine, instead of manipulating population in RD 96 to reduce the number of white residents and thereby *increase* the relative VAP of African-Americans in RD 96; and (ii) a significant population of African-Americans lies just outside the borders of RD 96, particularly outside Springfield, which

7

the General Assembly could have included in RD 96 had it been consumed, above all else, with

maximizing African-American VAP in that district. Third, the General Assembly passed

resolutions on legislative intent that provided several nonracial reasons for the drawing of RD 96

that are entitled to the presumption of good faith, and which Plaintiffs have not and cannot

challenge with any evidence to the contrary. Fourth, there can be no dispute that the shape of RD

96, from a simple visual inspection, is entirely ordinary and does not remotely resemble the

spindly, monstrous shapes invalidated by the Supreme Court *Shaw*. The law and undisputed facts

compel summary judgment for Defendants on Count 5.

A.    **The Racial Breakdown of RD 96 Belies Any Claim of Racial Gerrymandering.**

Adding to Plaintiffs' already heavy burden is the fact that Plaintiffs are in the very unique

position of claiming as an African-American racial gerrymander a district that is overwhelmingly

white and only 24.87% African-American. *See* SOF ¶ 16. While there is admittedly no magical

VAP cut-off for a *Shaw* challenge, to our knowledge no court has ever invalidated a district under

*Shaw* where the racial group allegedly targeted for success consisted of less than half of the

district's VAP. *See Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 446 (S.D.N.Y. 2004) (three-judge

court), *aff'd*, 543 U.S. 997 (2004) ("*Shaw* challenges have almost always been directed against

majority-minority districts"). In fact, the Supreme Court based its rejection of a *Shaw* claim in

part on this very fact.

In *Lawyer v. Dep't of Justice*, 521 U.S. 567 (1997), just as Plaintiffs do here, plaintiffs

alleged that Florida's revised District 21 was drawn specifically to include African-Americans

"with divergent interests residing in several different communities." *Scott v. Dep't of Justice*, 920

F. Supp. 1248, 1250 (M.D. Fla. 1996) (three-judge court), *aff'd sub nom. Lawyer*, 521 U.S. 567.

As here, the African-American VAP in District 21 was less than a majority of the VAP. The

Supreme Court rejected plaintiffs' *Shaw* challenge and upheld the validity of District 21: "The fact

8

that District 21 under Plan 386 is not a majority black district, the black voting-age population

being 36.2%, supports the District Court's finding that the district is not a 'safe' one for black-

preferred candidates, but one that 'offers to any candidate, without regard to race, the opportunity'

to seek and be elected to office." *Lawyer*, 521 U.S. at 581 (quotations omitted). *See also Cano v.*

*Davis*, 211 F. Supp. 2d 1208, 1218 (C.D. Cal. 2002) (three-judge court), *aff'd*, 537 U.S. 1100

(2003) (rejecting *Shaw* challenges to two districts containing just under 50% Latino VAP, finding

that *Shaw*'s concern over representational harm was not present.).

The same is true in RD 96. No one could argue that RD 96 is a "safe" district for African-

American candidates, where African American VAP is not even a quarter of the district's overall

VAP. *See* SOF ¶ 16. It would be "political folly, if not suicide," *id.*, for a representative in RD 96

to ignore the supermajority of the district's eligible voters and focus exclusively on one-quarter of

them. Indeed, the inclusion of the urban centers of Springfield and Decatur in one district will

have the polar opposite effect of a *Shaw* violation: "the message communicated by the redistricting

plan is that in order to succeed … a representative must build and maintain multi-racial

coalitions." *Id.*

**B.     Two Facts Not Capable of Dispute—The Map's Compliance With The One-Person, One-Vote Doctrine And The Fact That African-American Population Adjacent To RD 96 Was Not Included—Can Lead Only To One Conclusion: Racial Considerations Did Not Predominate.**

It cannot be disputed that the Illinois Map complied down to the person with the

Fourteenth Amendment's requirement of one-person, one-vote. *See* SOF ¶ 12. Every district was

equally populated down to the lowest possible deviation—one person. But compliance with the

equal-population mandate is incompatible with racial gerrymandering. *Id.* The General

Assembly, after all, is allowed a 10% deviation from population equality in drawing its districts

without sacrificing the presumption of constitutionality. *Connor v. Finch*, 431 U.S. 407, 417-18

9

(1977). The General Assembly could have lowered the white population totals in RD 96, left the African-American population intact, and by that act alone significantly increased African-American VAP in RD 96.

