THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, ANGEL GARCIA, and EDWIN TOLENTINO, and THE ILLINOIS REPUBLICAN PARTY (Intervening Plaintiff), | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) No. 1:11-cv-04884 ) |
| vs | ) Judges Sykes, Bucklo and Simon ) (3-judge court convened pursuant to 28 ) U.S.C. § 2284) |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, and JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, AFRICAN AMERICANS FOR LEGISLATIVE REDISTRICTING (Intervening Defendant), UNITED NEIGHBORHOOD ORGANIZATION (Intervening Defendant), | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**DEFENDANTS' STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(a)(3)**

Pursuant to Local Rule 56.1(a)(3), Defendants, ILLINOIS STATE BOARD OF

ELECTIONS, RUPERT BORGSMILLER, HAROLD D. BYERS, BRYAN A. SCHNEIDER,

BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE,

CHARLES W. SCHOLZ, and JESSE R. SMART (collectively referred to herein as

"Defendants"), by their respective undersigned attorneys, submit the following Statement of Material Facts as to which there is no genuine issue. The Defendants contend that the law applicable to the facts below supports the entry of summary judgment in their favor and against Plaintiffs on Counts 1 and 5 of Plaintiffs' Second Amended Complaint.

## Parties, Venue and Jurisdiction

1. The Plaintiffs are a mix of three Republican state legislators (Christine Radogno, Thomas Cross and Adam Brown), the Illinois Republican Party (an intervening plaintiff), and three alleged citizens-voters (Veronica Vera, Angel Garcia and Edwin Tolentino). *See* Exhibit ("Exh.") A, Second Amended Complaint ("SAC"), ¶¶ 2-7.

2. One of the Plaintiffs, Adam Brown, is a Republican State Representative from what is currently the 101st Representative District and is alleged to be a duly registered voter and citizen residing in the State of Illinois in Macon County within the boundaries of Representative District 96 of the Redistricting Plan. *See* Exh. A, SAC, ¶ 5.

3. Defendant Borgsmiller is the Executive Director of the Illinois State Board of Elections and has been sued only in his capacity as such. *Id.* at ¶ 10.

4. Defendants Byers, Schneider, Coffrin, Gowen, McGuffage, Rice, Scholz and Smart are members of the Illinois State Board of Elections and are sued only in their respective capacities as members of the Illinois State Board of Elections. *Id.* at ¶¶ 11-18.

5. This Court has jurisdiction under 28 U.S.C. §§ 1337 and 1343 because Plaintiffs seek relief pursuant to 42 U.S.C. § 1983 based on alleged violations of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1973, the Voting Rights Act of 1965. *See* Exh. A, ¶ 19.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiffs claim that substantial acts are alleged to have occurred within the Northern District of Illinois. *Id.* at ¶ 20.

## The Illinois State Re-Districting Process

7. The Illinois General Assembly redrew its State House and Senate districts following the 2010 decennial census through the enactment of Public Act 97-6 ("PA 97-6"), which passed both chambers of the Illinois General Assembly on May 27, 2011. *See* PA 97-6, Ill. Gen. Assembly.

8. Prior to the enactment of PA 97-6, the Illinois House and the Illinois Senate held hearings throughout the State of Illinois at which interested parties and interests were given the opportunity to present their views as to the formulation of Senate and House districts. *See* Exhs. B-1 through B-4, respectively Hearing Transcripts dated 3/28/11, 4/6/11, 4/19/11 and 5/24/11.

9. Prior to enacting PA 97-6, the Illinois House of Representatives passed House Resolution 385 ("HR 385") and the Illinois Senate passed Senate Resolution 249 ("SR 249"). *See* P.A. 97-6, § 5(c) Ill. Gen. Assembly. *See* Exhs. C and D, respectively HR 385 and SR 249.

10. HR 385 and SR 249 provided narrative explanations of the re-drawn House and Senate Districts, setting forth many of the reasons why the districts were drawn as they were. *Id.*

11. For purposes of identifying legislative intent pertinent to PA 97-6, HR 385 and SR 249 were adopted and incorporated by reference as part of PA 97-6. *Id.*

12. The Illinois redistricting map enacted under PA 97-6 establishes House districts that are precisely compliant with the constitutional requirement of one person, one vote. Each of the 118 House Districts consists of either 108,734 or 108,735 residents. *See* Exh. C, HR 385 at pp. 2-5.

