## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, ANGEL GARCIA, and EDWIN TOLENTINO, and THE ILLINOIS REPUBLICAN PARTY (Intervening Plaintiff), | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-04884 |
| vs | ) ) ) | Judges Sykes, Bucklo and Simon (3-judge court convened pursuant to 28 U.S.C. § 2284) |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, and JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, AFRICAN AMERICANS FOR LEGISLATIVE REDISTRICTING (Intervening Defendant), UNITED NEIGHBORHOOD ORGANIZATION (Intervening Defendant), COLOMBIANOS UNIDOS PARA UNA LABOR ACTIVE (Intervening Defendant), HISPANIC AMERICAN CONSTRUCTION INDUSTRY ASSOCIATION (Intervening Defendant, and FEDERACION JALISCIENSE DEL MEDIO OESTE DE LOS ESTADOS UNIDOS (Intervening Defendant). | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR
## RULE 12(b)(6) MOTION TO DISMISS
## COUNTS 2, 3 AND 4 OF PLAINTIFFS' SECOND AMENDED COMPLAINT

# I.     INTRODUCTION

Plaintiffs' First Amended Complaint contained two claims that the State adopted Redistricting Plan discriminates against Republican voters through the manipulation of district lines to such a degree as to run afoul of the Constitution.  On October 21, 2011, this Court dismissed Count 3 (First Amendment) with prejudice and dismissed Count 4 (Fourteenth Amendment) providing Plaintiffs "leave to amend Count 4 of their Amended Complaint in order to attempt to provide a 'workable test' or a 'reliable standard' for judging partisan gerrymanders."  D.E. 59, p. 11.

Undeterred by this directive, Plaintiffs not only re-filed the same political gerrymander claims in Count 2, but they added, without leave of Court, two completely new counts that they claim "are not political gerrymander claims."  D.E. 59, p. 11. Counts 3 and 4 of the Second Amended Complaint should be dismissed because, if Plaintiffs are taken at their word, they have not been given leave to file new claims at this late state of the litigation, approximately one month before trial.[1]  However, as set forth below, these counts really are nothing other than additional failed attempts to assert political gerrymander claims masquerading as something else, and should be dismissed.

---

[1] While these new counts went beyond the Court's order, Defendants nevertheless treated the Second Amended Complaint as an attempt to take three bites at the political gerrymander apple.  Convinced that none of these three counts succeeded in establishing a workable test or reliable standard, Defendants moved to dismiss all three counts.  In their Reply to the Motion to Dismiss, Plaintiffs, for the first time, announce that although Counts 3 and 4 both claim that the State adopted Redistricting Plan discriminates against Republicans in violation of the 14th Amendment's guarantee of equal protection, neither new Count 3 nor Count 4 are political gerrymandering claims.  If this were the case, both counts should be dismissed for failure to comply with Rule 15(a)(2).  In this regard, it should also be noted that expert discovery is almost concluded (Plaintiffs' experts have filed their reports, and Defendants' experts are to be deposed this week).  Equally importantly, these new claims are being raised for the first time after the deadline for dispositive motions has passed.  In such a circumstance, the heightened good-cause standard of Rule 16(b)(4) applies in considering whether the requirements of Rule 15(a)(2) are satisfied. *Alioto v. Town of Lisbon*, 651 F.3d 715 (7th Cir., 2011).

Count 2 should be dismissed because it completely fails to set forth a standard upon which to judge Plaintiffs' political gerrymander claim. Plaintiffs' defense of Count 2 of the Second Amended Complaint is simply a restatement of the factual allegations they make in the earlier in the Complaint. These factual allegations, however, were also contained, sometimes verbatim, in the First Amended Complaint. As a result, the allegations Plaintiffs point to as establishing a workable and reliable standard were already considered and rejected by this Court. Moreover, any proposed standard fashioned solely upon a restatement of specific factual allegations is no standard at all, and provides neither a workable nor reliable guide for legislatures and courts.

## II.    ARGUMENT

### A.    Count 2 Should Be Dismissed Because it is Nothing More Than a Restatement of The Factual Allegations Set Forth In the First Amended Complaint.

