IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, CHLOE MOORE, JOE TREVINO, ANGEL GARCIA, ELIDIA MARES, EDWIN TOLENTINO, and THE ILLINOIS REPUBLICAN PARTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | NO. 1:11-cv-04884 |
| vs | ) ) | Judge Elaine E. Bucklo Judge Diane S. Sykes |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, AFRICAN AMERICANS FOR LEGISLATIVE REDISTRICTING, and LATINO COALITION FOR FAIR REPRESENTATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Philip P. Simon |
| Defendants. | ) | |

**OPINION AND ORDER**

This opinion and order addresses the second round of motion-to-dismiss litigation in the ongoing challenge to the Illinois legislative redistricting plan enacted after the 2010 federal Census. The Plaintiffs, a mix of voters, Republican state legislators, and interested parties, filed a complaint alleging that the redistricting plan violates federal and state law. They later amended their complaint, and on October 21, 2011, we issued an order granting in part and denying in part

the Defendants' motion to dismiss the amended complaint. We granted leave to replead some of the dismissed claims.

The Plaintiffs accepted our invitation and filed a Second Amended Complaint. The Defendants again moved to dismiss. The issue now before us is the sufficiency of the Plaintiffs' restated political gerrymandering claims alleged in Counts 2, 3, and 4 of the Second Amended Complaint. In our previous order we gave the Plaintiffs a second opportunity to (1) identify a constitutionally appropriate and administrable standard by which to adjudicate political gerrymandering claims; and (2) make allegations sufficient to raise a plausible inference that the redistricting plan violates the standard. On November 16, 2011, we issued a minute order granting the Defendants' motion and dismissing Counts 2, 3, and 4 of the Second Amended Complaint with prejudice. This opinion explains why the Plaintiffs' second effort falls short.

## BACKGROUND

Our previous order discussed the background allegations in this case, so we will not rehearse them in great detail here. Following the 2010 federal Census, the Illinois General Assembly, pursuant to the state constitution, drew new district lines for its 59 Legislative (or "Senate") districts and 118 Representative (or "House" district). After a series of public hearings, which the Plaintiffs contend were a sham, the new redistricting plan was signed into law on June 3, 2011.

The Plaintiffs in this case include the minority leaders of the two houses of the Illinois General Assembly, several voters, and the Illinois Republican Party, which was granted leave to intervene as a plaintiff on August 20, 2011. The first Amended Complaint named the Illinois

2

State Board of Elections and its individual members as defendants, and alleged violations of the federal Voting Rights Act, political gerrymandering claims under the First and Fourteenth Amendments, racial gerrymandering claims, and various state-law claims.

The Defendants filed a motion to dismiss, which we granted in part and denied in part in our October 21 order. On sovereign immunity grounds, we dismissed the state-law claims entirely and dismissed all claims against the Board itself except for those arising under the Voting Rights Act. We dismissed the Voting Rights Act claims on various grounds, but granted leave to replead. We dismissed the state-wide racial gerrymandering claim, but allowed the racial gerrymandering claim specific to District 96 to go forward. And most importantly for present purposes, we dismissed with prejudice the political gerrymandering claim premised on the First Amendment, but dismissed with leave to replead the political gerrymandering claim arising under the Equal Protection Clause of the Fourteenth Amendment.[1] Regarding the latter, we specifically explained that we were giving the Plaintiffs a chance to articulate a "workable test" or a "reliable standard" for judging partisan gerrymanders and to "make allegations sufficient to give rise to a plausible inference that the redistricting plan violates the standard." [DE 59 at 10-11.] The Plaintiffs filed a Second Amended Complaint, which includes three counts alleging political gerrymandering violations. Count 2 is styled as a traditional partisan gerrymandering claim [DE 65 at 21-24], and Counts 3 and 4 allege that the redistricting plan violates the Equal Protection Clause by discriminating against Republican voters on the basis of their political beliefs and affiliations [DE 65 at 24-26].

