IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, ANGEL GARCIA, EDWIN TOLENTINO, and THE ILLINOIS REPUBLICAN PARTY (Intervening Plaintiff), | ) ) ) ) ) ) ) ) ) ) ) ) | NO.    1:11-cv-04884 |
| | ) | |
| Plaintiffs, | ) ) | Judges Elaine E. Bucklo Diane S. Sykes and Philip P. Simon |
| vs | ) ) ) | Magistrate Geraldine Soat Brown |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, and JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, AFRICAN AMERICANS FOR LEGISLATIVE REDISTRICTING (Intervening Defendant), UNITED NEIGHBOR-HOOD ORGANIZATION (Intervening Defendant), COLOMBIANOS UNIDOS PARA UNA LABOR ACTIVE (Intervening Defendant), HISPANIC AMERICAN CONSTRUCTION INDUSTRY ASSOCIATION (Intervening Defendant), and FEDERACION JALISCIENSE DEL MEDIO OESTE DE LOS ESTADOS UNIDOS (Intervening Defendant), | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' L.R. 56.1(b)(3)(C) STATEMENT OF ADDITIONAL UNDISPUTED
MATERIAL FACTS**

Pursuant to Local Rule 56.1(b)(3)(C), Plaintiffs, CHRISTINE RADOGNO, TOM CROSS, ADAM BROWN, VERONICA VERA, ANGEL GARCIA and EDWIN TOLENTINO (hereinafter referred to as "Plaintiffs"), by and through their respective undersigned attorneys, hereby submit the following statement of additional undisputed material facts that support Plaintiffs' request for denial of Defendants' Motion for Summary Judgment.

## 2011 REDISTRICTING PROCESS

1.      On May 27, 2011, the Redistricting Plan was adopted by both the House and Senate on a partisan roll call (the "Adopted Plan"). House Resolution 385 (HR 385) and Senate Resolution (SR 249) were also adopted by the House and Senate respectively on the same partisan roll call. It was signed into law by Governor Pat Quinn on June 3, 2011, becoming Public Act 97-06. (Ex. 1, Official Roll Call Votes for Senate Bill 1177, House Amendment #2, HR 385 and SR 249).

2.      According to the text of SB 1177, Amendment #2, HR 385 and SR 249 purported to state the legislative intent behind each and every district. (Ex. 2, Excerpts from SB 1177, #2, p. 3, lines 7-11). Both HR 385 and SR 249 were voted upon after the passage of SB 1177, House Amendment #2. (Ex. 3, Excerpts from May 27, 2011 House Journal; See also Ex. 1).

## CREATION OF REPRESENTATIVE DISTRICT 96

3.      Mr. Lawrence Hill, co-chair of the Defendants-Intervenors African-Americans for Legislative Redistricting ("AALR"), stated that it was his idea to create Representative District 96 for the purpose of combining the substantial African-American populations residing in Decatur and Springfield. (*See* Defendants' Statement of Undisputed Material Facts ("DSOF") Ex. E, Deposition of Mr. Lawrence Hill, p. 10, lines 22-24; p. 11, lines 1-7; pp.13-16, p. 41, lines 1-10).

4.      Mr. Hill stated that when he drew Representative District 96, he did not consider the boundaries of the previous districts, the political history of the area or neighborhood communities of interest. (DSOF Ex. E, p. 44, lines 15-21; p. 68, lines 1-3).

5.      Mr. Hill also stated that the fact that some African-Americans had moved from the City of Chicago to the Springfield area was one of the motivating factors in creating Representative District 96.  (DSOF Ex. E, p. 76, lines 12-24; p. 77, lines 1-13).

6.      Mr. Hill stated that prior to creating Representative District 96, he did not seek input on the interests of the communities in Decatur and Springfield from anyone other than Mr. Frank McNeil and Reverend Eric Jackson. (DSOF Ex. E, p. 55, lines 6-18; p. 74, lines 19-24; p. 75, lines 1-10; p. 78, line 24; p. 79, lines 1-6).