Moreover, the undisputed, publicly-available census data on racial demography, when laid over the map of RD 96, shows that the General Assembly passed on the opportunity to include a significant segment of African-Americans residing adjacent to RD 96. *See* SOF ¶ 51-54. Exhibit N to Defendants' SOF shows the African-American population in and around RD 96 by precincts. *Id.* at ¶ 52. As the key indicates, the shades of purple vary according to the percentage of African-Americans residing in that precinct. *Id.* The northwest corner of RD 96 (the bottom left on the page) is the city of Springfield and the northeast corner (top left on the page) is Decatur. *Id.* It is abundantly clear that the mapmakers did not include in RD 96 a sizeable portion of African-American population in and around Springfield and to a lesser extent in Decatur. *Id.* These boundaries are a far cry from district lines that "wind in snakelike fashion ... until it gobbles in enough enclaves of black neighborhoods," *Shaw*, 509 U.S. at 635, or lines that contain "many narrow corridors, wings, or fingers [that] reach out to enclose black voters, while excluding nearly [non-black] voters." *Bush*, 517 U.S. at 973.

To illustrate this point, undersigned counsel asked House Democratic staff to draw a district that did both of the things the mapmakers did *not* do in P.A. 97-6—utilize the wiggle room in population equality to the detriment of white voters in RD 96, and draw boundary lines that captured as many African-Americans in RD 96 as possible. *See* SOF ¶ 53, Exh. R. The resulting map, found in Exhibit R to Defendants' SOF under the title "Hypothetical Springfield-Decatur District to Maximize African-American Population," dropped total population in by 9% (to 98,948) and reached out to capture as many African-Americans as possible, resulting in an African-American VAP in RD 96 of 30.31%, an increase of almost six percentage points

10

compared to RD 96 as drawn in P.A. 97-6. This hypothetical map's shape is far more reminiscent of *Shaw* than RD 96.

But the General Assembly did not draw that district. Instead of tinkering with population totals, it perfectly complied with the equal-population mandate. Instead of grabbing every last African-American resident, it excluded a sizeable population of African-American voters residing very near RD 96's borders. *See* SOF, Exh. N. This indisputable evidence can only lead to one conclusion: The map drawers did not focus predominantly on race.

### C. There is No Genuine Issue of Material Fact That Other Non-Racial Reasons Played A Role In The Drawing of RD 96.

The Statement of Facts outlined a number of non-racial factors, considered by the General Assembly at the time RD 96 was drawn, explaining how and why the border lines of RD 96 were formed. *See* SOF ¶¶ 24-25. The House and Senate Resolutions outlining the legislature's intent in drawing RD 96 are entitled to a presumption of good faith that must be overcome by Plaintiffs to defeat summary judgment. *Miller*, 515 U.S. at 916-17; *Chen*, 206 F.3d at 507.

### 1. Partisan Considerations, Not Race, Support Inclusion of Springfield and Decatur in RD 96.

It is well-settled that state legislatures may, and indeed are expected to, consider the partisan composition of districts they draw. *Davis v. Bandemer*, 478 U.S. 109, 128-29 (1986). Moreover, where racial identity correlates to partisan affiliation, if mapmakers draw lines based on partisan preference that happen also to correspond to racial lines, there is no constitutional violation. *Easley*, 532 U.S. at 243; *Bush*, 517 U.S. at 968 (1996) ("if district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify").

In addition to lay witnesses who testified that African-Americans were substantially loyal Democratic Party voters, Dr. Allan Lichtman testified to a joint House-Senate hearing that, based

on actual voter behavior, he found a "substantial correlation" between African-American voters and preference for the Democratic candidate in general elections. *See* SOF ¶ 45. Moreover, as stated above, the affidavit of Tim Mapes, the principal drafter of the Illinois Map for the House, makes clear that one of the principal reasons for joining the urban centers of RD 96 was to have a downstate district where Democrats had a chance to compete. *See* SOF ¶¶ 46-48. Indeed, Mr. Mapes never looked at the racial demography of RD 96 before signing off on the final line-drawing. *Id.* He did, however, look at the map overlaid with the results of the "Democratic Index" created by staff to judge the partisan composition by precincts. *Id.* That map, attached as Exhibit M to the SOF, colored areas that were majority-Republican shades of red (the more Republican, the darker the shade of red) and those that were majority-Democratic shades of blue (the more Democratic, the deeper the shade of blue), as the key indicates.