13. HR 385 and SR 249 reflect that the partisan composition of each district was one of a number of factors considered in drawing the district boundaries for legislative districts. *See* Exh. C, HR 385 at p. 3; Exh. D, SR 249 at p. 3.

### Plaintiffs' *Shaw* Challenge to RD 96

14. On October 31, 2011, Plaintiffs filed their Second Amended Complaint. *See* Docket No. 65.

15. Count 5 of the Second Amended Complaint seeks to challenge Representative District 96 on equal protection grounds, contending that "the Democratic Caucuses used the ethnicity of the African-American communities in Springfield and Decatur as the prominent factor over all other constitutional and traditional redistricting principles in drawing Representative District 96." *See* Exh. A, SAC ¶ 198.

16. RD 96 contains a White Voting Age Population ("VAP") of 71.3%, an African-American VAP of 24.87%, and an Asian VAP of 1.01%. *See* Exh. C, HR 385, p. 282. Thus, the African-American VAP of RD 96 comprises less than 25% of RD 96's total VAP. *Id.*

### Evidence Considered by the General Assembly Regarding RD 96

17. The concept of joining the downstate urban centers of Springfield and Decatur was first proposed by the African-Americans for Legislative Redistricting ("AALR"). An AALR representative, Lawrence Hill, testified that there exists numerous communities of interest between voters in the eastern part of Springfield and the area of Decatur included within District 96:

> "Poor education outcomes, poor economic outcomes for the citizens. There is a stream of commerce between those two along I-72 [Interstate Highway 72]. They advertise in those same communities, the print media does and the radio. They worship along those communities. And when I say that, I say that there are people who are from Springfield who go to Decatur and vice versa for services."

4

*See* Exh. E, Deposition of Lawrence Hill, at pp. 42-43.

      18.     Mr. Hill testified that he sought input from individuals such as Reverend Eric Jackson, a pastor in Decatur, who told him that some of his parishioners travelled from Springfield for services. *Id*. at pp. 74-75.

      19.     During his testimony, Mr. Hill also discussed the idea of joining the urban centers of Springfield and Decatur with former Springfield Alderman Frank McNeil, a community activist who was also the lead plaintiff in *McNeil v. City of Springfield*, 851 F.2d 937 (7th Cir. 1988), where he challenged Springfield's at-large system of voting for park and school boards. Mr. McNeil told Mr. Hill that he favored the inclusion of those two urban centers in a single district. *Id*. at 55-56.

      20.     Current Springfield Alderman Doris Turner testified to a joint House-Senate hearing in favor of joining "the eastern parts of Springfield, communities along Interstate 72, and western Decatur." *See* Exh. F, Testimony of Doris Turner, at p. 124. She testified as follows:

> Currently both of these communities are urban areas that continue to be represented by individuals with a very rural perspective. This dilemma speaks to our most fundamental right, appropriate representation by our government. *** When concerns are not understood and appropriately addressed, it leads to the disenfranchisement of an entire community. And I believe that's the situation currently being experienced by the individuals residing in Springfield and Decatur.
>
> I think it should also be brought to your attention that currently these two cities are joined by media markets and co-sponsor events and a lot of other things that join them together in a very real way throughout the entire year.
>
> *** We, the people residing within this community, want our voices to be heard and stand wholeheartedly in support of the new 96th House District. This House District will bring a new focus and attention to the many issues that continue to plague this community, among them an increase in violence and declining educational outcomes, and increase voter participation in the election process.

*Id*. at 124-26.

21. Alderman Turner elaborated that the common issues these urban centers faced included inner-city violence, declining educational outcomes, and "the types of jobs that need to be brought into both of these communities." *Id*. at 128. She stated that she previously served on the Sangamon County Board and in that capacity, represented both the inner-city portion of Springfield and portions of the outlying rural area, "but their issues were very—were very different." *Id*. at 131.