For the past twenty-five years, the Supreme Court has considered many different proposed standards for measuring political gerrymandering claims, and has rejected every one of them. The Supreme Court rejected an "intent and effect standard" in *Vieth v. Jubelirer*, 541 U.S. 267, 283-284 (2004). In *Vieth*, the Supreme Court also flatly rejected a proposed "predominant intent" standard under which "a plaintiff must 'show that the mapmakers acted with a *predominant intent* to achieve partisan advantage,' which can be shown 'by direct evidence or by circumstantial evidence that other neutral and legitimate redistricting criteria were subordinated to the goal of achieving partisan advantage.'" *Id.* at 284 (Emphasis in original). The Supreme Court has also rejected a "sole motivation" standard. *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 418-420 (2006) ("*LULAC*") ("a successful claim attempting to identify unconstitutional acts of

partisan gerrymandering must do what appellants' sole-motivation theory explicitly disavows: show a burden, as measured by a reliable standard, on the complainants' representational rights.").

In *Vieth*, the Supreme Court not only rejected the proposed standards mentioned above, but also a "totality of the circumstances" test. 541 U.S. at 291. The plurality Opinion also rejected Justice Stevens' proposed use of racial gerrymandering analysis (*Id*. at 293-294), Justice Souter's proposed Title VII based standard (*id.* at 295), and Justice Bryer's proposed "unjustified entrenchment" standard. *Id*. at 299. Simply put, "no judicially discernible and manageable standards for adjudicating political gerrymandering claims have emerged." *Id*. at 281.

Plaintiffs argue that the plurality opinion in *Vieth* (Justices Scalia, O'Connor and Thomas and Chief Justice Rehnquist) is not the "Opinion of the Court," contending that the opinion that concurred on the narrowest of grounds was Justice Kennedy's, and that pursuant to his opinion, relief in partisan gerrymandering cases must rest "on the conclusion that [political] classifications, though generally permissible, were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." 541 U.S. at 307 (Kennedy, J., concurring).

It would be hard to find a better example of a "strawman" argument. First of all, the issue that separated Justice Kennedy from the plurality was the question of whether a plaintiff could *ever* state a workable standard. Both Justice Kennedy and the plurality agreed that no such standard, to date, had been proposed, but Justice Kennedy was not willing to "foreclose *all possibility* of judicial relief if some *limited and precise rationale*

were found to correct an established violation of the Constitution in some redistricting cases." 541 U.S. at 306 (Kennedy, J., concurring) (emphasis added).

Plaintiffs, however, try to convert Justice Kennedy's hesitancy in ruling out all possibilities of judicial relief into an opinion of the court that a justiciable standard had been found. He reached no such conclusion. To the contrary, he concluded:

> "Because there are yet no agreed upon substantive principles of fairness in districting, we have no basis on which to define clear, manageable, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights. Suitable standards for measuring this burden, however, are critical to our intervention."

*Id*. at 307-308. Purporting to rely on Justice Kennedy's concurring opinion as defining what an acceptable standard should look like is a red herring that simply attempts to avoid doing what plaintiffs were given leave to do by this Court: "[A]mend and correct Count 4 of their Amended Complaint in order to attempt to provide a 'workable test' or a 'reliable standard' for judging partisan gerrymandering under the Equal Protection Clause of the Fourteenth Amendment." (DE # 59).

In any event, the Second Amended Complaint offers no such standard. It merely seeks to "quantify the extent to which political classifications were applied" and then to conclude that this quantification of political consideration is "invidious" and unrelated "to any legitimate legislative objective." (DE # 78 at p. 3). Merely stating the goal that might be gleaned from the words found in Justice Kennedy's opinion cannot equate with setting a standard – otherwise Justice Kennedy would have concluded that goal to be the applicable standard, in and of itself. He did nothing of the sort, acknowledging that a manageable standard (including each of the proposed standards rejected in the plurality

4

opinion) had not been found and joining the plurality in dismissing the complaint. *Id.* at 317.