---

[1] We also noted that Plaintiffs Christine Radogno and Thomas Cross, respectively the Minority Leaders of the Illinois Senate and House of Representatives, have standing only to raise the political gerrymandering claims, and not any of the others.

## DISCUSSION

As we indicated in our previous order, the Supreme Court's caselaw on political gerrymandering offers limited guidance, as the Court has not coalesced around a position regarding the legal standard by which they are to be judged. The Court first declared partisan gerrymandering claims justiciable in *Davis v. Bandemer*, 478 U.S. 109, 113 (1986), but there was no majority opinion regarding the proper standard for adjudicating these claims. In *Vieth v. Jubelirer*, 541 U.S. 267 (2004), a four-Justice plurality concluded that *Bandemer* should be overruled, and that partisan gerrymandering claims are nonjusticiable. *Id.* at 305-06 (plurality opinion). Justice Kennedy provided the fifth vote to affirm the dismissal of the claim in *Vieth*; he agreed that neither *Bandemer* nor the plaintiffs or the dissenting Justices in *Vieth* had articulated an appropriate standard, but he declined to foreclose all political gerrymandering claims on the chance that a proper standard might emerge in the future. *Id.* at 306 (Kennedy, J., concurring in the judgment).

The Court addressed partisan gerrymandering once more in *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), but did little to clarify the issue for lower courts and litigants. The Court declined to revisit the question of justiciability in *LULAC*. Justice Kennedy, announcing the judgment of the Court, simply noted that the plaintiffs' claims must be dismissed because of "the absence of any workable test for judging partisan gerrymanders." *Id.* at 420.

As we explained in our previous order, the point that we draw from these cases is that political gerrymandering claims remain justiciable in principle but are currently "unsolvable" based on the absence of any workable standard for addressing them. The crucial theoretical

problem is that partisanship will *always* play *some* role in the redistricting process. As a matter of fact, the use of partisan considerations is inevitable; as a matter of law, the practice is constitutionally acceptable. *See Vieth*, 541 U.S. at 286-88 (plurality opinion); *id.* at 313 (Kennedy, J., concurring in the judgment). The relevant question is not whether a partisan gerrymander has occurred, but whether it is so excessive or burdensome as to rise to the level of an actionable equal-protection violation. How much is too much, and why?

So as things currently stand, minority-party plaintiffs may continue to bring political gerrymandering claims, but they face the Sisyphean task of articulating a standard by which judges may reliably and objectively sort the "routine" use of partisanship in redrawing district lines from that which is excessive to the point of violating the Equal Protection Clause. To illustrate concretely the enormity of this challenge, it is useful to identify the standards that a majority of the Supreme Court has rejected:

- A showing of intent to discriminate, plus denial of a political group's chance to influence the political process as a whole (offered by the plurality in *Bandemer*, 478 U.S. at 132-22 (plurality opinion), rejected by a majority[2] in *Vieth*, 541 U.S. at 281-82 (plurality opinion)).

- Whether boundaries were drawn for partisan ends to the exclusion of fair, neutral factors (offered by Justice Powell's concurrence in *Bandemer*, 478 U.S. at 161, 173 (Powell, J., concurring in part and dissenting in part), rejected by a majority in *Vieth*, 541 U.S. at 290-91 (plurality opinion)).

---

[2] Although Justice Kennedy did not join the *Vieth* plurality, he did concur in the conclusion that no reliable standard had been identified and that the claim at issue should be dismissed. *Vieth,* 541 U.S. at 308 (Kennedy, J., concurring in the judgment). Accordingly, we think it appropriate to conclude that a majority of the Justices found all the standards discussed in the *Vieth* plurality insufficient, even if a majority did not conclude that such claims were per se nonjusticiable.

- Whether mapmakers acted with the "predominant intent" to achieve partisan advantage and subordinated neutral criteria; for example, where the map "packs" and "cracks" the rival party's voters and thwarts its ability to translate a majority of votes into a majority of seats (offered by the appellants in *Vieth*, *id.* at 284-90, rejected by a majority in *Vieth*, *id.*).