7.      However, prior to constructing Representative District 96, Mr. Hill did, on the advice of counsel, study a law review article by Frank Adams entitled "Why Legislative Findings Can Pad-Lock Redistricting Plans in Racial-Gerrymandering Cases."  (DSOF Ex. E, p. 75, lines 18-24; p. 76, line 1; See also Ex. 4, Law Review Article).

## ADOPTION OF AALR PLAN BY THE GENERAL ASSEMBLY

8.      According to Mr. Hill, Representative District 96 is substantially similar to the version that AALR submitted to the Senate and House Redistricting Committee for consideration.  (DSOF Ex. E, p. 43, line 24; p. 44, lines 1-4).

9.      Mr. Timothy Mapes, the individual principally responsible for drawing the Representative Districts in the Redistricting Plan, recalls that AALR did submit a proposed Representative District 96, and that it was considered by his staff.  (DSOF Ex. L, Affidavit of Mr. Timothy Mapes).

10.     Mr. Mapes stated that he wanted to use the AALR proposal and create an even more Democratic competitive district, so he modified the boundaries of the AALR proposal to make sure that all possible Democratic-leaning precincts were brought into the district.  (DSOF Ex. L, ¶¶ 4,5, and 8; Ex. 5, Deposition of Timothy Mapes, November 16, 2011, p. 67, lines 6-10).

11.     Representative District 96 could have been drawn in a manner that better maximizes the Democratic competitiveness of the district while splitting less counties, municipalities and townships.  (Ex. 6, Affidavit of Art Hanlon).

12.     Mr. Mapes also testified that he was the person principally responsible for the drawing of representative districts under the previous map.  (DSOF Ex. L, ¶ 3).  Under the previous configuration of representative districts, the cities of Springfield and Decatur were kept largely intact. (Ex. 7, Picture of Representative Districts under 2001 Redistricting Plan).

## THE SHAPE OF REPRESENTATIVE DISTRICT 96

13.     As Dr. Jeffrey Lewis explains in his Affidavit, the measure of compactness for any given district must take into account more than just objective measures of physical geographic boundaries.  (Ex. 8, Affidavit of Dr. Jeffrey Lewis, pages 3-7).

14.     According to Dr. Lewis, any measure of compactness must factor in how the district combines and divides individuals and communities based on political and demographic data.  (Ex. 8, page 3-7).

15.     At the public hearings before the House Redistricting Committee, the Committee acknowledged that there are at least 30 different ways to scientifically measure the compactness of a district.  (Ex. 9, Transcript from April 25, 2011 House Redistricting Committee Hearing, p.

18, lines 15-23). The Committee stated that compactness measurements should focus on "how spread out a district is from the central core or a district's center of population is." *Id.*

16.     Representative District 96, as adopted by the General Assembly, bears some resemblance to the 12th North Carolina Congressional District that was found non-compact by the Supreme Court in *Shaw v. Reno*. (Ex. 8, pages 3-5).

17.     It loops together two far-flung African-American communities by dipping south of the main interstate connecting these communities, reaching into parts of Christian, Macon and Sangamon counties. (Ex. 8, pages 3-5).

18.     The majority of the region between the far-flung African-American communities consists of farmland which is sparsely populated and racial and politically distinct from the population cores at the northwest and northeast corners. (Ex. 8, pages 3-5).

19.     Based on visual inspection, Representative District 96 strongly resembles the AALR proposal. (Ex. 8, page 5).

**OTHER CHARACTERISTICS OF REPRESENTATIVE DISTRICT 96**

20.     In the Redistricting Plan, the eastern-most boundaries of all 118 Representative Districts are on average only 28 miles apart from their western-most boundaries. (Ex. 8, page 5, FN 2).

21.     The population centers of Representative District 96 are 40 miles apart. (Ex. 8, page 4-5). 82% of the population of Representative District 96 resides in either Springfield or Decatur. (Ex. 8, page 4). The district fractures both Springfield and Decatur with 25% of the voting-age population(VAP) in Decatur and 75% VAP of Springfield excluded from the Representative District 96 . (Ex. 8, page 4).