The map obviously shows that the vast majority of the area in and around RD 96 was heavily Republican (red) and that virtually the only area that was Democratic (blue) was contained within the northwest and northeast borders of RD 96. *Id.* In fact, flipping back and forth between Exhibits M and N, it is patently clear that the heaviest African-American precincts in RD 96 (the darkest purple in Exhibit N) were the most heavily Democratic (the darkest blue in Exhibit M). This phenomenon was especially true in Springfield. This point underscores, beyond all doubt, that to the extent the borders of RD 96 seem to track racial lines, in fact they were based far more on partisanship, which does not violate *Shaw*. *Easley*, 532 U.S. at 243; *Bush*, 517 U.S. at 968.

## 2. The House and Senate Resolutions Provided Several Non-Racial Reasons For the Drawing of RD 96.

Most importantly, the witness testimony and House and Senate Resolutions convincingly demonstrate that the urban centers of Decatur and Springfield have much in common—in part because of communities of interest such as government workers and medical professionals, and in

12

part because of how *little* they each have in common with their neighbors. *See* SOF ¶¶ 17-23, 26-31. East Springfield and Decatur have problems typically associated with urban settings, such as crime, unemployment, and educational challenges, while their rural neighbors do not. *Id.* at ¶ 21. The General Assembly found that these urban islands have a much stronger ability to have their voices heard if they are joined in one district, with one representative responsive to their needs, rather than being relegated to the status of a bystander in overwhelmingly rural districts. *Id.* at ¶¶ 24-25. The reasons contained in the House and Senate Resolutions are reasonable and logical and are entitled to a presumption of validity.

### D.    The Shape of RD 96 Provides No Hint of a Racial Gerrymander.

The shape of a district may be so bizarre on its face that it provides circumstantial evidence that racial considerations predominated above all else. *Shaw*, 509 U.S. at 646-47. The shape of RD 96 (attached hereto as Exhibit H), however, is unremarkable. There are no narrow corridors, snake-like appendages, or spindly tentacles, as was the case in *Shaw*. *See* SOF ¶ 32. Many of the boundary lines stretch in several miles as entirely straight lines, and as detailed above, most of the borders follow county or township boundaries or other logical boundaries. *See* SOF, Exh. C at 277-279. The distance between Springfield and Decatur is 28.72 miles, connected by Interstate Highway 72, and even a cursory review of the other downstate Illinois House Districts in the Illinois Map shows that RD 96 is not nearly the longest or widest—in fact, it is one of the smallest in terms of geographic size, however measured. *See* SOF, Exh. I.

RD 96 stands in stark contrast to District 12 in *Shaw*, which spanned 160 miles and, for much of its length, was no wider than the I-85 corridor. *Id.* at 635-36. *See* SOF, Exhs. J-1 (map of *Shaw*'s District 12 in North Carolina map as a whole), and J-2 (map of District 12 alone). Nor is RD 96 anything like the districts invalidated in *Bush v. Vera*, 517 U.S. 952 (1996), where District 30 consisted of "narrow and bizarrely shaped tentacles," District 18 contained "many

13

narrow corridors, wings, or fingers," and District 29 resembled "a sacred Mayan bird" with a

"plumed head," "spindly legs," an "open beak," and "ruffled feathers." 517 U.S. at 965, 973-74.

*See* Exhibits J-3, J-4, and J-5 for maps of these invalidated districts.

RD 96's compactness is well above the minimum acceptable thresholds. *See* SOF ¶¶ 41-

44. Its geographic dispersion (Reock) measure is 0.32, more than double the acceptable

minimum. Its perimeter, or Polsby-Popper measure is 0.22, more than four times the magnitude of

the minimum level of 0.05. *Id.* There is simply no basis to infer, from the shape alone, that racial

considerations predominated in the drawing of RD 96.