22. Turner stated that her constituents in inner-city Springfield did not feel as if they were adequately represented by the current state representative, whom she saw as more responsive to rural issues than to the unique issues facing urban Springfield. *Id*. at 132-33.

23. Ultimately, the AALR proposed to the General Assembly a House District that included the two urban centers in Decatur and Springfield. Democratic staff for the House and Senate drafted a district that was not identical to the AALR proposal but that did contain those two urban centers. *See* Exh. D, SR 249 at p. 86.

**Legislative Intent as Expressed in HR 385 and SR 249**

24. The General Assembly outlined its legislative intent regarding the drafting of RD 96 in HR 385 and in SR 249's discussion of Senate District 48 (which contains RD 96). *See* Exhs. C and D. In that regard, the General Assembly made the following findings with respect to RD 96:

- RD 96 contains the equal-population target of 108,734 residents. *See* Exh. C, HR 385 at p. 276.

- The boundaries of RD 96 generally adhere to township boundaries, follow major roadways such as Illinois Route 48, or run along natural boundaries, such as the Sangamon River. *Id.* at p. 277.

- RD 96 contains a strong community of interest of government employees, both state, county, and municipal. State employees work at the state capital in Springfield and at the state prison in Decatur, and many Decatur residents travel

along Interstate 72 to work at the state capital. As Springfield is the county seat of Sangamon County and Decatur is the county seat of Macon County, these two cities are home to many county as well as municipal employees. *Id.* at p. 281; *see* Exh. D, SR 249 at p. 85. Government employees at all levels generally have similar income levels and have shared interests in political issues such as controversial legislation in Illinois (as in other states) concerning reform of government employee pensions, as well as facility closings and employee layoffs caused by budgetary constraints in state, county, and local governments.

- The majority of the portions of Springfield and Decatur included in RD 96 have median household incomes of less than $45,000 and require greater social services than the rural communities surrounding them. Both communities are central Illinois, urban population centers with a high population of African-Americans. "Under the current [2001] map, both of these communities are isolated and surrounded by rural farm communities with few minorities and have little in common with their neighbors." These communities are linked by Interstate 72, and "many African-American residents of one community have links to the other either through family, churches, or their employment." *See* Exh. C, HR 385 at pp. 281-82.

- RD 96 was drawn to include, in Springfield, all of the Mid-Illinois Medical District (only the second medical district in Illinois), including the state-of-the-art medical facilities Southern Illinois School of Medicine, the Simmons Cancer Institute, Memorial Medical Center, and St. John's Hospital, and in Decatur, the Decatur Memorial Hospital and St. Mary's Hospital. These facilities provide vital health care services to numerous residents of RD 96 and Senate District 48. *See* Exh. D, SR 249 at p. 86; Exh. C, HR 385 at p. 278. Health-care professionals generally have common interests (along with the health-care facilities themselves) with political issues such as health-care reform, medical-malpractice reform, and laws concerning health insurance.

25. The House and Senate resolutions described the specific boundary lines forming

the outline of RD 96 as follows:

- Northern Border: To maintain a continuous district from east to west, many township lines and precinct lines the Christian County border are utilized as the majority of the northern border of RD 96. Rochester Township and Rochester are split for equal-population purposes so that the Mid-Illinois Medical District in Springfield can remain intact. *See* Exh. C, HR 385 at pp. 277, 278; Exh. D, SR 249 at p. 84.

- Southern Border: The southern border of proposed RD 96 goes east to west along the Pleasant View Township border and then follows Illinois Route 48 diagonally south. Further west, the southern border splits Taylorville Township to allow the vast majority of the non-rural parts of the city of Taylorville to

7

remain in neighboring RD 95, as they were in the 2001 map, and cuts across southern South Fork Township where it meets the western border of RD 96. In part because the boundaries of RD 96 are predominantly along county and township boundaries, much of the southern boundary of RD 96 is drawn in order to satisfy equal population. *Id.* at p. 277.

- <u>Western Border</u>: The western border of proposed RD 96 runs along the borders of South Fork and Cotton Hill townships and then moves into the city of Springfield and takes in the low-income areas of the city. *Id.* at p. 280.