In the face of this long history of rejected standards, Plaintiffs do not even try to articulate one. Instead, they offer up what can best be described as an "I know it when I see it" standard, merely restating their factual allegations, such as:

> (1) Democratic incumbents in the Redistricting retain on average 70% of their core constituency (2d Amend. Compl. ¶ 156), but Republican incumbents retain on average 13% less of their core constituency than their Democratic incumbent counterparts. *Id.* ¶ 157.

> (2) That 23% of the Representative Districts in the Redistricting Plan fail to adhere to the compactness requirement as set forth in the Illinois Constitution. *Id.* ¶ 125.

> (3) The current Redistricting Plan is demonstrably less compact and splits more traditional redistricting boundaries, such as municipalities and townships, than its predecessor. *Id.* ¶¶ 112, 114, 146.

> (4) That Republican incumbents were saddled with more than double (69.6% versus 30.4%) the total number of pairings. *Id.* ¶ 158.

Most of these allegations are simply restatements of factual allegations contained in the First Amended Complaint, sometimes verbatim. For example, paragraphs 112 and 125, concerning compactness, are simply verbatim restatements of paragraph 103 and 134 of the First Amended Complaint. D.E. 65. If the allegations were insufficient to survive the first Motion to Dismiss, how can Plaintiffs expect them, simply by renumbering and restating them, to survive here?

Plaintiffs admit that they do not even attempt to enunciate a measurable standard but assure us that "[w]hile there are undoubtedly cases in which it is difficult to determine whether political classifications were applied in an invidious manner or in a way unrelated to any legitimate legislative objective, this case is not one of them." *Id*. at 4. Thus uncertain about a standard, the best Plaintiffs can manage is to translate their

5

factual allegations into a six-factor test: (1) the plan is less compact than the one it replaces; (2) the plan splits more traditional political boundaries than the one it replaces; (3) the plan is demonstrably less compact and splits more traditional political boundaries than necessary; (4) the non-compact districts "effect" the representational interests of the Republican party; (5) minority-party incumbents are deprived of a substantially greater proportion of their core constituencies than majority-party incumbents; and (6) more than two-thirds of incumbent pairings pit one minority-party incumbent against another. (DE # 78, p. 4). In short, Plaintiffs' proposed standard focuses upon four elements: compactness (factors 1, 3 and 4), splitting traditional boundaries (factors 2 and 3), incumbent pairings (factor 6), and constituency retention (factor 5).

None of these four elements, however, even if proven, can possibly lead to the conclusion that a redistricting plan is or is not unfair to a minority party, much less so unfair as to be unconstitutional. Assuming a plaintiff can plead and prove the four elements, what does that establish? At best, Plaintiffs would have a court infer discriminatory intent. Setting aside that questionable proposition, their factors say nothing about the effect of a plan that contains the features they find so objectionable. Indeed, the only mention Plaintiffs make of the plan's effect is to say that the non-compact districts must "effect" the minority party's interests. How the plan must "effect" those interests, they do not say.

Knowing that the Supreme Court has specifically rejected a proposed "totality of circumstances" standard in *Vieth*, Plaintiffs deny that is what they are proposing. Regardless, Plaintiffs' proposal, which is not a standard by any definition, does nothing to assess "when political gerrymandering has gone too far." *Vieth*, 541 U.S. at 296. The

Supreme Court has rejected these multiple factor proposals because "[i]t does not solve that problem to break down the original unanswerable question (How much political motivation and effect is too much?) into four more discrete but equally unanswerable questions." *Id*. at 296-97.

In fact, a plan that contains all of Plaintiffs' "undesirable" elements could be the fairest plan imaginable. Moreover, a plan containing these elements could be the most advantageous possible to the minority party's voters. As Justice Scalia recognized in *Vieth*, "[f]airness is compatible with noncontiguous districts, it is compatible with districts that straddle political subdivisions, and it is compatible with a party's not winning the number of seats that mirrors the proportion of its vote." *Id*.