- Whether, at a district-to-district level, a district's lines are so irrational as to be understood only as an effort to discriminate against a political minority (offered by Justice Stevens's dissent in *Vieth*, *id.* at 321-27 (Stevens, J., dissenting), rejected by a majority in *Vieth*, *id.* at 292-95 (plurality opinion)).

- Application of a five-part test requiring a plaintiff to show (1) that he is a member of a cohesive political group; (2) that the district of his residence paid little or no heed to traditional districting principles; (3) that there were specific correlations between the district's deviations from traditional districting principles and the distribution of the population of his group; (4) that a hypothetical district exists which includes the plaintiff's residence, remedies the "packing" or "cracking" of the plaintiff's group, and deviates less from traditional districting principles; and (5) that the defendants acted intentionally to manipulate the shape of the district in order to pack or crack his group (offered by Justice Souter's dissent in *Vieth*, *id.* at 347-51 (Souter, J., dissenting), rejected by a majority in *Vieth*, *id.* at 295-98 (plurality opinion)).

- Whether a statewide plan results in unjustified entrenchment, such that a party's hold on power is purely the result of partisan manipulation and not other factors (offered by Justice Breyer's dissent in *Vieth*, *id.* at 360-62 (Breyer, J., dissenting), rejected by a majority in *Vieth*, *id.* at 298-301 (plurality opinion)).

- Whether the sole intent of a redistricting plan is to pursue partisan advantage (offered by appellants in *LULAC*, 548 U.S. at 416-20 (Kennedy, J., announcing the judgment of the Court), effectively rejected by a majority[3] in *LULAC*, *id.*).

In their Second Amended Complaint, the Plaintiffs have alleged a broad array of facts that, if true, plausibly suggest that the redistricting plan was enacted in large part to give Democrats a partisan advantage. But the challenge is to explain how these facts fit together to violate an administrable and non-arbitrary standard for governing political gerrymandering claims *generally*. "I know it when I see it," *Jacobellis v. Ohio,* 378 U.S. 184, 196 (1964) (Stewart, J., concurring), will not do.

In their response to the motion to dismiss, the Plaintiffs combine several of their factual allegations to arrive at a proposed standard. Abstracting away from the particulars of this case, that standard says that political gerrymanders are unconstitutional when six requirements are met:

1. A plan is less compact than the one it replaces.

2. A plan splits more traditional political boundaries than the one it replaces.

3. Alternative plans are available that are more compact and split fewer traditional political boundaries.

4. The new districts violate state law redistricting standards to favor the majority party.

5. Minority-party incumbents are deprived of a substantially greater proportion of their core constituencies than majority-party incumbents.

---

[3] Although Justice Kennedy wrote only for himself in the section of the opinion discussing and rejecting the appellants' "sole motivation" theory, four other Justices effectively concurred in that conclusion. *LULAC,* 548 U.S. at 492-93 (Roberts, C.J., concurring in part, concurring in the judgment in part, dissenting in part); *id.* at 511-12 (Scalia, J., concurring in the judgment in part and dissenting in part).

7

      6. More than two-thirds of incumbent pairings pit minority-party incumbents against each other.

      The Plaintiffs have clearly taken to heart the thrust of the caselaw explaining that an appropriate standard must be both objective and administrable using the traditional tools of judicial adjudication; standards relying on vague notions of "unfairness" or "excessive burdens" or a "totality of the circumstances" have been rejected as insufficient. They have identified factors that are, for the most part, reasonably objective and measurable. The Defendants object that there is too much ambiguity in how the factors should be measured (e.g., what test to use for "compactness," how to define "traditional political boundaries"), but these ambiguities are not so great as to place the factors beyond the competency of the courts to adjudicate. For example, courts routinely consider the "bizarre shape" of districts when considering racial gerrymandering claims. *See Shaw v. Reno*, 509 U.S. 630, 644 (1993). Taking account of a district's bizarre shape is one way to measure its "compactness."