22.     According to House Resolution 385, which purports to contain the legislative intent of the General Assembly in passing the Redistricting Plan, Representative District 96 was drawn to "unite[] the only two significant African American communities of interest in the region."  (DSOF Ex. C, HR 385, p. 282).

23.     Representative District 96 splits 14 townships, five municipalities and three counties.  It also severs the core of five separate representative districts that existed in the previous legislative map: Representative Districts 87, 98, 99, 100, and 101.  (DSOF Ex. C, HR 385, pp. 276-78).

24.     Representative District 96 disregards the partisan composition of the area by lowering the partisan advantage of Representative District 96 as well as that of areas formerly represented by Representative Districts 96 and 101.  (DSOF Ex. C, HR 385, p. 282).

25.     In creating Representative District 96, legislative staff relied upon various socioeconomic data including data from the 2009 American Community Survey done by the U.S. Census.   (DSOF Ex L, Mapes Affidavit, ¶ 5)(Ex. 10, Senate Dem Production ("SD Prod.") 2392-99).

26.     According to the data relied upon by the legislative staff, the State of Illinois is considered a major employer of the residents of Springfield with 24.90% of its residents employed by State government; however, the State of Illinois is not a major employer of the residents of Decatur, with only 11.90% of its population working for the State government.  (Ex. 10, SD Prod. 2393, 97).

27.     Over 35% of the population in Decatur works in the manufacturing, production, or transportation business at companies such as Archer Daniels Midland and Caterpillar, whereas

only about 10% of the residents in Springfield work in the same industry.  (Ex. 10, SD Prod. 2392).

28.     Springfield has a much stronger work force at 67.9% as compared to Decatur at 59.2%.  (Ex. 10, SD Prod. 2392).

29.     Springfield and Decatur do not share the same court system.  Springfield is in the 7th Judicial Circuit, and Decatur is in the 6th Judicial Circuit.  (Ex. 11, Printout of Counties and Corresponding Circuits from Administrative Office of the Illinois Courts Website)

30.     Springfield and Decatur do not share the same school system or Regional Superintendent of Schools.  Springfield is in Area III, and Decatur is in Area IV.  (Ex. 12, Printout from Illinois Association of Regional Superintendents Website).

31.     The median income of owner-occupied housing units in Springfield is $109,300. The median income of owner-occupied housing units in Decatur is $76,400. (Ex. 10, SD Prod. 2393).

## PUBLIC TESTIMONY REGARDING REPRESENTATIVE DISTRICT 96

32.     At the May 24, 2011 hearing of the House and Senate Redistricting Committees, Mr. Eddie Price, a deacon at Union Baptist Church testified in opposition to Representative District 96 stating that linking Springfield to Decatur made no sense to him because "those communities are so different."  (DSOF Ex. B-4, May 24th, 2011 Senate/House Hrg. Transcript, pp. 153-55).

33.     At the same hearing on May 24, 2011, Alderwoman Doris Turner, a supporter of Representative District 96, stated that the primary community of interest that the district brings together are the African-American communities.  (DSOF Ex. B-4, May 24th, 2011 Transcript, p. 127, lines 4-17).

34.     Alderwoman Turner also admitted that based on her experience on the Sangamon County Board, the issues facing the African-American community in Springfield and the rural areas that would be joined with them in Representative District 96 are "very different." (DSOF Ex. B-4, May 24th, 2011 Transcript, p. 130, lines 24; p. 131, lines 1-19).

35.     Alderman Sam Cahnman testified at an earlier hearing lamenting the fact that the City of Springfield was split between two House districts and stressed that it must be kept in one House district due to its unique commonality of interest. (Ex. 9, April 25, 2011 House Redistricting Committee Hearing Transcript, pp. 71-72).

36.     Mr. Jerry White, a local real estate agent and member of the Sangamon County Board of Review, also advocated for keeping the City of Springfield and Sangamon County together noting that "the city of Decatur is not at all like Springfield. It is more blue collar workers, a different kind of environment, Archer Daniels Midland." (Ex. 9, April 25, 2011 Transcript, pp. 76-78).