### E.   Plaintiffs Cannot Show That All Other Redistricting Principles Were Subordinated to Race in Drawing RD 96.

Plaintiffs cannot demonstrate that all other redistricting principles were subordinated to

race. First, the single most important redistricting principle—one person, one vote—

unquestionably took precedence. *See* SOF ¶ 12. And many of the boundary lines of RD 96 were

drawn based on political subdivisions or other logical boundaries. Plaintiffs are correct that RD

96 splits the counties of Macon, Sangamon, and Christian (Second Am. Complt., ¶ 195), but they

do not mention that the 2001 Illinois Map did so as well. *See* SOF ¶ 49. Plaintiffs also complain

that RD 96 joined urban populations that have little in common with the rural population in the

district. (Second Am. Complt., ¶ 197.) But, as already explained, that was precisely the point—

each of these urban centers was on an island surrounded by rural areas with different issues, and

joining the urban areas gave them a collective voice. Plaintiffs finally complain that the

mapmakers lowered the Republican partisan advantage in that district. (*Id.*, ¶ 193.) Again,

enchancing partisan advantage *is* a traditional redistricting tool and is perfectly constitutional.

Moreover, RD 96 lacks the two common features of districts found to violate *Shaw*. First,

every district invalidated under *Shaw* was drawn at the census block level, not at a higher level of

14

geography, such as along census tract, precinct, township, municipal or county lines etc.[1] At the

census-block level, only total population and racial data are available to line drawers from the U.S.

Census Bureau, thus leading to the conclusion that the state focused too heavily on race in drawing

lines. *Bush*, 517 U.S. at 970-71 ("Given that the districting software used by the state provided

only racial data at the block-by-block level, the fact that District 30 . . . splits voter tabulation

districts [i.e., precincts] and even individual streets in many places . . . suggests that racial criteria

predominated over other districting criteria in determining the districts boundaries."). Census

tracts, precincts and higher levels of geography, in contrast, allow a line drawer to construct a

district using election, socioeconomic and demographic data, which are legitimately considered in

any line-drawing drawing decision. *Id* at 964-65 (as to election data); *Lawyer*, 117 S.Ct. at 2195

(approving district that was drawn along socioeconomic lines). As detailed in SR 295 and HR

385, RD 96 was drawn along precinct, township, municipal, and county lines. *See* SOF ¶ 50.

Second, even had RD 96 been drawn using census blocks, the district would not fall victim

under *Shaw* because the Democratic Index created by legislative staff allowed for estimates of

partisanship even at the census-block level, which was not true in *Bush*. *Bush*, 517 U.S. at 970-71.

Indeed, the Supreme Court in *Easley* upheld the challenged district in part because the state's

redistricting software (as with Illinois') *did* provide both racial and political data. *Easley v.

Cromartie*, 532 U.S. 234, 249-50 (2001).

Along with all of the other evidence submitted above, it is clear that Plaintiffs cannot not

possibly carry the burden of proving that racial considerations predominated over all other

---

[1] *See, e.g., Bush*, 517 U.S. at 961-64, 966-67, 972-76; *Johnson v. Miller*, 864 F.Supp. 1354, 1377-78 (S.D.Ga.1994) (invalidating district where the legislature split precincts in order to include African-American voters in the challenged districts and engaged in a "block by block search for black voters to add to the [district].") *aff'd*, 515 U.S. 900 (1995); *Silver v. Diaz*, 118 S.Ct. 36 (1997), summarily aff'g, 978 F.Supp. 96, 110-11, 118 (E.D.N.Y. 1997) (three judge court) (invalidating district that was at points "one-block long," and "curve[d] and weave[d] among street blocks" to pick up minority voters); *Meadows v. Moon*, 117 S.Ct. 2501 (1997), *summarily aff'ing*, 952 F.Supp. 1141, 1147 (E.D.Va. 1997) (three-judge court) (invalidating district drawn "based upon race at the census block level to divide precincts and apportion large number of voters based on race into, and out of the [challenged district]").

traditional redistricting factors. Accordingly, this Court should enter summary judgment on Count 5 of the Second Amended Complaint.

## II. Summary Judgment Should Be Granted On Count 1

Plaintiffs, who initially challenged no less than ten House Districts under Section 2 of the Voting Rights Act (Representative Districts ("RD") 1, 2, 7, 21, 22, 23, 60, 77, 83, 114), have now dropped all challenges to African-American districts and all challenges to Latino districts, save one—a Section 2 challenge to RD 23, in Count 1. It is undisputed that RD 23 is a district with a Latino voting-age population that comprises 46.27% of the district's total voting age population. SAC, ¶ 117.