- <u>Northwest/Springfield</u>: The boundaries within Springfield follow precinct lines and are largely based on socioeconomic status. Exh. D, SR 249 at 84, Exh. C, HR 385 at 276-82. The Springfield area of RD 96 is located east of MacArthur Boulevard, a major thoroughfare and recognizable east-west boundary to Springfield residents. Using this boundary, the villages of Jerome and Southern View and the city of Leland Grove are excluded from RD 96. Those municipalities share more in common with the west, north, and south sides of Springfield in that they have a much lower percentage of minorities and a higher median income than the east side of Springfield. RD 96's boundary in Springfield also roughly follows the line that divides Springfield Wards 2, 3, and 5 from Wards 6, 7, and 8. As stated previously, parts of Rochester and Rochester Township are split so that the Mid-Illinois Medical District could be entirely included in RD 96. *Id.* at p. 278.

- <u>Northeast/Decatur</u>: The boundaries in Decatur are to a large extent based upon major roadways and Decatur's municipal borders. RD 96 does not contain the more affluent areas of Decatur on the east and south sides of Lake Decatur. *Id.* at p. 279.)

**Further Evidence Regarding Communities
Of Interests Between Springfield And Decatur**

26. Frank McNeil, a former Springfield Alderman, former Sangamon County Board member and community activist in the Springfield/Decatur area, has by sworn affidavit testified that Springfield and Decatur communities included within RD 96 share a number of commonalities and communities of interest. *See* Exh. G, McNeil Affidavit. In that regard, Mr. McNeil has explained that he and other African-Americans from both cities, have come together in Springfield or Decatur on many occasions for many different things, as the distance between the two cities is only a 30-minute drive along Interstate 72. *Id* at ¶ 12(a). For instance,

Mr. McNeil explained that there are chapters of African-American fraternities and sororities in both cities where the groups come together socially on a regular basis for scholarship drives, dances and other philanthropic efforts. *Id.* at ¶ 12(b).

27. The churches in both cities share parishioners from each city. In fact, Mr. McNeil's brother, the Reverend Earnest McNeil, who also lives in Springfield, at one time pastored a church in Decatur. *Id.* at ¶ 12(c). And demonstrating the interrelatedness of the African-American church community between the cities is the existence of the Wood River Church Association, an association made up African-American churches from Springfield, Decatur and other towns in central Illinois. *Id.* at ¶ 12(d).

28. Mr. McNeil further explained in his affidavit that every summer Decatur has what is called the "Decatur Celebration." *Id.* at ¶ 12(e). It is a two day festival in the streets of downtown Decatur that features entertainment, food and booths with vendors selling a variety of items. *Id.* He has attended this event for the past 20 years. *Id.* Many Springfield residents with common interests look forward to this event, as it gives them an opportunity to get together with friends from Decatur, whom are both black and white, in a relaxing and festive atmosphere. *Id.*

29. In addition, Mr. McNeil has described how there are social clubs that share membership from both cities, from "The Elks" to a motorcycle club that is multi-racial. *Id.* at ¶ 12(f).

30. Mr. McNeil explained that there are African-American newspapers with circulations that include Springfield and Decatur: Pure News USA, Capital City Courier and The Voice. These papers cover the goings on in the African-American communities in central Illinois, and many times give African-Americans a voice to be heard by those who choose to read the papers. *Id.* at ¶ 12(g).

31. In terms of socio-economic issues, Mr. McNeil explained that African-Americans in these communities disproportionately, experience higher unemployment rates, have limited employment opportunities or labor occupations, lower educational levels, lower socio-economic status, live in segregated housing, have limited access to adequate healthcare and are the victims of crime. *Id.* at ¶ 12(i).

### Shape and Compactness of RD 96

32. Based upon visual inspection, the shape of RD 96 is unremarkable. *See* Exh. H, RD 96 map. It does not contain narrow corridors, snake-like appendages, or spindly tentacles. *Id.*

33. Many of the boundary lines of RD 96 stretch for several miles as entirely straight lines and most of the boarders follow county or township boundaries or other logical boundaries. *See* Exh. C, HR 385.