The same can be said for compactness. A redistricting plan may stretch boundaries for the purpose of ensuring political fairness. A Plan could certainly be less compact, but at the same time, more competitive. And as five Justices in *Vieth* noted, a perfectly "compact" set of districts could have the effect of being politically unfair to one party. *See* 541 U.S. at 289-90 (plurality opinion) (even if mapmakers drew "district lines with no objectives in mind except compactness and respect for the lines of political subdivisions … political groups that tend to cluster [as is the case with Democratic voters in cities] would be systematically affected by what might be called a 'natural' packing effect") (parenthetical in original); *Id*. at 309 (Kennedy, J., concurring) (citing M. Altman, *Modeling the Effect of Mandatory District Compactness on Partisan Gerrymanders*, 17 Pol. Geography 989, 1000–1006 (1998) (explaining that compactness standards help Republicans because Democrats are more likely to live in high density regions)). Compactness, clearly, is not the tool of political neutrality Plaintiffs claim.

The same holds for incumbent pairings. A plan putting two incumbents together in a safe minority party district can be better for minority party *voters* than splitting them into two majority party districts. Finally, while a plan that separates an incumbent politician from his core constituency may make that politician unhappy, that says nothing about the plan's impact on the constituency itself, which may be benefited by such a plan.

It is worth noting that these last two elements, incumbent pairing and constituency retention, are not really even aimed at protecting the interests of minority party voters. Instead, they are directed toward minority *incumbents* complaining that a redistricting plan works against their own interests. It says nothing as to how pairing incumbents in a safe minority party district would necessarily be harmful to minority party *voters*.

The same can be said for constituency retention. Note that Plaintiffs do not complain that the core constituency of a minority party district is fractured into several different majority party districts, but only that a portion of the politician's current constituency is separated from the incumbent politician. The end result is that the politician, separated from some of his current constituents, may complain that he or she has to work a little harder to get to know a new group of voters.

In addition to these shortcomings, Plaintiffs' proposed factors are just an exercise in questions begging. They claim a Plan must be "less compact than the one it replaces." (DE # 78, p. 4.) How is that measured, district by district or statewide? Is it an average? What if it is more compact by one measure, but less by another? Can there be any justification, such as equi-population or the Voting Rights Act? Next, the plan cannot "split more traditional boundaries than the one it replaces." What is a traditional

boundary – counties, municipalities, wards, townships, precincts, parishes? Are they all weighted the same? Is one more boundary split all it takes to push it over the edge? If an election authority changes precinct boundaries next year, does that render unconstitutional a plan that was acceptable today?

Next, the non-compact nature of the plan must "effect" the minority party's "representational interests." *Id*. What they mean by "representational interest," Plaintiffs do not say. Likewise, the nature or extent of that "effect" on that interest is left to the imagination. Indeed, Plaintiffs presumably mean that the plan must have a negative effect on the politician's representational interest, but they do not bother to say so. Regarding constituency retention, how can a legislature possibly be guided by nothing more specific than "substantially more"?

These and the many, many more questions presented by Plaintiffs' factors simply reiterate Justice Scalia's conclusion that "[s]ome criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking." *Vieth*, 541 U.S. at 291.

Finally, a plan that has non-compact districts, splits traditional boundaries, separates incumbents from constituents and pairs incumbents could benefit one party at one election, and another in the next. That is because, as the Court concluded in *Vieth*:

> a person's politics is rarely as readily discernible—and *never* as permanently discernible—as a person's race. Political affiliation is not an immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line. We dare say (and hope) that the political party which puts forward an utterly incompetent candidate will lose even in its registration stronghold. These facts make it impossible to assess the effects of

9

partisan gerrymandering, to fashion a standard for evaluating a violation, and finally to craft a remedy.

*Vieth*, 541 U.S. at 287 (emphasis in original). Perhaps because of this undeniable fact, "no judicially discernable and manageable standards for adjudicating political gerrymandering claims have emerged." *Id*. at 281. Count 2 of the Second Amended Complaint does nothing to change that fact and should, therefore, be dismissed.