      The more fundamental problem, however, is that to the extent this six-factor "test" is *administrable*, it is also essentially and fatally *arbitrary*. The test only works as a legal standard if the factors are taken as requirements, all six of which are individually necessary and jointly sufficient to make out a political gerrymandering claim. Otherwise, the standard simply dissolves into the kind of multi-factor "totality of the circumstances" or "fairness" test that the Supreme Court has firmly rejected. *See Vieth,* 541 U.S. at 295-98. And what accepted principles of equal-protection jurisprudence point to the conclusion that *these six factors* make out *the* appropriate standard for adjudicating partisan gerrymandering claims as a general matter? Why the two-thirds requirement for incumbent pairings, as opposed to three-fifths or three-quarters? Why the specific need to show a violation of state-law redistricting requirements? What if five of the

8

factors are met and even exceeded, but the sixth one barely falls short?

Maybe reasonable people could agree that where all six of these factors converge it looks like "excessive" political gerrymandering has occurred. Perhaps this proposed "standard" marks a prudent policy boundary. But it's hard to see how this particular six-factor test is implied by the requirements of the Equal Protection Clause, which as we have noted tolerates some degree of partisanship in redistricting. If judicial adjudication of political gerrymandering were just a matter of isolating a set of factors, even *objective* factors, that inhere in the redistricting context and suggest that partisan considerations played a substantial role, courts would have solved this problem long ago. The challenge is not just administrability; it is constitutional line-drawing. The law requires an objective, measurable standard that admits of rational judicial resolution *and* is a direct and non-arbitrary implication of accepted constitutional norms.

The Plaintiffs can hardly be faulted for failing to sail successfully between the Scylla of administrability and the Charybdis of non-arbitrariness; no such ship has yet found this narrow path. Because the Plaintiffs have not identified a workable standard for partisan gerrymanders, Count 2 of the Second Amended Complaint must be dismissed for failure to state a claim.

Counts 3 and 4 of the Second Amended Complaint allege equal-protection violations that the Plaintiffs insist are distinct from the political gerrymandering claim in Count 2. They allege in these counts that the redistricting plan discriminates against Republican voters on the basis of their political beliefs and affiliations, and that this "intentional and purposeful" (Count 3) and "invidious and arbitrary" (Count 4) discrimination violates the Equal Protection Clause. But of course, political gerrymandering claims themselves arise under the Equal Protection Clause, and the action being challenged—redrawing legislative districts to favor one political party over

9

another—is the same in all three counts. The act of drawing district lines to favor the majority party (i.e., "political gerrymandering") *is* the act of discriminating against voters based on their political beliefs. There is no meaningful distinction between "political gerrymandering" and "drawing district lines so as to discriminate against certain voters based on their political affiliation."

But even if a distinction between Count 2 and Counts 3 and 4 could be found, all of the same problems in articulating an appropriate legal standard would still apply. At the risk of repeating ourselves, it is clearly *not* the law that redistricting may take *no* account of partisanship, so the challenge is to locate a standard that identifies unconstitutionally *excessive* partisan discrimination. For all the reasons already discussed, the Plaintiffs have not proposed such a standard, nor can we identify one.

Accordingly, the Defendants' Motion to Dismiss the Second Amended Complaint is **GRANTED**. Counts 2, 3, and 4 of the Plaintiffs' Second Amended Complaint are **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**

ENTERED: November 22, 2011.

                                      s/ Elaine E. Bucklo
                                      ELAINE E. BUCKLO, JUDGE
                                      UNITED STATES DISTRICT COURT
                                      NORTHERN DISTRICT OF ILLINOIS

                                      s/ Diane S. Sykes
                                      DIANE S. SYKES, JUDGE
                                      UNITED STATES COURT OF APPEALS
                                      SEVENTH CIRCUIT

                                               <u>s/ Philip P. Simon</u>
                                               PHILIP P. SIMON, CHIEF JUDGE
                                               UNITED STATES DISTRICT COURT
                                               NORTHERN DISTRICT OF INDIANA