### *GINGLES* PRONG 3

37.     Dr. Liu found that in all four reconstituted elections in Representative District 23 that there was a consistent pattern of racially-polarized voting that the majority of white voters never voted for a Latino candidate, and the majority of Latino voters never voted for a white candidate. This pattern normally results in a defeat of the Latino candidate. (Ex. 13, Liu Affidavit, ¶ 15).

38.     In the reconstituted elections in House District 23, whites would have won three out of four elections as a group. (Ex. 13, Liu Affidavit, ¶ 5 and Ex. A thereto).

39.     According to Dr. Liu, Exhibit 13.A of his Affidavit includes elections with the following "special circumstances" that lead to minority candidates winning as individuals: (a) the special field of candidates; and (b) the special plurality victory. (Ex. 13, Liu Affidavit, ¶ 8).

40.     There was only one Latino candidate in each of the four elections presented in Exhibit 13.A, while three out of these four statewide and countywide elections involved multiple white candidates who divided the white bloc votes (*i.e.,* the exogenous elections). (Ex. 13, Liu Affidavit, Exhibit 13.B)

41.     Exhibit 13.C provides the field of the candidates for the biracial Illinois State House elections involving white candidates during the decade of 2002 to 2010. None of these biracial elections involved one Latino and multiple white candidates. (Ex. 13, Liu Affidavit, ¶ 10 and Ex. C thereto)

42.     If it were not because of the special circumstances of having an unrealistic field of candidates (*i.e.,* multiple white candidates versus one single Latino candidate), white candidates would have prevailed three out of four times in the Adopted Plan District 23 reconstituted elections. (Ex. 13, Liu Affidavit, ¶ 11). If an election is characterized by multiple white candidates and a single Latino candidate, then this single Latino candidate can win in this "special circumstance" as a "plurality victor." (Ex. 13, Liu Affidavit, ¶ 12)

43.     The Latino candidate won less than 50% of the votes in all but the 2008 County Judicial election based on the Adopted Plan District 23 reconstituted elections. In the past ten years, however, no Latino candidate has ever defeated a white candidate as a plurality victor in a Illinois State House election. (Ex. 13, Liu Affidavit, ¶ 12 and Ex. E thereto). Further, over the past ten years, no Latino candidate in the south side Cook County area has ever been elected to the House or Senate from a non-majority Latino VAP district. (Ex. 13, Liu Affidavit, ¶ 23).

44.     Defendants' expert, Dr. Lichtman, admitted in his deposition that he has performed and relied upon elections where he compared total white candidate votes versus total minority votes in analyzing both Prongs 2 and 3 under *Gingles.* (Ex. 14, Deposition of Allan Lichtman, Nov. 15, 2011 at pp. 47-48). Dr. Lichtman also agreed in his deposition that there are usually not enough endogenous elections to draw a conclusion based on endogenous elections alone. (Ex. 14, Deposition of Allan Lichtman, Nov. 15, 2011 at p. 50).

45.     The 2010 House District 23 is an endogenous election that overlaps with four of the new districts in the Adopted Plan that featured only one white candidate, State Representative Dan Burke and three Latino candidates. All the white bloc votes were cast for Dan Burke, the only white candidate in the race. (Ex. 13, Liu Affidavit, ¶ 14 and Ex. F thereto)

46.     State Representative Dan Burke won the 2010 House District 23 primary based upon a deep level of racial polarization in which the turnout rate of whites (17.8%) was almost twice as much as that of Latinos (9.4%) in this primary election. (Ex. 13, Liu Affidavit, ¶ 15 and Ex. F thereto)

47.     Dr. Liu found that all three prongs of the *Gingles* test have been satisfied in this case. (Ex. 13, Liu Affidavit, ¶ 26).