To prevail on Count 1, Plaintiffs must prove that, through some election procedure, practice or standard, Latinos have been denied an equal opportunity to participate in the political process and to elect candidates of their choice in that particular district. 42 U.S.C. § 1973(b); *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986). As a threshold matter, a plaintiff is required to prove three facts—known as the *Gingles* factors—before reaching the ultimate question of equal opportunity under Section 2 in any particular district. The plaintiff must establish that (1) the minority group in question is sufficiently large and geographically compact to constitute a majority in a district; (2) this minority group is politically cohesive; and (3) whites vote sufficiently as a bloc to usually defeat the minority's preferred candidate in that district. *Gingles*, 478 U.S. at 49-51.

The failure to prove any prong is fatal to a Section 2 challenge. *Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994). But the converse is not true; it is not sufficient, by itself, for Plaintiffs to establish the *Gingles* factors. *DeGrandy*, 521 U.S. at 1011; *Gonzalez v. City of Aurora*, 535 F.3d 594, 597-98 (7th Cir. 2008) (satisfaction of the *Gingles* factors "just sets the stage"). If Plaintiffs can successfully establish the *Gingles* preconditions, they must then proceed to the second step of

16

proving a Section 2 violation based on the "totality of the circumstances." 42 U.S.C. § 1973(b); *DeGrandy*, 512 U.S. at 1011.

Defendants seek summary judgment on Count 1 because, as Plaintiffs' own expert's report demonstrates, Plaintiffs cannot establish the third *Gingles* prong as a matter of law. Moreover, even if they could avoid summary judgment based on the failure to satisfy one or more of the *Gingles* prongs, Plaintiffs would be unable, as a matter of law, to prove under the totality of the circumstances that Latinos have been denied an equal opportunity to participate in the political process and to elect candidates of their choice in RD 23. Their own expert's report is silent on this critical subject.

### A. Plaintiffs Are Unable to Satisfy *Gingles* Prong 3.

In the First Amended Complaint, when Plaintiffs challenged ten House Districts under Section 2, Defendants moved to dismiss those claims, among other reasons, because Plaintiffs failed to plead, with respect to each district, that the majority "votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate," the third *Gingles* prong. 478 U.S. at 51. Defendants expressed skepticism that Plaintiffs could plead the third *Gingles* prong with respect to any district they had challenged. (DE # 29 at 6) ("If Plaintiffs truly have a good-faith basis to properly allege the *Gingles* third prong, they should have pleaded it.").

Plaintiffs, while acknowledging other pleading defects and asking for leave to amend, nevertheless insisted that this prong of *Gingles* was satisfied by the bare allegation that "racial bloc voting is pervasive in Illinois, both among majority and minority groups." (DE # 21, Am. Complt., ¶ 21.) In its Opinion and Order on Defendants' Motion to Dismiss (DE # 59), this Court agreed with Defendants, dismissing the Voting Rights Act challenges and ordering Plaintiffs to "include allegations for *each* challenged district sufficient to indicate … that it satisfies *each* of the

17

three *Gingles* prongs for *each* of the districts they believe violates Section 2. . . ." *Id.* at 5-6 (emphasis in original).

Subsequent to the Court's Opinion and Order, nine of the ten Section 2 challenges disappeared, and Plaintiffs now challenge only RD 23. Defendants submit, however, that their skepticism remains well-founded, because even taking Plaintiffs' evidence on *Gingles* prong 3 as true, relevant, and accurate—not challenging it in any way—their very own calculations demonstrate that, in RD 23, whites do *not* vote as a bloc to usually defeat the minority's preferred candidate. In fact, the white-preferred candidate usually loses.

*Gingles* prong 3 contains two requirements: that whites vote as a bloc in the first instance against minority candidates (polarized white-bloc voting), and that they do so sufficiently to usually defeat the minority's preferred candidate. It is in Table 13 of his report (*see* SOF, Exh. P, p. 25) that Plaintiffs' expert, Dr. Liu, reaches the question of whether white-bloc voting usually defeats the Latino's chosen candidate specifically in RD 23.