34. The distance between Springfield and Decatur is 28.72 miles, connected by Interstate Highway 72. *See* Exh. I.

35. RD 96 is not nearly the longest or widest Representative District in Illinois. *Id.*

36. RD 96 differs from District 12 in the *Shaw* cases, which spanned 160 miles and, for much of its length, was no wider than the I-85 corridor. *See* Exhs. J-1, map of *Shaw*'s District 12 in North Carolina map as a whole, and J-2, map of District 12 alone.

37. RD 96 is unlike the districts invalidated in *Bush v. Vera*, 517 U.S. 952 (1996), where District 30 consisted of "narrow and bizarrely shaped tentacles," District 18 contained "many narrow corridors, wings, or fingers," and District 29 resembled "a sacred Mayan bird" with a "plumed head," "spindly legs," an "open beak," and "ruffled feathers." 517 U.S. at 965, 973-74. *See* Exhs. J-3, J-4, and J-5 for maps of these invalidated districts.

38.     As is explained in the affidavit of Dr. Gerald Webster, there are several different methods that have been proposed to evaluate geographic compactness of electoral districts over the past few decades, including the geographic dispersion or Reock Measure, and the perimeter or Polsby-Popper Measure. *See* Exh. K, Webster Report, p. 1. These two measures were highlighted in a 1993 *Michigan Law Review* article by Richard Pildes and Richard Niemi, and have become the most commonly employed indicators for evaluating district compactness. *Id.*

39.     The geographic dispersion compactness measure focuses on the level of spatial concentration of a district's geographic area. *Id.* To calculate this indicator the smallest possible circle is circumscribed around a district. *Id.* The reported coefficient is the proportion of the area in the circle that is also included in the district. *Id.* The coefficient ranges from 1.0 (most compact) to 0.0 (least compact). *Id.* Notably, a perfect square has a geographic dispersion coefficient of 0.64, and a typical rectangle has a score of approximately 0.40. *Id.*

40.     The perimeter compactness measure focuses on the length of a district's perimeter relative to the amount of area included in the district. *Id.* The reported coefficient is the proportion of the area in the district relative to a circle with the same perimeter. *Id.* The coefficient also theoretically ranges from 1.0 (most compact) to 0.0 (least compact). *Id.* at pp. 1-2. A perfect square has a perimeter coefficient of 0.78, and a typical rectangle has a coefficient of approximately 0.60. *Id.* at p. 2.

41.     The above noted Pildes and Niemi (1993: 565) article provides guidance for evaluating the two compactness measures. *Id.* at p. 2. Paying substantial attention to the Court's language in *Shaw v. Reno* (1993), Pildes and Niemi propose cut off levels for low compactness for both measures. *Id.* With respect to the geographic dispersion compactness measure they suggest that low is equal to or less than 0.15. On the perimeter measure they suggest that low is

11

equal to or less than 0.05. With respect to this guidance they state that "In choosing the cutoff points used . . . [here] . . . we do not imply that all districts below these points, or only those districts, are vulnerable after *Shaw* (Pildes and Niemi 1993: 564). *Id.*

42. The mean level of compactness for all 118 districts in the Illinois Redistricting Plan on the geographic dispersion or Reock measure is 0.35. *Id.* House District 96's coefficient on this measure is 0.32. *Id.* Both the plan mean and District 96's coefficient are more than double the magnitude of the proposed cutoff level for low compactness of 0.15 noted above. *Id.* District 96's coefficient is further only slightly less than the mean for the plan as a whole. *Id.*

43. The mean level of compactness for all 118 districts in the Adopted Plan on the perimeter or Polsby-Popper measure is 0.27. *Id.* House District 96's coefficient on this measure is 0.22. *Id.* Both the plan mean and District 96's coefficient are more than four times the magnitude of the proposed cutoff level for low compactness of 0.05. *Id.* While House District 96's coefficient on this measure is 0.05 less than the Adopted Plan's overall mean, its score of 0.22 remains well above the Pildes and Niemi (1993: 565) suggested cutoff point for low geographic compactness. *Id.*