**B.      Counts 3 and 4 Should Be Dismissed.**

**1.      Counts 3 and 4 Are Governed By *Vieth* and *LULAC***

Regardless of the window dressing Plaintiffs place around them, it is undisputed that Counts 3 and 4 are equal protection claims alleging that a redistricting plan intentionally discriminated against members of a certain political party. (DE # 65, ¶ 179 (the Illinois Map "intentionally and purposefully discriminates against … Republican voters due to their political beliefs and desire to affiliate" and violates "the Equal Protection Clause"), ¶ 186 (the Illinois Map "invidiously and arbitrarily discriminates against … Republican voters because of their political beliefs and desire to affiliate" and violates "the Equal Protection Clause"). These claims are typically referred to as "political gerrymander" claims but the moniker is irrelevant. What is very relevant, however, is that when an equal protection challenge alleging discrimination against members of a political party is made in the context of legislative redistricting, that claim is governed by *Vieth*, *LULAC*, and its predecessors. *See Vieth*, 541 U.S. at 272-73 (plaintiffs alleged that map violated the "Equal Protection Clause of the Fourteenth Amendment" by creating districts that were "meandering and irregular" and "ignored all traditional redistricting criteria … solely for the sake of partisan advantage."); *LULAC*, 548 U.S. at 416-17 (plaintiffs claimed that the Texas map at issue was "solely motivated

by partisan objectives, violate[d] equal protection" and "burden[ed] one group because of

its political opinions and affiliation"); *Davis v. Bandemer*, 478 U.S. 109, 113 (1986)

(plaintiffs raised "an equal protection challenge to Indiana's 1981 state redistricting on

the basis that the law unconstitutionally diluted the votes of Indiana Democrats").  Thus,

Plaintiffs' attempts to avoid *Vieth et al.* by simply claiming that Counts 3 and 4 "are not

political gerrymandering claims" (DE # 78, p. 11), and basing that so-called distinction

on case law that did not involve redistricting, must fail.

　　Plaintiffs argue that because their alleged *proof* of intentional discrimination

comes in the form of a purported violation of a state constitution, their claims somehow

catapult into an entirely different legal arena—one that does not concern redistricting or

*Vieth* or *LULAC*.  They can cite no support for that proposition because none exists.  For

the purposes of the Equal Protection Clause, there is nothing about an alleged violation of

state law that makes these claims any different than complaints that a map, for example,

paired too many incumbents or created too many "safe" districts for one political party,

or that the map drawers' predominant consideration was partisanship.  The claim of a

federal constitutional violation is made no better or worse by the fact that a state law was

violated; even the case on which Plaintiffs rely so held.  *See Snowden v. Hughes*, 321

U.S. 1, 11 (1944) ("illegality [of canvassing board's actions] under the state statute can

neither add to nor subtract from its constitutional validity. Mere violation of a state

statute does not infringe the federal Constitution.").  Plaintiffs' attempt to find a safe

harbor from *Vieth* and *LULAC* simply by pointing to a state constitutional provision is

therefore unavailing. Counts 3 and 4 are no more, and no less, than claims alleging

11

intentional discrimination against a political party in the drawing of a redistricting map—in other words, they are claims governed by *Vieth* and *LULAC*.[2]

### 2. Counts 3 and 4 Should Be Dismissed Under *Vieth* and *LULAC*

Plaintiffs grudgingly argue at the end of their submission that, if in fact a standard is required, it is this:  "Wherever a map is drawn in violation of state law for a predominantly discriminatory purpose based on party affiliation or political voting patterns, it is a violation of the Equal Protection Clause."  (DE # 78 at p. 11.)  They do not explain why they need two separate counts (Counts 3 and 4) to articulate this standard.  Nor do they explain whether even a single violation of state law will suffice—will a *single* district drawn in violation of the "compactness" provision in a state constitution suffice to strike down the entire statewide map?