## TOTALITY OF CIRCUMSTANCES / PROPORTIONALITY

48.     In Representative Districts 1, 2, 21, 22, 23 and 24 (the "South Side Latino Districts"), the majority of white voters voted for a White candidate 40 out of 51 times (78.4%), and the majority of Latino voters voted for a Latino candidate 29 out of 37 times (also 78.4%). Racially polarized voting took place 32 out of 51 times (62.8%) in the seven districts. (Ex. 13, Liu Affidavit, ¶ 17)

49.     Based on the 2010 American Community Survey (the "2010 ACS"), the rate for high school graduates or higher for Latinos was only 60.8%, while those for whites and blacks were 92.8% and 82.6%, respectively.  The median family income was $52,254 for the Latinos in Cook County, while those for whites and blacks were $95,285 and $64,797, respectively.  The poverty rate in Cook County was 20.8% for Latinos, 8.0% for whites and 29.2% for blacks.  The unemployment level for Latinos is over 45% higher than for whites.  (Ex. 13, Liu Affidavit, ¶ 18 and Ex. G thereto).

50.     In the eight elections relied upon and analyzed in Dr. Liu's report, the average Latino turnout in these elections was 7.12%, while the average turnout rate for the whites in the same elections was over three times larger at 23.17%.  (Ex. 13, Liu Affidavit, ¶ 19 and Ex. H thereto).

51.     The State of Illinois currently has zero Latino U.S. Senators (0%), one Latino U.S. Congressman (5.3% of the total 19 seats according to the 2001 redistricting, and 5.6% of the total 18 seats according to the 2011 redistricting), four Latino State Senators (6.8% of the total 59 Senators), and nine State House Representatives (7.6% of the total 118 Representatives). (Ex. 13, Liu Affidavit, ¶ 20).  In fact, at least since 1972, no Latinos have been a United States Senator or held a statewide constitutional office in Illinois.  (Ex. 6, Hanlon Affidavit, ¶ 14 ).

52.     Table 421 from the 2010 American Community Survey ("ACS") data shows that there are only 60 elected Latino county and municipal officials, eight elected Latino judicial and law enforcement officials and 30 elected Latino education and school board officials throughout the State of Illinois. Exhibit 13.I.   (Ex. 13, Liu Affidavit, ¶ 20 and Ex. I thereto).  There are 102 counties, over 1250 municipalities, 573 elected judges, and 902 elected school boards in Illinois. (Ex. 6, Affidavit of Hanlon, ¶ 16).

53.     Defendants' expert, Dr. Lichtman, admits that proportionality is not dispositive. (Ex. 14, Deposition of Allan Lichtman at p. 28).

54.     The ACS data relied upon by Dr. Lichtman is less accurate than actual Census data because the 2010 ACS data is based on surveys.  (Ex. 13, Liu Affidavit, ¶ 25)

55.     Dr. Lichtman does not know if any of the districts in the Adopted Plan have a CVAP of over 50%.  (Ex. 14, Deposition of Allan Lichtman at p. 15).  In fact, based on Dr. Lichtman's statewide CVAP, none of the districts in the Adopted Plan would have a CVAP of over 50%.  (Ex. 13, Liu Affidavit, ¶ 23; Ex. 14, Deposition of Allan Lichtman at pp. 16-20).

56.     There are three Representative Districts under the Adopted Plan that encompass parts of Cicero:    District 21 (4,844 residents), District 23 (47,529 residents) and District 24 (31,453 residents).  (Ex. 6, Hanlon Affidavit, ¶ 18).

57.  There are five Representative Districts under the Adopted Plan that encompass parts of the City of Chicago. Districts 1 and 2 are entirely within the City of Chicago, while District 21 (66,966 residents), District 22 (104,147 residents), and District 24 (29,752 residents) are at least partially in the City of Chicago.  (Ex. 6, Hanlon Affidavit, ¶ 20).

58.     At the May 21, 2011 public hearing of the Senate Redistricting Committee, Sylvia Puente, Executive Director of the Latino Policy Forum, a Latino citizen advocacy group, urged the General Assembly create as a many as six majority-minority Latino districts on the south side of Chicago and Cook County, citing elected officials lack of responsiveness to the Latino community. (Ex. 15, Senate Redistricting Committee Public Hearing, May 21, 2011 at pp. 59-60).