Dr. Liu relies on four elections in RD 23 involving a Latino candidate within the last 3 years. But in the final column of Table 13, entitled "White Winner," where he shows the instances where the white-supported candidate defeated the Latinos' preferred candidate, *the white-preferred candidate lost 3 out of 4 races to the Latino candidate of choice.* (*Id.*; *see also* SOF, Exh. Q, Affidavit of Dr. Allan Lichtman, at p. 7.) It was only in one race, the 2010 race for Lieutenant Governor, that the white candidate (Scott Lee Cohen, who ultimately won the Democratic primary) won the vote in RD 23.[2]

Thus, Plaintiffs' own proof demonstrates that RD 23 elected the Latino-preferred candidate over the white-preferred candidate in three out of four elections. While the Court in *Gingles*

---

[2] Notably, even that single race, by Dr. Liu's own calculations, proves very little, because his calculations show that, while there was a Latino candidate in that Lt. Governor election, only by the barest of margins could she be called the Latinos' "candidate of choice"—only 51% of Latino voters in RD 23 voted for her. (Exh. P, p. 25, Table 13, third column.) Thus, this lone race qualifies for consideration under *Gingles* prong 3 only by the thinnest of threads.

assigned no specific numerical determination to prong 3, it would seem beyond debate that when the Court required historical proof that whites vote as a bloc to "usually" defeat the minority-preferred candidate, the Justices at least demanded something more than winning one time out of four. At a minimum, "usually" must mean "more often than not." *Williams v. State Bd. of Elections*, 718 F. Supp. 1324, 1328 (N.D. Ill. 1989) (granting summary judgment on Section 2 challenge to Cook County judicial elections process due to the failure to prove prong 3 of *Gingles*; evidence showed that black-preferred candidates won 14 out of 21 contested elections).

In *Milwaukee Branch of the N.A.A.C.P. v. Thompson*, 116 F.3d 1194 (7th Cir. 1997), concerning a Section 2 challenge to Wisconsin's system of nonpartisan judicial elections, the Seventh Circuit upheld the district court's finding that plaintiffs failed to satisfy *Gingles* prong 3 based on the following historical evidence:

> During the last 25 years, black candidates have prevailed in 6 uncontested races, qualified for the general election in 5 of 6 contested primaries [meaning they finished in the top 2], and won 2 of 10 contested general elections. Black candidates did not lose "consistently." Plaintiffs observe that both of the black candidates who prevailed in contested general elections had been appointed to the bench by the Governor and enjoyed the advantage of incumbency, but the fact remains that these judges' color did not lead the voters to turn them out.

*Id.* at 1198 (parenthetical supplied). *See also Askew v. City of Rome*, 127 F.3d 1355, 1381 (11th Cir. 1997) (*Gingles* prong 3 not satisfied where black-preferred candidates won 45% (22 out of 49) of the races in which they ran); *Morris v. City of Houston*, 894 F. Supp. 1062, 1066 (S.D. Tex. 1995), *aff'd sub nom. Campos v. City of Houston*, 113 F.3d 544 (5th Cir. 1997) (granting summary judgment based on plaintiff's failure to prove *Gingles* prong 3, where whites voted as a bloc to defeat minority candidates of choice in only 2 out of 4 races).

In discussing the results of Table 13, Dr. Liu seeks to avoid the *Gingles* prong 3 question in much the same way Plaintiffs did in their previous complaint. *See* SOF, Exh. P. *Nowhere* does he read Table 13 for the proposition that whites vote as a bloc to usually defeat the Latino

19

candidate of choice in RD 23, an observation he could not possibly make. *Id.* Instead, Dr. Liu

states that "*[w]hites as a group* would have won three out of four times (75%)" in the elections in

Table 13. *See* SOF, Exh. P at p.11 (emphasis added). But neither whites nor candidates of any

other race run as a group. They run as individuals. Even were the Court to accept Dr. Liu's

calculations and all reasonable inferences therefrom in their entirety, Plaintiffs do not and cannot

show, specific to challenged District 23, that whites "vote sufficiently as a bloc to enable it …

usually to defeat the minority's preferred candidate," *Gingles*, 478 U.S. at 51. Their failure to

satisfy a necessary precondition to a Section 2 challenge entitles Defendants to summary judgment

on Count 1.