44. House District 96's coefficients on the Reock (geographic dispersion) and Polsby-Popper (perimeter) compactness measures are substantially above the Pildes and Niemi (1993: 565) suggested cutoff levels for low geographic compactness. *Id.* House District 96's coefficients on the Reock (geographic dispersion) and Polsby-Popper (perimeter) compactness measures vary only moderately from the means for the plan as a whole. *Id.* As a result, House District 96's level of geographic compactness is evaluated favorably. *Id.*

**Partisan Considerations Played a Role in Drafting RD 96**

45.     Dr. Allan Lichtman testified to a joint House-Senate hearing that, based on actual voter behavior, he found a "substantial correlation" between African-American voters and preference for the Democratic candidate in general elections. *See* Exh. B-4, 5/24/11 Hearing Tr. at pp. 22, 83.

46.     The affidavit of Tim Mapes, the principal drafter of the Illinois Map for the House, makes clear that one of the principal reasons for joining the urban centers of RD 96 was to have a downstate district where Democrats had a chance to compete. *See* Exh. L at ¶ 8.

47.     Mr. Mapes never looked at the racial demography of RD 96 before signing off on the final line-drawing. *Id.* He did, however, look at the map overlaid with the results of the "Democratic Index" created by staff to judge the partisan composition by precincts. *Id.* That map, attached as Exhibit M, colored areas that were majority-Republican shades of red (the more Republican, the darker the shade of red) and those that were majority-Democratic shades of blue (the more Democratic, the deeper the shade of blue), as the key indicates.

48.     The map shows that the vast majority of the area in and around RD 96 was heavily Republican (red) and that virtually the only area that was Democratic (blue) was contained within the northwest and northeast borders of RD 96. *See* Exh. M. In fact, in comparing Exhibits N and M, it is patently clear that the heaviest African-American precincts in RD 96 (the darkest purple in N) were the most heavily Democratic (the darkest blue in M).

49.     RD 96 splits the counties of Macon, Sangamon, and Christian (*see* Exh. A, SAC, ¶ 195), but the 2001 Illinois Map did so as well. *See* Exh. L, ¶ 12; Exh. O, Counties split by Currie House Map. I.

50. As detailed in SR 295 and HR 385, RD 96 was drawn along precinct, township, municipal, and county lines. *See* Exh. D, SR 295 at pp. 84-85; Exh. C, HR 385 at pp. 276-82.

### Substantial African-American Population Adjacent to RD 96 Was Not Included

51. The undisputed, publicly-available census data on racial demography, when laid over the map of RD 96 shows that the General Assembly passed on the opportunity to include a significant block of African-Americans residing adjacent to RD 96. *See* Exh. N.

52. Exhibit N shows the African American population in and around RD 96 by precincts. As the key indicates, the shades of purple vary according to percentage of African-Americans residing in that precinct. The northwest corner of RD 96 (the bottom left on the page) is the city of Springfield and the northeast corner (top left on the page) is Decatur.

53. The map, found in Exhibit R, under the title "Hypothetical Springfield-Decatur District to Maximize African-American Population," dropped total population in by 9% (to 98,948) and reached out to capture as many African-Americans as possible, resulting in an African-American VAP in RD 96 of 30.31%, an increase of almost six percentage points compared to RD 96 as drawn in P.A. 97-6.

### RD 23: Proportionality (VAP v. CVAP)

54. On behalf of Plaintiffs. Baodong Liu has submitted a report regarding RD 23's compliance with Section 2 of the Voting Rights Act. *See* Exh. P, Liu Report. Section VII of the Liu report on page 8 addresses the issue of whether the state of Illinois has achieved rough proportionality with Latino voting strength in establishing 10 unchallenged effective Latino opportunity districts for the State House. *Id.* at p. 8. The Liu report notes that Latinos are "13.45% of the state's total VAP" according to the 2010 US Census. *Id.* He then multiplies this

14

percentage of the state's total VAP by 188 House districts to translate this percentage into "15.86 seats for Hispanics in the 118-seat State House of Representatives." *Id.*