Regardless, these questions need not be answered because Plaintiffs' standard was explicitly rejected by five Justices in *Vieth*.  Justice Scalia, writing for the plurality, rejected the "predominant intent" standard that would posit that "partisan intent must outweigh *all other goals*—contiguity, *compactness*, preservation of neighborhoods, etc." *Vieth*, 541 U.S. at 285 (plurality opinion) (emphasis added).  Justice Kennedy concurred with the rejection of the "predominant intent" standard for measuring partisan gerrymandering.  *Id*. at 308 (Kennedy, J., concurring) ("[t]he plurality demonstrates the

---

[2] Notably, of the 28 districts allegedly violative of the Illinois Constitution's compactness requirement (DE # 65, ¶ 125), 17 are minority-opportunity districts, some of which were previously challenged by Plaintiffs under Section 2 of the Voting Rights Act.  While Defendants do not concede that any of these districts lack compactness, it is critical to note that "Section 2 does not forbid the creation of a noncompact majority-minority district."  *LULAC*, 548 U.S. at 402.  Obviously, a state's attempted compliance with Section 2 supersedes any state-law requirement such as compactness.  *See Voinovich v. Quilter*, 507 U.S. 146, 159 (1993) (special master's drafting of map that allegedly "disregarded the requirements of the Ohio Constitution where he believed that [Section 2] required a contrary result" was a proper "preference for federal over state law" and "does not raise an inference of intentional discrimination; it demonstrates obedience to the Supremacy Clause of the United States Constitution.").

shortcomings of the other standards that have been considered to date"). The predominant-purpose standard is a non-starter under *Vieth*.

Plaintiffs assure this Court that "[c]ourts have already decided that one can determine the predominant purpose behind map drawing," citing *Miller v. Johnson*, 515 U.S. 900 (1995). (DE # 78 at p. 11.) But plaintiffs in *Vieth* made this same argument, even citing *Miller*, and the plurality (joined by Justice Kennedy) emphatically rejected a comparison between a "predominant intent" standard for *racial* gerrymandering and one for *political* gerrymandering. *Vieth*, 541 U.S. at 284-85 (plurality opinion).

In fact, Justice Kennedy's concurrence, which plaintiffs regard as the Opinion of the Court, went so far as to single out compactness as an inappropriate principle for judging partisan gerrymandering:

> even those criteria that might seem promising at the outset (*e.g.*, contiguity and compactness) are not altogether sound as independent judicial standards for measuring a burden on representational rights. They cannot promise political neutrality when used as the basis for relief. Instead, it seems, a decision under these standards would unavoidably have significant political effect, whether intended or not. For example, if we were to demand that congressional districts take a particular shape, we could not assure the parties that this criterion, neutral enough on its face, would not in fact benefit one political party over another.

*Id*. at 308-09 (Kennedy, J., concurring) (parenthetical in original).

Thus, Plaintiffs break no new ground here, but rather try to dress up their claims to be something they are not. Indeed, if Plaintiffs could avoid *Vieth* and *LULAC* by simply claiming non-compactness in violation of a state constitution, the floodgates would open for these claims. After all, the *sine qua non* of any gerrymander claim is that the shape of a district is irregular—which is another way of saying "not compact." Virtually every gerrymander plaintiff alleges that districts are not compact. And over

13

half of the states in this country have a constitutional or statutory provision requiring compact districts. Thus, if Plaintiffs are able to avoid the dictates of *Vieth* and *LULAC* simply by raising the utterly unremarkable allegation that the shapes of districts are irregular—or "not compact"—*Vieth* and *LULAC* will be wiped out of existence.[3]

The case law cited by Plaintiffs for their novel theory does not lend them any support. *Snowden* concerned a claim that plaintiff was improperly denied certification as a nominee for a general election. 321 U.S. at 3-4. *Hunter v. Hamilton County Bd of Elections*, 635 F.3d 219 (6th Cir. 2011), was a case reminiscent of *Bush v. Gore* involving the counting of provisional ballots and the use of non-uniform standards in doing so. *Kendrick v. Walder*, 527 F.2d 44 (7th Cir. 1975), did not involve a violation of state law at all, but simply concerned whether the town of Cairo, Illinois violated the equal-protection rights of minorities in holding at-large elections for city council instead of single-district contests. None of these cases involved redistricting, and none of them concerned the transformation of a violation of state law into an equal protection challenge. In fact, *Snowden* expressly held that "[a] construction of the equal protection clause which would find a violation of federal right in every departure by state officers from state law is not to be favored." 321 U.S. at 11-12. These cases do not remotely intrude on the holdings in *Vieth* and *LULAC*, which compel the dismissal of Counts 3 and 4.