59.     Martin Torres, a policy analyst at the Latino Policy Forum, also expressed skepticism that the Democratic Caucuses that were drawing the maps had the best interests of the Latino community in mind.  (Ex. 16, House Redistricting Hearing, April 18, 2011 at, pp. 49-50).

60.     Jose Laneapealde, a citizen of the Little Village community in the city of Chicago, testified that the Latinos in his community have been invisible to the incumbent legislators. (Ex. 17, House Redistricting Committee Hearing, April 21, 2011 at p. 100).

Respectfully submitted,

/s/--------Phillip A. Luetkehans----------------------
One of the Attorneys for Plaintiffs Christine Radogno, Veronica Vera and Edwin Tolentino

/s/ --------Andrew Sperry-----------------------------
One of the Attorneys for Plaintiffs Thomas Cross, Adam Brown and Angel Garcia

/s/--------Thomas M. Leinenweber------------------
One of the Attorneys for Plaintiffs Thomas Cross, Adam Brown and Angel Garcia

E-filed: November 23, 2011

Phillip A. Luetkehans, 06198315
pluetkehans@slg-atty.com
Brian J. Armstrong, 06236639
barmstrong@slg-atty.com
Stephanie J. Luetkehans, 06297066
sluetkehans@slg-atty.com
SCHIROTT, LUETKEHANS & GARNER, P.C.
105 East Irving Park Road
Itasca, IL 60143
630-773-8500

14

Thomas M. Leinenweber, 6208096
thomas@landb.us
Peter Baroni, 6236668
peter@ilesq.com
Leinenweber Baroni & Daffada LLC
203 N. LaSalle St., Suite 1620
Chicago, IL 60601
(866) 786-3705

Andrew Sperry, 6288613
asperry@laroseboscolaw.com
LaRose & Bosco, Ltd.
200 N. LaSalle St., Suite 2810
Chicago, IL 60601
(312) 642-4414

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of November, 2011, I electronically filed Plaintiffs'

L.R. 56.1(b)(3)(C) Statement of Additional Undisputed Material Facts with the Clerk of the U.S.

District Court, Northern District of Illinois, Eastern Division using the CM/ECF system which

will send notification of such filing to the following:

asperry@laroseboscolaw.com

thomas@landb.us

bstratton@atg.state.il.us

dellis@hds.ilga.gov

mlayden@rjpltd.com

rprendergast@rjpltd.com

mjkasper60@mac.com

peter@ilesq.com

emadiar@senatedem.ilga.gov

fogartyjr@gmail.com

mike.persoon@gmail.com

kennethjohnsonlaw@earthlink.net

courtneynottage@aol.com

htristan@tristancervantes.com

pcervantes@tristancervantes.com

kreidy@trisancervantes.com

lmishkin@sandmlegal.com

wharte@williamharteltd.com

jmannix@williamharteltd.com

and I hereby certify that I mailed by U.S. Postal Service the document(s) to the following non-

registered attorneys and interested parties:  NONE.

/s/  Phillip A. Luetkehans
One of the Attorneys for Plaintiffs
Christine Radogno, Veronica Vera
and Edwin Tolentino

Phillip A. Luetkehans, 06198315
pluetkehans@slg-atty.com
Brian J. Armstrong, 06236639
barmstrong@slg-atty.com
Stephanie J. Luetkehans, 06297066
sluetkehans@slg-atty.com
Schirott, Luetkehans & Garner, P.C.
105 East Irving Park Road
Itasca, IL 60143
630-773-8500

Thomas M. Leinenweber
thomas@landb.us
Peter G. Baroni
peter@ilesq.com
Leinenweber Baroni & Daffada LLC
203 N. LaSalle St., Suite 1620
Chicago, IL 60601
(866) 786-3705

Andrew Sperry, 6288613
LaRose & Bosco, Ltd.
200 N. LaSalle St., Suite 2810
Chicago, IL 60601
(312) 642-4414
asperry@laroseboscolaw.com

16