**B. Plaintiffs Have Provided No Evidence To Support Their Claim That, Under The Totality Of Circumstances, The State Must Maximize Latino-Opportunity Districts Above And Beyond The Proportional Representation Latinos Already Enjoy Under The Illinois Map.**

When considering the totality of the circumstances under Section 2, a critical threshold

inquiry is whether Latinos in Illinois comprise a majority of the electorate in a number of districts

roughly proportional to Latinos' citizen voting-age population ("CVAP") statewide. *League of*

*United Latin American Citizens v. Perry*, 548 U.S. 399, 436 (2006) ("*LULAC*"); *Barnett v. City of*

*Chicago*, 141 F.3d 699, 705 (7th Cir. 1998). Where rough proportionality can be shown—that is,

where a minority group "has electoral power … equal to its fraction of the electorate—[it] will be

hard-pressed to demonstrate … that its members nevertheless 'have less opportunity than other

members of the electorate … to elect representatives of their choice.'" *Barnett*, 141 F.3d at 705;

*DeGrandy*, 512 U.S. at 1000 ("We hold that no violation of § 2 can be found here, where, in spite

of continuing discrimination and racial bloc voting, minority voters form effective voting

majorities in a number of districts roughly proportional to the minority voters' respective shares"

of the voting population). Section 2, in other words, does not require states to draw as many

20

majority-minority districts as they possibly can. *Id.* at 1017 ("Failure to maximize cannot be the measure of § 2.").

Here, it is indisputable that Latinos' share of the statewide CVAP in Illinois is proportional to the number of *unchallenged* Latino-majority districts in the Illinois Map. The U.S. Census Bureau provides citizenship data through its "American Community Survey" ("ACS"). The ACS for 2005-2009, available to the Illinois mapmakers in Spring of 2011, found that the Latino CVAP statewide was 8.2%. *See* SOF, Exh. Q, Affidavit of Dr. Allan Lichtman, at 4-5. Calculating 8.2% of Illinois's 118 House Districts yields a number of 9.68 seats. *Id.* If one were to use the recently-released 2010 ACS, not available to the map drawers, the Latino statewide CVAP would be 8.7%, translating into 10.27 seats in the Illinois House. *Id.* Either calculation rounds to ten House seats.

Now that Plaintiffs have dropped nine of their ten Section 2 challenges to House Districts under the Illinois Map, the Court is presented with ten Latino-majority districts that are not challenged under Section 2. (DE # 65, Am. Complt., ¶ 118.) Thus, Latinos enjoy proportional representation under the Illinois Map.[3]

Seeking to avoid the difficult hurdle they face, Plaintiffs try to dodge it altogether by arguing that CVAP is not the appropriate standard for judging proportionality, but rather that this Court should look at the statewide Latino VAP. (DE # 65, Second Am. Complt., ¶ 116.) Their Voting Rights Act expert, Dr. Baodong Liu, bases his conclusions on that same flawed premise. *See* SOF, Exh. P, Report of Dr. Baodong Liu, at p. 8. Plaintiffs challenging the 2011 Illinois Congressional Map tried that argument, too, and failed. *See Comm. for a Fair & Balanced Map v. Illinois State Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567 at * 5 (N.D. Ill. Nov. 1,

---

[3] Defendants do not concede that these ten Latino-majority districts are the only ones in the Illinois Map that provide Latinos an effective opportunity to elect their preferred candidate. In other words, Defendants do not concede that a proportionality analysis at trial would be limited simply to ten Latino-effective districts. Simply for the purposes of this Motion, however, because Plaintiffs' expert limits what he considers effective Latino districts to be the ten Latino-majority districts (*see* SOF, Exh. P, Report of Dr. Liu, at 8) for the purposes of proportionality, Defendants will accept that conclusion *arguendo* as an operative premise.

21

2011) (appropriate standard for proportionality inquiry is statewide CVAP, not VAP). The

Seventh Circuit has clearly held that CVAP is the appropriate standard for proportionality,

*Barnett*, 141 F.3d at 705, as has the Supreme Court. *LULAC*, 548 U.S. at 436.

Plaintiffs, therefore, must overcome the fact that the Illinois Map provides Latinos with

proportional representation by introducing additional evidence that demonstrates not just the

*possibility* but the *need* for an additional Latino-majority district. It is not nearly enough to simply

satisfy the three *Gingles* prongs. *DeGrandy*, 512 U.S. at 1011. In *DeGrandy*, Florida's

redistricting plan contained 9 Latino House districts out of 20 overall districts in Dade County

(45%). Latinos comprised 47% of the voting electorate in Dade. The district court found that 11

Latino-majority districts *could* be drawn—that is, plaintiffs satisfied the *Gingles* factors in 11

separate areas in the Dade County area. *Id.* at 1002. The lower court bolstered this conclusion by

finding that "Florida's minorities bore the social, economic, and political effects of past

discrimination." *Id.* at 1004. The court thus ordered the drawing of 11 Latino-majority districts.