55. At the time of the May 2010 redistricting for the state legislature, decision-makers had available to them citizenship data for the United States Bureau of the Census, American Community Survey for 2005- 2009 (ACS). *See* Exh. Q, Affidavit of Allan J. Lichtman, p. 4. As a report of the Census Bureau has noted, "The ACS is the replacement for the decennial census long form." *Id.* at pp. 4-5. It provides sample data on citizenship, no different from such sample data on citizenship reported during the regular Census year of 2000 for example. *Id.* Social scientists and governments across the United States rely on data from the ACS. *Id.* The Census report stated, "Information from the survey generates data that help determine how more than $400 billion in federal and state funds are distributed each year."[1] *Id.*

56. According to the 2005-2009 ACS data, available to the state in the Spring of 2011, the Latino citizen voting age percentage (or what is referred to as CVAP) across the state of Illinois was 8.2 percent. *Id.* At the level of the state of Illinois, where there is little sampling error, ACS data is highly reliable within an error margin of just of few tenths of one percent. According to Dr. Liu's methodology, this percentage translates into 9.68 seats for Hispanics in the 118-seat State House of Representatives. *Id.* at p. 5. Thus with 10 unchallenged effective Latino opportunity House districts the state of Illinois was well within the bounds of "rough proportionality." *Id.*

57. Since adoption of the state legislative plan, the US Bureau of the Census has released in 2010 citizenship data. *Id.* This data is little changed from the 2005 to 2009 data. *Id.* For 2010, the Latino citizen voting age percentage across the state of Illinois was 8.7 percent,

---

1 "Citizen Voting Age Population (CVAP) Special Tabulation From the 2005-2009 5-Year American Community Survey," p. 1, http://www.census.gov/rdo/pdf/CVAP_Documentation_Version2.pdf.

with once again an error margin of only a few tenths of a percent. *Id.* According to Dr. Liu's methodology, this percentage translates into 10.27 seats for Hispanics in the 118-seat State House of Representatives, still placing the state of Illinois well within "rough proportionality." *Id.*

### RD 23: *Gingles* Prong 3

58. As Plaintiffs' expert, Dr. Liu, recognizes in his report, to meet the requirements of *Gingles* Prong 3, analysis must demonstrate that in challenged districts of any redistricting plan there is a usual pattern of polarized voting, and secondly, that polarized voting if it exists is sufficiently strong to usually defeat the Latino candidates of choice within challenged districts. *See* Exh. P, Liu Report, p. 3.

59. Dr. Liu's results, as reported in Table 13 show that non-Latino bloc voting by whites and blacks in this district was not usually sufficient to defeat the candidate of choice of Latino voters. *See* Exh. Q, Affidavit of Allan J. Litchman, p. 6. To the contrary, Dr. Liu's results show that a white candidate would have prevailed in Adopted RD 23 only in one of four elections, which means that a Latino candidate preferred by Latino voters would have prevailed in three elections in challenged RD 23, for a win rate of 75 percent. *Id.*

60. The findings that Dr. Liu presents in Table 13 demonstrate that the Latino candidate preferred by Latino voters in Adopted RD 23 would have lost only in the 2010 primary for Lieutenant Governor, where there is a lack of cohesion by Latino voters. *Id.* Dr. Liu finds that only 51 percent of Latino voters backed the Latino candidate in that primary. *Id.*

Respectfully submitted,

By: /s/ Richard J. Prendergast, Esq.

                                          One of the Attorneys for Defendants Illinois State Board of Elections, its Executive Director, and individual members

Brent D. Stratton
Chief Deputy Attorney General
Office of the Illinois Attorney General
100 W. Randolph, 12th Floor
Chicago, IL 60601
(312) 814-4499

Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(312) 641-0881

David W. Ellis
Special Asst. Attorney General
402 State House
Springfield, IL 62706
(217) 782-3392

Eric M. Madiar
Special Asst. Attorney General
605 State House
Springfield, IL 62706
(217) 782-2156

Michael J. Kasper
Special Asst. Attorney General
222 N. LaSalle St., Suite 300
Chicago, IL 60601-1013
(312) 405-3292