Respectfully submitted,

By: /s/ Richard J. Prendergast, Esq.
One of the Attorneys for Defendants
Illinois State Board of Elections, its
Executive Director, and individual
members

---

[3] A list of the 31 states with compactness requirements is attached to this Reply as an Addendum.

14

Brent D. Stratton
Chief Deputy Attorney General
Office of the Illinois Attorney General
100 W. Randolph, 12th Floor
Chicago, IL  60601
(312) 814-4499

Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois  60602
(312) 641-0881

David W. Ellis
Special Asst. Attorney
General
402 State House
Springfield, IL  62706
(217) 782-3392

Eric M. Madiar
Special Asst. Attorney
General
605 State House
Springfield, IL  62706
(217) 782-2156

Michael J. Kasper
Special Asst. Attorney
General
222 N. LaSalle St., Suite 300
Chicago, IL  60601-1013
(312) 405-3292

William J. Harte
Joan M. Mannix
William J. Harte, Ltd.
135 S. LaSalle St., Suite 2200
Chicago, Illinois  60603
(312) 726-5015

15

# ADDENDUM

## STATES WITH COMPACTNESS REQUIREMENTS

**Alaska** - Alaska Const. art. VI, §6.6 (Legislative)
**Arizona** - Ariz. Const. art. IV, part 2, § 14 (Legislative and Congressional)
**California** - Cal. Const. art. II, § 2(d) (Legislative and Congressional)
**Colorado** - Colo. Const. art. V, § 47(1) (Legislative)
**Florida** - Fla. Const. art. III, § 21 (Legislative)
**Hawaii** - Haw. Const. art. IV, § 6 (Legislative); HRS § 25-2(b) (Congressional)
**Idaho** – I.C. § 72-1506 (Legislative and Congressional)
**Illinois** - Ill. Const. art. IV, § 3(a) (Legislative)
**Iowa** - Iowa Const. art. III, § 24 (Legislative); Iowa Code § 42.4 (Legislative and Congressional)
**Maine** - Me. Const. art IV, part first, § 2 (Legislative); 21-A M.R.S.A. § 1206 (Congressional)
**Maryland** - Md. Const. art. III, § 4 (Legislative)
**Michigan** - Mich. Const. art. IV, §§ 2(3), 3 (Legislative); MCL 3.63 (Congressional)
**Mississippi** – Miss. Code § 5-3-101 (Legislative)
**Missouri** - Mo. Const. art. III, §§ 2, 5, 45 (Legislative and Congressional)
**Montana** - Mont. Const. art. V, § 14(1) (Legislative)
**Nebraska** - Neb. Const. art. III, § 5 (Legislative)
**New Jersey** - N.J. Const. art. IV, § 2, ¶¶ 1, 3 (Legislative)
**New Mexico** – NMSA 1978, §§ 2-7C-3, 2-8D-2 (Legislative)
**New York** - N.Y. Const. art. III, §§ 4, 5 (Legislative)
**North Dakota** - N.D. Const. art. IV, § 2 (Legislative)
**Ohio** - Ohio Const. art. XI, § 7(A) (Legislative)
**Oklahoma** - Okl. Const. art. V, § 9A (Legislative)
**Pennsylvania** - Penn. Const. art. II, § 16 (Legislative)
**Rhode Island** - R.I. Const. art. VII, § 1 (House); R.I. Const. art. VIII, § 1 (Senate)
**South Dakota** - S.D. Const. art. III, § 5 (Legislative)
**Vermont** - Vt. Const. ch. 11, §§ 13, 18 (Legislative)
**Virginia** - Va. Const. art. II, § 6 (Legislative and Congressional)
**Washington** - Wash. Const. art. II, § 43(5) (Legislative and Congressional)
**West Virginia** - W.Va. Const. art. I, § 4 (Congressional); W.V. Const. art. VI, § 4 (Legislative)
**Wisconsin** - Wisc. Const. art. IV, § 4 (Legislative)
**Wyoming** - Wyo. Const. art. III, § 49 (Congressional)