The Supreme Court reversed. The Court did not dispute that plaintiffs could satisfy the

*Gingles* factors in 11 different proposed districts or that Latinos suffered historical and current

discrimination. But the court rejected the district court's interpretation of Section 2 as mandating

the maximization of Latino-majority districts: "Without more, and on the apparent assumption

that what could have been done to create additional Hispanic supermajority districts should have

been done, the District Court found a violation of § 2. But the assumption was erroneous, and

more is required . . . ." *Id.* at 1009. Because "Hispanics in Dade County would enjoy substantial

proportionality ... we think the State's scheme would thwart the historical tendency to exclude

Hispanics, not encourage or perpetuate it." *Id.* at 1014.[4]

---

[4] In the 1994 *DeGrandy* decision, the Court based its proportionality numbers on minority VAP, and on a countywide level, not statewide. 512 U.S. at 1014. Both *LULAC* and *Barnett* have subsequently clarified, however, that the

22

The report of Dr. Liu, their expert, is exclusively devoted to Gingles. However inadequate it may be, Plaintiffs' evidence is thus limited to the three *Gingles* factors. There is no discussion in his report of the myriad factors that go into a totality-of-the-circumstances analysis, other than perhaps his flawed view of proportionality being measured by statewide Latino VAP instead of CVAP. Even assuming as true, for the purposes of this Motion, that RD 23 is not "effective" under Section 2, neither Dr. Liu nor any other evidence presented by Plaintiffs explains in any way why it is necessary for the Illinois Map to *maximize* Latino-majority districts—that is, create Latino-majority districts in excess of proportionality. In *DeGrandy*, the district court's findings of present and historical discrimination suffered by Latinos did not suffice to require additional Latino districts above proportionality. In this case, Plaintiffs have even less evidence; they have none.[5]

Because the law and undisputed facts show that, at a bare minimum, the number of *unchallenged* Latino-majority districts in Illinois are proportional to Latinos' statewide CVAP, and because Plaintiffs have not even attempted to put forth any evidence that, under the totality of the circumstances, Illinois should maximize Latino-majority districts by adding a sixth Latino-majority district in the area of RD 23, summary judgment should be entered for the Defendants on Count 1.

---

appropriate standard for proportionality is CVAP on a statewide basis. *LULAC*, 548 U.S. at 437 ("We conclude the answer ... is to look at proportionality statewide"); *id.* at 436 (the proportionality inquiry "compar[es] the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population."); *Barnett*, 141 F.3d at 704 ("We think that citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of [Section 2]."); *id.* at 705 (considering CVAP on a citywide basis, as the redistricting plan at issue was a city map, not state).

[5] *See Larios v. Cox*, 314 F. Supp. 2d 1357, 1365 n.11 (N.D. Ga. 2004) (three-judge court) (upholding redistricting plan where 24.44% of state House districts and 23.20% of Senate districts were majority-minority and where African-Americans comprised 25.62% of the state's voters, relying on *DeGrandy*'s rough-proportionality analysis, and noting that there was no evidence that the plans "constrict[ed] any minority group's access to the political process").

Respectfully submitted,

By: /s/ Richard J. Prendergast, Esq.
One of the Attorneys for Defendants Illinois
State Board of Elections, its Executive
Director, and individual members

Brent D. Stratton
Chief Deputy Attorney General
Office of the Illinois Attorney General
100 W. Randolph, 12th Floor
Chicago, IL 60601
(312) 814-4499

Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(312) 641-0881

David W. Ellis
Special Asst. Attorney General
402 State House
Springfield, IL 62706
(217) 782-3392

Eric M. Madiar
Special Asst. Attorney General
605 State House
Springfield, IL 62706
(217) 782-2156

Michael J. Kasper
Special Asst. Attorney General
222 N. LaSalle St., Suite 300
Chicago, IL 60601-1013
(312) 405-3292

William J. Harte
Joan M. Mannix
William J. Harte, Ltd.
135 S. LaSalle St., Suite 2200
Chicago, Illinois 60603
(312) 726-5015