**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTINE RADOGNO, in her official capacity as Minority Leader of the Illinois Senate, THOMAS CROSS, in his official capacity as Minority Leader of the Illinois House of Representatives, ADAM BROWN, in his official capacity as a state representative from the 101st Representative District and individually as a registered voter, VERONICA VERA, ANGEL GARCIA, and EDWIN TOLENTINO, and THE ILLINOIS REPUBLICAN PARTY (Intervening Plaintiff), | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:11-cv-04884 |
| vs | ) ) ) | Judges Sykes, Bucklo and Simon (3-judge court convened pursuant to 28 U.S.C. § 2284) |
| ILLINOIS STATE BOARD OF ELECTIONS, RUPERT BORGSMILLER, Executive Director of the Illinois State Board of Elections, HAROLD D. BYERS, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, ERNEST C. GOWEN, WILLIAM F. McGUFFAGE, JUDITH C. RICE, CHARLES W. SCHOLZ, and JESSE R. SMART, all named in their official capacities as members of the Illinois State Board of Elections, AFRICAN AMERICANS FOR LEGISLATIVE REDISTRICTING (Intervening Defendant), UNITED NEIGHBORHOOD ORGANIZATION (Intervening Defendant), | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**<u>PLAINTIFFS' L.R. 56.1(b)(3) RESPONSE TO DEFENDANTS' STATEMENT OF</u>**
**<u>MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(a)(3)</u>**

Pursuant to Local Rule 56.1(b)(3), Plaintiffs, CHRISTINE RADOGNO, TOM CROSS,

ADAM BROWN, VERONICA VERA, ANGEL GARCIA and EDWIN TOLENTINO

(hereinafter referred to as "Plaintiffs"), by and through their respective undersigned attorneys,

submit the following Response to Defendants' Statement of Material Facts.

**Parties, Venue and Jurisdiction**

1.      The Plaintiffs are a mix of three Republican state legislators (Christine Radogno, Thomas Cross and Adam Brown), the Illinois Republican Party (an intervening plaintiff), and three alleged citizens-voters (Veronica Vera, Angel Garcia and Edwin Tolentino).  *See* Exhibit ("Exh.") A, Second Amended Complaint ("SAC"), ¶¶ 2-7.

**RESPONSE:  Plaintiffs object to the inaccurate reference to Plaintiffs Radogno and Cross as simply state legislators.  Radogno and Cross are plaintiffs in their official capacity as Constitutional Leaders of the Minority Caucuses in the Illinois Senate and House, respectively.  Const. of Ill. Art. IV, Sec. 6 (c).  Plaintiffs object to the characterization of Plaintiffs Veronica Vera, Angel Garcia and Edwin Tolentino as "alleged citizens-voters." Plaintiffs admit that Ms. Vera, Mr. Garcia and Mr. Tolentino are registered citizen voters within Representative District 22, 1 and 23 respectively.  Without waiving these objections, Plaintiffs admit that Adam Brown is a state legislator plaintiff in part of the statement in paragraph 1.**

2.      One of the Plaintiffs, Adam Brown, is a Republican State Representative from what is currently the 101st Representative District and is alleged to be a duly registered voter and citizen residing in the State of Illinois in Macon County within the boundaries of Representative District 96 of the Redistricting Plan.  *See* Exh. A, SAC, ¶ 5.

**RESPONSE: Plaintiffs admit the statements in paragraph 2.**

3.      Defendant Borgsmiller is the Executive Director of the Illinois State Board of Elections and has been sued only in his capacity as such. *Id.* at ¶ 10.

**RESPONSE: Plaintiffs admit the statements in paragraph 3.**

4.      Defendants Byers, Schneider, Coffrin, Gowen, McGuffage, Rice, Scholz and Smart are members of the Illinois State Board of Elections and are sued only in their respective capacities as members of the Illinois State Board of Elections.  *Id.* at ¶¶ 11-18.

**RESPONSE: Plaintiffs admit the statements in paragraph 4.**

5.      This Court has jurisdiction under 28 U.S.C. §§ 1337 and 1343 because Plaintiffs seek relief pursuant to 42 U.S.C. § 1983 based on alleged violations of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1973, the Voting Rights Act of 1965.  *See* Exh. A, ¶ 19.

**RESPONSE: Plaintiffs admit the statements in paragraph 5 as they relate to the Court's jurisdiction, but deny that the Second Amended Complaint alleges any violations of the First Amendment to the United States Constitution.**

6.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiffs claim that substantial acts are alleged to have occurred within the Northern District of Illinois. *Id.* at ¶ 20.

**RESPONSE: Plaintiffs admit the statements in paragraph 6.**

<u>**The Illinois State Re-Districting Process**</u>

7.      The Illinois General Assembly redrew its State House and Senate districts following the 2010 decennial census through the enactment of Public Act 97-6 ("PA 97-6"), which passed both chambers of the Illinois General Assembly on May 27, 2011.  *See* PA 97-6, Ill. Gen. Assembly.

**RESPONSE: Plaintiffs admit that the Illinois General Assembly redrew its Representative and Legislative Districts following the 2010 decennial census through the**

enactment of Public Act 97-6 ("PA 97-6"), which passed both chambers of the Illinois General Assembly on May 27, 2011.

8.      Prior to the enactment of PA 97-6, the Illinois House and the Illinois Senate held hearings throughout the State of Illinois at which interested parties and interests were given the opportunity to present their views as to the formulation of Senate and House districts.  *See* Exhs. B-1 through B-4, respectively Hearing Transcripts dated 3/28/11, 4/6/11, 4/19/11 and 5/24/11.

**RESPONSE: Plaintiffs admit that public hearings were held on March 28, 2011, April 6, 2011, April 19, 2011 and May 24, 2011 and that members of the public were allowed to present testimony to the Illinois House and Senate Redistricting Committees.**

9.      Prior to enacting PA 97-6, the Illinois House of Representatives passed House Resolution 385 ("HR 385") and the Illinois Senate passed Senate Resolution 249 ("SR 249").  *See* P.A. 97-6, § 5(c) Ill. Gen. Assembly.  *See* Exhs. C and D, respectively HR 385 and SR 249.

**RESPONSE: Plaintiffs admit that HR 385 and SR 249 were passed by the Illinois General Assembly, but deny that HR 385 and SR 249 were passed "prior to enacting PA 97-6."  *See* Plaintiffs' Statement of Additional Undisputed Material Facts ("PSAF"), ¶¶ 1-2, Exs. 1-3.**

10.     HR 385 and SR 249 provided narrative explanations of the re-drawn House and Senate Districts, setting forth many of the reasons why the districts were drawn as they were.  *Id.*

**RESPONSE: Plaintiffs admit that HR 385 purports to provide narrative explanations of the redrawn Representative Districts and that SR 249 purports to provide narrative explanations of the redrawn Legislative Districts as defined by the Illinois Constitution.**

4

11.     For purposes of identifying legislative intent pertinent to PA 97-6, HR 385 and SR 249 were adopted and incorporated by reference as part of PA 97-6.  *Id.*

**RESPONSE: Plaintiffs admit the statements in paragraph 11.**

12.     The Illinois redistricting map enacted under PA 97-6 establishes House districts that are precisely compliant with the constitutional requirement of one person, one vote.  Each of the 118 House Districts consists of either 108,734 or 108,735 residents.  *See* Exh. C, HR 385 at pp. 2-5.

**RESPONSE: Plaintiffs object to the legal arguments and conclusions regarding whether PA 97-6 is "precisely compliant with the constitutional requirement of one person, one vote."  Without waiving these objections, Plaintiffs admit that each of the 118 Representative Districts consists of either 108,734 or 108,735 residents.**

13.     HR 385 and SR 249 reflect that the partisan composition of each district was one of a number of factors considered in drawing the district boundaries for legislative districts.  *See* Exh. C, HR 385 at p. 3; Exh. D, SR 249 at p. 3.

**RESPONSE:  Plaintiffs admit that HR 385 contains data regarding the partisan composition of some, but not all, Representative Districts and SR 249 contains data regarding the partisan composition of some, but not all, Legislative Districts.  For example, but not by way of limitation, HR 385 contains no information regarding partisan composition of Representative Districts 21, 24 or 26 and SR 249 contains no information regarding partisan composition of Legislative Districts 21, 23 or 24 .  *See* Ex. C to Defendants' Statement of Undisputed Material Facts ("DSOF"), HR 385 at pp. 60-62, 66-68, 71-74 and DSOF Ex. D, SR 249 at pp. 42-43, 45-46, 47-48.**

**Plaintiffs' *Shaw* Challenge to RD 96**

14. On October 31, 2011, Plaintiffs filed their Second Amended Complaint. *See* Docket No. 65.

**RESPONSE: Plaintiffs admit the statements in paragraph 14.**

15. Count 5 of the Second Amended Complaint seeks to challenge Representative District 96 on equal protection grounds, contending that "the Democratic Caucuses used the ethnicity of the African-American communities in Springfield and Decatur as the prominent factor over all other constitutional and traditional redistricting principles in drawing Representative District 96." *See* Exh. A, SAC ¶ 198.

**RESPONSE: Plaintiffs admit that paragraph 15 generally reflects the allegations in Count 5 of the Second Amended Complaint. Plaintiffs deny that paragraph 15 accurately states the allegation in paragraph 198 of the Second Amended Complaint." In paragraph 198 of the Second Amended Complaint, Plaintiffs allege that the ethnicity of the African-American communities in Springfield and Decatur was used as the "predominant," not "prominent," factor in drawing Representative District 96. *See* DSOF Ex. A, SAC ¶ 198.**

16. RD 96 contains a White Voting Age Population ("VAP") of 71.3%, an African-American VAP of 24.87%, and an Asian VAP of 1.01%. *See* Exh. C, HR 385, p. 282. Thus, the African-American VAP of RD 96 comprises less than 25% of RD 96's total VAP. *Id.*

**RESPONSE: Plaintiffs deny that that HR 385 contains a White VAP for RD 96. *See* DSOF Ex. C, HR 385, p. 276-82. Plaintiffs admit the statements in paragraph 16 represent the VAP totals list in HR 385 for the African-American and Asian populations for Representative District 96.**

## Evidence Considered by the General Assembly Regarding RD 96

17.     The concept of joining the downstate urban centers of Springfield and Decatur was first proposed by the African-Americans for Legislative Redistricting ("AALR").  An AALR representative, Lawrence Hill, testified that there exists numerous communities of interest between voters in the eastern part of Springfield and the area of Decatur included within District 96:

> "Poor education outcomes, poor economic outcomes for the citizens.  There is a stream of commerce between those two along I-72 [Interstate Highway 72].  They advertise in those same communities, the print media does and the radio.  They worship along those communities.  And when I say that, I say that there are people who are from Springfield who go to Decatur and vice versa for services."

*See* Exh. E, Deposition of Lawrence Hill, at pp. 42-43.

**RESPONSE: Plaintiffs admit that the second sentence of paragraph 17 accurately quotes Mr. Hill's testimony at his deposition.  Plaintiffs deny that the pages cited by Defendants support the facts alleged in sentence one of paragraph 17.** *See* **DSOF Ex. E, Hill dep. at pp. 42-43.**

18.     Mr. Hill testified that he sought input from individuals such as Reverend Eric Jackson, a pastor in Decatur, who told him that some of his parishioners travelled from Springfield for services.  *Id.* at pp. 74-75.

**RESPONSE: Plaintiffs admit that paragraph 18 reflects the testimony of Mr. Lawrence Hill in his deposition.**

19.     During his testimony, Mr. Hill also discussed the idea of joining the urban centers of Springfield and Decatur with former Springfield Alderman Frank McNeil, a community activist who was also the lead plaintiff in *McNeil v. City of Springfield*, 851 F.2d 937 (7th Cir. 1988), where he challenged Springfield's at-large system of voting for park and school boards.

**RESPONSE: Plaintiffs admit that Mr. Hill testified that he spoke with Mr. Frank McNeil about the African-American communities in Springfield and Decatur and that Mr. Hill recalls Mr. McNeil telling him that connecting Springfield and Decatur into one district was a "good idea." Plaintiffs deny that the deposition pages cited by the Defendants support the facts alleging that Mr. McNeil was a former Springfield Alderman, or that he was involved in the cited case.** *See* **DSOF Ex. E, Hill dep. at pp. 55-56.**

20. Current Springfield Alderman Doris Turner testified to a joint House-Senate hearing in favor of joining "the eastern parts of Springfield, communities along Interstate 72, and western Decatur." *See* Exh. F, Testimony of Doris Turner, at p. 124. She testified as follows:

> Currently both of these communities are urban areas that continue to be represented by individuals with a very rural perspective. This dilemma speaks to our most fundamental right, appropriate representation by our government. *** When concerns are not understood and appropriately addressed, it leads to the disenfranchisement of an entire community. And I believe that's the situation currently being experienced by the individuals residing in Springfield and Decatur.

> I think it should also be brought to your attention that currently these two cities are joined by media markets and co-sponsor events and a lot of other things that join them together in a very real way throughout the entire year.

> *** We, the people residing within this community, want our voices to be heard and stand wholeheartedly in support of the new 96th House District. This House District will bring a new focus and attention to the many issues that continue to plague this community, among them an increase in violence and declining educational outcomes, and increase voter participation in the election process.

*Id*. at 124-26.

**RESPONSE: Plaintiffs admit that paragraph 20 accurately quotes the testimony of Ms. Doris Turner at a public hearing.**

21.     Alderman Turner elaborated that the common issues these urban centers faced included inner-city violence, declining educational outcomes, and "the types of jobs that need to be brought into both of these communities." *Id*. at 128.  She stated that she previously served on the Sangamon County Board and in that capacity, represented both the inner-city portion of Springfield and portions of the outlying rural area, "but their issues were very—were very different." *Id*. at 131.

**RESPONSE: Plaintiffs admit that paragraph 21 reflects part of the testimony of Mr. Doris Turner, though Ms. Turner never mentioned "outlying rural area," she said "county," in the context of "different issues."** ***See*** **DSOF Ex. F, Testimony of Doris Turner at p. 131.**

22.     Turner stated that her constituents in inner-city Springfield did not feel as if they were adequately represented by the current state representative, whom she saw as more responsive to rural issues than to the unique issues facing urban Springfield. *Id*. at 132-33.

**RESPONSE:  Plaintiffs deny that Ms. Turner stated in her testimony that her current state representative "is more responsive to rural issues than to the unique issues facing urban Springfield."** ***See*** **DSOF Ex. F, Testimony of Doris Turner at p. 132-33. Plaintiffs admit the remainder of paragraph 22 accurately reflects part of the testimony of Ms. Doris Turner.**

23.     Ultimately, the AALR proposed to the General Assembly a House District that included the two urban centers in Decatur and Springfield.  Democratic staff for the House and Senate drafted a district that was not identical to the AALR proposal but that did contain those two urban centers. *See* Exh. D, SR 249 at p. 86.

**RESPONSE: Plaintiffs object to any reference in paragraph 23 to SR 249 because it describes Legislative Districts and while LD 48 contains RD 96, LD 48 is collectively a distinct geographic area and SR 249 makes no specific reference to RD 96. Plaintiffs admit that SR 249 describes LD 48 as "closely resemble[ing]" the map proposed by AALR. *See* DSOF Ex. D, SR 249 at p. 86.**

## Legislative Intent as Expressed in HR 385 and SR 249

24.     The General Assembly outlined its legislative intent regarding the drafting of RD 96 in HR 385 and in SR 249's discussion of Senate District 48 (which contains RD 96). *See* Exhs. C and D. In that regard, the General Assembly made the following findings with respect to RD 96:

- RD 96 contains the equal-population target of 108,734 residents. *See* Exh. C, HR 385 at p. 276.

    **RESPONSE: Plaintiffs admit that HR 385 contains the language in this dot point of paragraph 24.**

- The boundaries of RD 96 generally adhere to township boundaries, follow major roadways such as Illinois Route 48, or run along natural boundaries, such as the Sangamon River. *Id.* at p. 277.

    **RESPONSE: Plaintiffs admit that HR 385 contains most of the language in this dot point of paragraph 24.**

- RD 96 contains a strong community of interest of government employees, both state, county, and municipal. State employees work at the state capital in Springfield and at the state prison in Decatur, and many Decatur residents travel along Interstate 72 to work at the state capital. As Springfield is the county seat of Sangamon County and Decatur is the county seat of Macon County, these two cities are home to many county as well as municipal employees. *Id.* at p. 281; *see* Exh. D, SR 249 at p. 85. Government employees at all levels generally have similar income levels and have shared interests in political issues such as controversial legislation in Illinois (as in other states) concerning reform of government employee pensions, as well as facility closings and employee layoffs caused by budgetary constraints in state, county, and local governments.

**RESPONSE: Plaintiffs object to any reference in this dot point of paragraph 24 to SR 249 because it describes Legislative Districts and while LD 48 contains RD 96, LD 48 is collectively a distinct geographic area and SR 249 makes no specific reference to RD 96. Plaintiffs object to the factual conclusion in this dot point of paragraph 24 after the citation as it is a subjective opinion not contained in any resolution. Without waiving those objections, Plaintiffs admit HR 385 contains some of the language in this dot point of paragraph 24.**

• The majority of the portions of Springfield and Decatur included in RD 96 have median household incomes of less than $45,000 and require greater social services than the rural communities surrounding them. Both communities are central Illinois, urban population centers with a high population of African-Americans. "Under the current [2001] map, both of these communities are isolated and surrounded by rural farm communities with few minorities and have little in common with their neighbors." These communities are linked by Interstate 72, and "many African-American residents of one community have links to the other either through family, churches, or their employment." *See* Exh. C, HR 385 at pp. 281-82.

**RESPONSE: Plaintiffs object to the mischaracterization in this dot point of paragraph 24 that says the "majority of the portions of Springfield and Decatur included in RD 96 have median household incomes of less than $45,000 and require greater social services than the rural communities surrounding them." HR 385 says "much of the city of Springfield and the city of Decatur in proposed RD 96 having median household incomes of less than $45,000". *See* DSOF Ex. C, HR 385 at pp. 278-79. Without waiving that objection, Plaintiffs admit HR 385 contains the quoted language in the last two sentences in this dot point of paragraph 24.**

• RD 96 was drawn to include, in Springfield, all of the Mid-Illinois Medical District (only the second medical district in Illinois), including the state-of-the-art medical facilities Southern Illinois School of Medicine, the Simmons Cancer Institute, Memorial Medical Center, and St. John's Hospital, and in Decatur, the Decatur Memorial Hospital and St. Mary's Hospital. These facilities provide vital health care services to numerous residents of RD 96 and Senate District 48. *See* Exh. D, SR 249 at p. 86; Exh. C, HR 385 at p. 278. Health-care professionals generally have common interests (along with the health-care facilities themselves) with political issues such as health-care reform, medical-malpractice reform, and laws concerning health insurance.

**RESPONSE: Plaintiffs object to any reference in this dot point of paragraph 24 to SR 249 because it describes Legislative Districts and while LD 48 contains RD 96, LD 48 is collectively a distinct geographic area and SR 249 makes no specific reference to RD 96. *See* DSOF Ex. D, SR 249, at**

**pp. 84-87. Plaintiffs deny that the factual conclusion in last sentence of this dot point of Paragraph 24 are contained in either HR 385 or SR 249. Without waiving that objection, Plaintiffs admit HR 385 and SR 249 contains the remainder of the facts alleged in this dot point of paragraph 24.**

**RESPONSE: Plaintiffs object to any legal arguments and conclusions contained in defendants' purported long and drawn out, multi-pronged fact statement. Parties may not allege legal arguments and conclusions in a 56.1(a) statement of <u>facts</u>. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D.Ill 2000). Such practice "wastes the judicial time that summary judgment was intended to save." *Malec*, 191 F.R.D. at 583. Plaintiffs further object to any reference in paragraph 24 to SR 249 because it describes Legislative Districts and while LD 48 contains RD 96, LD 48 is collectively a distinct geographic area and SR 249 makes no specific reference to RD 96. *See* DSOF Ex. D, SR 249, at pp. 84-87.**

25.     The House and Senate resolutions described the specific boundary lines forming the outline of RD 96 as follows:

- Northern Border:  To maintain a continuous district from east to west, many township lines and precinct lines the Christian County border are utilized as the majority of the northern border of RD 96.  Rochester Township and Rochester are split for equal-population purposes so that the Mid-Illinois Medical District in Springfield can remain intact.  *See* Exh. C, HR 385 at pp. 277, 278; Exh. D, SR 249 at p. 84.

     **RESPONSE: Plaintiffs object to any reference in this dot point of paragraph 25 to SR 249 because it describes Legislative Districts and while LD 48 contains RD 96, LD 48 is collectively a distinct geographic area and SR 249 makes no specific reference to RD 96.  *See* DSOF Ex. D, SR 249, at pp. 84-87.  Plaintiffs admit that HR 385 and SR 249 contained the facts alleged in this dot point of paragraph 25.**

- Southern Border:  The southern border of proposed RD 96 goes east to west along the Pleasant View Township border and then follows Illinois Route 48 diagonally south.  Further west, the southern border splits Taylorville Township to allow the vast majority of the non-rural parts of the city of Taylorville to remain in neighboring RD 95, as they were in the 2001 map, and cuts across southern South Fork Township where it meets the western border of RD 96.  In

part because the boundaries of RD 96 are predominantly along county and township boundaries, much of the southern boundary of RD 96 is drawn in order to satisfy equal population. *Id.* at p. 277.

**RESPONSE: Plaintiffs deny that the cited page of HR 385 contains the facts alleged in this dot point of paragraph 25. *See* DSOF Ex. D, HR 385, at p. 277.**

- <u>Western Border</u>: The western border of proposed RD 96 runs along the borders of South Fork and Cotton Hill townships and then moves into the city of Springfield and takes in the low-income areas of the city. *Id.* at p. 280.

**RESPONSE: Plaintiffs admit that HR 385 contains the language in this dot point of paragraph 25.**

- <u>Northwest/Springfield</u>: The boundaries within Springfield follow precinct lines and are largely based on socioeconomic status. Exh. D, SR 249 at 84, Exh. C, HR 385 at 276-82. The Springfield area of RD 96 is located east of MacArthur Boulevard, a major thoroughfare and recognizable east-west boundary to Springfield residents. Using this boundary, the villages of Jerome and Southern View and the city of Leland Grove are excluded from RD 96. Those municipalities share more in common with the west, north, and south sides of Springfield in that they have a much lower percentage of minorities and a higher median income than the east side of Springfield. RD 96's boundary in Springfield also roughly follows the line that divides Springfield Wards 2, 3, and 5 from Wards 6, 7, and 8. As stated previously, parts of Rochester and Rochester Township are split so that the Mid-Illinois Medical District could be entirely included in RD 96. *Id.* at p. 278.

**RESPONSE: Plaintiffs object to any reference in this dot point of paragraph 24 to SR 249 because it describes Legislative Districts and while LD 48 contains RD 96, LD 48 is collectively a distinct geographical area and SR 249 makes no specific reference to RD 96. *See* DSOF Ex. D, SR 249, at pp. 84-87. Plaintiffs admit that the alleged facts in sentence one of this dot point are contained in HR 385. Plaintiffs can neither admit nor deny sentences 2, 3, 4, or 5 of this dot point as they are not cited to a document in the record. Plaintiffs admit that the facts alleged in the last sentence of this dot point of paragraph 25 are contained in HR 385.**

- <u>Northeast/Decatur</u>: The boundaries in Decatur are to a large extent based upon major roadways and Decatur's municipal borders. RD 96 does not contain the more affluent areas of Decatur on the east and south sides of Lake Decatur. *Id.* at p. 279.)

**RESPONSE: Plaintiffs admit that HR 385 contains the language in this dot point of paragraph 25**

**RESPONSE: Plaintiffs object to any legal arguments and conclusions contained in defendants' purported long and drawn out, multi-pronged fact statement.  Parties may not allege legal arguments and conclusions in a 56.1(a) statement of <u>facts</u>.  *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D.Ill 2000).  Such practice "wastes the judicial time that summary judgment was intended to save." *Malec*, 191 F.R.D. at 583.  Plaintiffs further object to any reference in paragraph 25 to SR 249 because it describes Legislative Districts and while LD 48 contains RD 96, LD 48 is collectively a distinct geographic area and SR 249 makes no specific reference to RD 96.  *See* DSOF Ex. D, SR 249, at pp. 84-87.**

**Further Evidence Regarding Communities
<u>Of Interests Between Springfield And Decatur</u>**

26.	Frank McNeil, a former Springfield Alderman, former Sangamon County Board member and community activist in the Springfield/Decatur area, has by sworn affidavit testified that Springfield and Decatur communities included within RD 96 share a number of commonalities and communities of interest.  *See* Exh. G, McNeil Affidavit.  In that regard, Mr. McNeil has explained that he and other African-Americans from both cities, have come together in Springfield or Decatur on many occasions for many different things, as the distance between the two cities is only a 30-minute drive along Interstate 72.  *Id* at ¶ 12(a).  For instance, Mr.McNeil explained that there are chapters of African-American fraternities and sororities in both cities where the groups come together socially on a regular basis for scholarship drives, dances and other philanthropic efforts.  *Id.* at ¶ 12(b).

**RESPONSE: Plaintiffs admit that Mr. McNeil's Affidavit contains the statements in paragraph 26.**

27.     The churches in both cities share parishioners from each city.  In fact, Mr.

McNeil's brother, the Reverend Earnest McNeil, who also lives in Springfield, at one time

pastored a church in Decatur.  *Id.* at ¶ 12(c).  And demonstrating the interrelatedness of the

African-American church community between the cities is the existence of the Wood River

Church Association, an association made up African-American churches from Springfield,

Decatur and other towns in central Illinois.  *Id.* at ¶ 12(d).

**RESPONSE: Plaintiffs admit that Mr. McNeil's Affidavit contains the statements in
paragraph 27.**

28.     Mr. McNeil further explained in his affidavit that every summer Decatur has what

is called the "Decatur Celebration."  *Id.* at ¶ 12(e).  It is a two day festival in the streets of

downtown Decatur that features entertainment, food and booths with vendors selling a variety of

items.  *Id.*  He has attended this event for the past 20 years.  *Id.*  Many Springfield residents with

common interests look forward to this event, as it gives them an opportunity to get together with

friends from Decatur, whom are both black and white, in a relaxing and festive atmosphere.  *Id.*

**RESPONSE: Plaintiffs admit that Mr. McNeil's Affidavit contains the statements in
paragraph 28.**

29.     In addition, Mr. McNeil has described how there are social clubs that share

membership from both cities, from "The Elks" to a motorcycle club that is multi-racial.  *Id.* at ¶
12(f).

**RESPONSE: Plaintiffs admit that Mr. McNeil's Affidavit contains the statements in
paragraph 29.**

30.     Mr. McNeil explained that there are African-American newspapers with

circulations that include Springfield and Decatur: Pure News USA, Capital City Courier and The

**RESPONSE: Plaintiffs admit that Mr. McNeil's Affidavit contains the statements in paragraph 30.**

31.     In terms of socio-economic issues, Mr. McNeil explained that African-Americans in these communities disproportionately, experience higher unemployment rates, have limited employment opportunities or labor occupations, lower educational levels, lower socio-economic status, live in segregated housing, have limited access to adequate healthcare and are the victims of crime.  *Id.* at ¶ 12(i).

**RESPONSE: Plaintiffs admit that Mr. McNeil's Affidavit contains the statements in paragraph 31.**

<u>**Shape and Compactness of RD 96**</u>

32.     Based upon visual inspection, the shape of RD 96 is unremarkable.  *See* Exh. H, RD 96 map.  It does not contain narrow corridors, snake-like appendages, or spindly tentacles. *Id.*

**RESPONSE: Plaintiffs object to any legal arguments and conclusions contained in defendants' purported fact statement in paragraph 32.  Parties may not allege legal arguments and conclusions in a 56.1(a) statement of <u>facts</u>.  *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D.Ill 2000).  Such practice "wastes the judicial time that summary judgment was intended to save." *Malec*, 191 F.R.D. at 583.   Without waiving this objection, Plaintiffs deny the statements in paragraph 32.  *See* PSAF ¶ ¶ 16-19 and Ex. 8 thereto, Lewis affid. at pp. 3-8.**

33.     Many of the boundary lines of RD 96 stretch for several miles as entirely straight lines and most of the boarders follow county or township boundaries or other logical boundaries. *See* Exh. C, HR 385.

**RESPONSE: Plaintiffs object to any legal arguments and conclusions contained in defendants' purported fact statement in paragraph 33.  Parties may not allege legal arguments and conclusions in a 56.1(a) statement of <u>facts</u>.  *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D.Ill 2000).  Such practice "wastes the judicial time that summary judgment was intended to save." *Malec*, 191 F.R.D. at 583.   Without waiving this objection,  Plaintiffs deny that the description of RD 96 in HR 385 contains the statement that "many of the boundary lines of RD 96 stretch for several miles as entirely straight lines."  *See* DSOF Ex. C, HR 385, at 276-282). Plaintiffs admit that the description of RD 96 in HR 385 contains that remainder of the facts alleged in paragraph 33.**

34.     The distance between Springfield and Decatur is 28.72 miles, connected by Interstate Highway 72.  *See* Exh. I.

**RESPONSE: Plaintiffs deny defendants' purported fact statement in paragraph 34. *See* PSAF ¶ 21 and Ex. 8 thereto, Lewis affid. at pp. 4-5.**

35.     RD 96 is not nearly the longest or widest Representative District in Illinois.  *Id.*

**RESPONSE: Plaintiffs object to any legal arguments and conclusions contained in defendants' purported fact statement in paragraph 35.  Parties may not allege legal arguments and conclusions in a 56.1(a) statement of <u>facts</u>.  *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D.Ill 2000).  Such practice "wastes the judicial time that summary judgment was intended to save." *Malec*, 191 F.R.D. at 583.  Without waiving this objection, Plaintiffs deny that Ex. I supports the fact alleged in paragraph 35.  Ex. I purports to lists the**

diagonal measurements of only 36% of all Representative Districts contained in PA 97-6. *See* **DSOF Ex. I at p. 2.**

36.     RD 96 differs from District 12 in the *Shaw* cases, which spanned 160 miles and, for much of its length, was no wider than the I-85 corridor.  *See* Exhs. J-1, map of *Shaw*'s District 12 in North Carolina map as a whole, and J-2, map of District 12 alone.

**RESPONSE: Plaintiffs object to any legal arguments and conclusions contained in defendants' purported fact statement in paragraph 36.  Parties may not allege legal arguments and conclusions in a 56.1(a) statement of <u>facts</u>.  *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D.Ill 2000).  Such practice "wastes the judicial time that summary judgment was intended to save." *Malec*, 191 F.R.D. at 583.  Without waiving this objection, Plaintiffs admit that RD 96 differs from the Congressional District in Defendants Exhibit J-2 in terms of total miles in length and proximity to I-85 in North Carolina.**

37.     RD 96 is unlike the districts invalidated in *Bush v. Vera*, 517 U.S. 952 (1996), where District 30 consisted of "narrow and bizarrely shaped tentacles," District 18 contained "many narrow corridors, wings, or fingers," and District 29 resembled "a sacred Mayan bird" with a "plumed head," "spindly legs," an "open beak," and "ruffled feathers."  517 U.S. at 965, 973-74.  *See* Exhs. J-3, J-4, and J-5 for maps of these invalidated districts.

**RESPONSE: Plaintiffs object to any legal arguments and conclusions contained in defendants' purported fact statement in paragraph 37.  Parties may not allege legal arguments and conclusions in a 56.1(a) statement of <u>facts</u>.  *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D.Ill 2000).  Such practice "wastes the judicial time that summary judgment was intended to save." *Malec*, 191 F.R.D. at 583. Without waiving this objection, Plaintiffs admit that paragraph 37 accurately reflects the descriptions of the districts referenced in**

*Bush v. Vera*.  **Plaintiffs deny that RD 96 is unlike those districts.**  *See* **PSAF ¶ ¶ 16-20 and Ex. 8 thereto, Lewis affid. at pp. 3-8.**

38.    As is explained in the affidavit of Dr. Gerald Webster, there are several different methods that have been proposed to evaluate geographic compactness of electoral districts over the past few decades, including the geographic dispersion or Reock Measure, and the perimeter or Polsby-Popper Measure.  *See* Exh. K, Webster Report, p. 1.  These two measures were highlighted in a 1993 *Michigan Law Review* article by Richard Pildes and Richard Niemi, and have become the most commonly employed indicators for evaluating district compactness.  *Id.*

**RESPONSE: Plaintiffs admit the facts in paragraph 38.**

39.    The geographic dispersion compactness measure focuses on the level of spatial concentration of a district's geographic area.  *Id.*  To calculate this indicator the smallest possible circle is circumscribed around a district.  *Id.*  The reported coefficient is the proportion of the area in the circle that is also included in the district.  *Id.*  The coefficient ranges from 1.0 (most compact) to 0.0 (least compact).  *Id.*  Notably, a perfect square has a geographic dispersion coefficient of 0.64, and a typical rectangle has a score of approximately 0.40.  *Id.*

**RESPONSE: Plaintiffs admit the facts in paragraph 39.**

40.    The perimeter compactness measure focuses on the length of a district's perimeter relative to the amount of area included in the district.  *Id.*  The reported coefficient is the proportion of the area in the district relative to a circle with the same perimeter.  *Id.*  The coefficient also theoretically ranges from 1.0 (most compact) to 0.0 (least compact).  *Id.* at pp. 1-2.  A perfect square has a perimeter coefficient of 0.78, and a typical rectangle has a coefficient of approximately 0.60.  *Id.* at p. 2.

**RESPONSE: Plaintiffs admit the facts in paragraph 40.**

41.     The above noted Pildes and Niemi (1993: 565) article provides guidance for evaluating the two compactness measures. *Id.* at p. 2. Paying substantial attention to the Court's language in *Shaw v. Reno* (1993), Pildes and Niemi propose cut off levels for low compactness for both measures. *Id.* With respect to the geographic dispersion compactness measure they suggest that low is equal to or less than 0.15. On the perimeter measure they suggest that low is equal to or less than 0.05. With respect to this guidance they state that "In choosing the cutoff points used . . . [here] . . . we do not imply that all districts below these points, or only those districts, are vulnerable after *Shaw* (Pildes and Niemi 1993: 564). *Id.*

**RESPONSE:  Plaintiffs admit that the above cited law review article proposed these "arbitrary" cutoffs.   *See* PSAF Ex. 8, Lewis affid. at pp. 6-8.**

42.     The mean level of compactness for all 118 districts in the Illinois Redistricting Plan on the geographic dispersion or Reock measure is 0.35. *Id.* House District 96's coefficient on this measure is 0.32. *Id.* Both the plan mean and District 96's coefficient are more than double the magnitude of the proposed cutoff level for low compactness of 0.15 noted above. *Id.* District 96's coefficient is further only slightly less than the mean for the plan as a whole. *Id.*

**RESPONSE: Plaintiffs admit the facts in paragraph 42.**

43.     The mean level of compactness for all 118 districts in the Adopted Plan on the perimeter or Polsby-Popper measure is 0.27. *Id.* House District 96's coefficient on this measure is 0.22. *Id.* Both the plan mean and District 96's coefficient are more than four times the magnitude of the proposed cutoff level for low compactness of 0.05. *Id.* While House District 96's coefficient on this measure is 0.05 less than the Adopted Plan's overall mean, its score of 0.22 remains well above the Pildes and Niemi (1993: 565) suggested cutoff point for low geographic compactness. *Id.*

**RESPONSE: Plaintiffs admit the Polsby-Popper measures alleged in paragraph 43. Plaintiffs also admit that the Polsby-Popper measure for RD 96 is above the "arbitrary" cutoff cited in the law review article. *See* PSAF Ex. 8, Lewis affid. at pp. 6-8.**

44.     House District 96's coefficients on the Reock (geographic dispersion) and Polsby-Popper (perimeter) compactness measures are substantially above the Pildes and Niemi (1993: 565) suggested cutoff levels for low geographic compactness. *Id.* House District 96's coefficients on the Reock (geographic dispersion) and Polsby-Popper (perimeter) compactness measures vary only moderately from the means for the plan as a whole. *Id.* As a result, House District 96's level of geographic compactness is evaluated favorably. *Id.*

**RESPONSE: Plaintiffs object to any legal arguments and conclusions contained in defendants' purported fact statement in paragraph 44. Parties may not allege legal arguments and conclusions in a 56.1(a) statement of <u>facts</u>. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D.Ill 2000). Such practice "wastes the judicial time that summary judgment was intended to save." *Malec*, 191 F.R.D. at 583. Plaintiffs admit the facts in sentence one of paragraph 44 that the measurements for RD 96 are above the "arbitrary" cutoff proposed in the cited law review article. *See* PSAF Ex. 8, Lewis affid. at pp. 6-8. Plaintiffs admit the facts alleged in the second sentence of paragraph 44. Plaintiffs deny the allegations in the third sentence of paragraph 44. *See* PSAF Ex. 8, Lewis affid. at pp. 3-8.**

### Partisan Considerations Played a Role in Drafting RD 96

45.     Dr. Allan Lichtman testified to a joint House-Senate hearing that, based on actual voter behavior, he found a "substantial correlation" between African-American voters and preference for the Democratic candidate in general elections. *See* Exh. B-4, 5/24/11 Hearing Tr. at pp. 22, 83.

21

**RESPONSE: Plaintiffs admit that the general statements in paragraph 45 were made by Dr. Lichtman in his testimony, however, he also specifically indicates that he did not analyze RD 96.** *See* **DSOF Ex. B-4, 5/24/11 Hearing Tr. at p. 76.**

46.     The affidavit of Tim Mapes, the principal drafter of the Illinois Map for the House, makes clear that one of the principal reasons for joining the urban centers of RD 96 was to have a downstate district where Democrats had a chance to compete. *See* Exh. L at ¶ 8.

**RESPONSE: Plaintiffs admit that the statements in paragraph 46 are made by Tim Mapes in his Affidavit, but deny that the principal reason for joining creating RD 96 was to increase Democrats' competitiveness.** *See* **PSAF ¶ 11 and Ex. 6 thereto, Hanlon affid.**

47.     Mr. Mapes never looked at the racial demography of RD 96 before signing off on the final line-drawing. *Id.* He did, however, look at the map overlaid with the results of the "Democratic Index" created by staff to judge the partisan composition by precincts. *Id.* That map, attached as Exhibit M, colored areas that were majority-Republican shades of red (the more Republican, the darker the shade of red) and those that were majority-Democratic shades of blue (the more Democratic, the deeper the shade of blue), as the key indicates.

**RESPONSE: Plaintiffs admit that the statements in paragraph 47 are made by Tim Mapes in his Affidavit.**

48.     The map shows that the vast majority of the area in and around RD 96 was heavily Republican (red) and that virtually the only area that was Democratic (blue) was contained within the northwest and northeast borders of RD 96. *See* Exh. M. In fact, in comparing Exhibits N and M, it is patently clear that the heaviest African-American precincts in RD 96 (the darkest purple in N) were the most heavily Democratic (the darkest blue in M).

**RESPONSE:  Plaintiffs admit that Exhibit M purport to indicate the location of certain Republican and Democratic voters and that Exhibit N purports to indicate the location of African-Americans.  However, Plaintiffs deny that facts in the second sentence of paragraph 48.  A visual inspection of both Exhibits M and N indicate that the areas of darkest blue in the Decatur portion of RD 96 on Exhibit M are south and west of the darkest purple in the Decatur portion of RD 96 on Exhibit N.  *See* DSOF Exs. M, N.**

49.     RD 96 splits the counties of Macon, Sangamon, and Christian (*see* Exh. A, SAC, ¶ 195), but the 2001 Illinois Map did so as well.  *See* Exh. L, ¶ 12; Exh. O, Counties split by Currie House Map.  I.

**RESPONSE: Plaintiffs admit that the statements in paragraph 49.**

50.     As detailed in SR 295 and HR 385, RD 96 was drawn along precinct, township, municipal, and county lines.  *See* Exh. D, SR 295 at pp. 84-85; Exh. C, HR 385 at pp. 276-82.

**RESPONSE: Plaintiffs deny the statement in paragraph 50.  Plaintiffs object to any reference in paragraph 50 to SR 249 (assuming the reference to SR 295 was erroneous and the intended reference was to SR 249) because it describes Legislative Districts and while LD 48 contains RD 96, LD 48 is collectively a distinct geographic area and SR 249 makes no specific reference to RD 96.  *See* DSOF Ex. D, SR 249, at pp. 84-87.   Without waiving these objections, Plaintiffs admit that HR 385 mentions "adherence" to some lines and boundaries, but those references are qualified and in other instances, HR 385 specifically contradicts the statement in paragraph 50.  *See* DSOF Ex. C, HR 385 at pp. 277-78.**

### Substantial African-American Population Adjacent to RD 96 Was Not Included

51.     The undisputed, publicly-available census data on racial demography, when laid over the map of RD 96 shows that the General Assembly passed on the opportunity to include a significant block of African-Americans residing adjacent to RD 96.  *See* Exh. N.

**RESPONSE: Plaintiffs object to the use of the term "undisputed" in paragraph 51. Without waiving this objection, Plaintiffs admit that Exhibit N indicates that some African-Americans live outside of RD 96.**

52.     Exhibit N shows the African American population in and around RD 96 by precincts.  As the key indicates, the shades of purple vary according to percentage of African-Americans residing in that precinct.  The northwest corner of RD 96 (the bottom left on the page) is the city of Springfield and the northeast corner (top left on the page) is Decatur.

**RESPONSE: Plaintiffs admit the statements in paragraph 52 with respect to what Exhibit N purports to represent.**

53.     The map, found in Exhibit R, under the title "Hypothetical Springfield-Decatur District to Maximize African-American Population," dropped total population in by 9% (to 98,948) and reached out to capture as many African-Americans as possible, resulting in an African-American VAP in RD 96 of 30.31%, an increase of almost six percentage points compared to RD 96 as drawn in P.A. 97-6.

**RESPONSE: Plaintiffs admit the statements in paragraph 53 with respect to what Exhibit R purports to represent regarding a hypothetical district.**

### RD 23: Proportionality (VAP v. CVAP)

54.     On behalf of Plaintiffs, Baodong Liu has submitted a report regarding RD 23's compliance with Section 2 of the Voting Rights Act.  See Exh. P, Liu Report.  Section VII of the

Liu report on page 8 addresses the issue of whether the state of Illinois has achieved rough proportionality with Latino voting strength in establishing 10 unchallenged effective Latino opportunity districts for the State House. *Id.* at p. 8. The Liu report notes that Latinos are "13.45% of the state's total VAP" according to the 2010 US Census. *Id.* He then multiplies this percentage of the state's total VAP by 188 House districts to translate this percentage into "15.86 seats for Hispanics in the 118-seat State House of Representatives." *Id.*

**RESPONSE: Plaintiffs deny that Dr. Liu states in his report that there are "10 unchallenged effective Latino opportunity districts for the State House." Rather, Dr. Liu's report discusses 10 Minority Latino Districts. *See* DSOF Ex. P, Liu Report, at p. 8. Plaintiffs admit the remaining allegations of paragraph 54.**

55. At the time of the May 2010 redistricting for the state legislature, decision-makers had available to them citizenship data for the United States Bureau of the Census, American Community Survey for 2005- 2009 (ACS). See Exh. Q, Affidavit of Allan J. Lichtman, p. 4. As a report of the Census Bureau has noted, "The ACS is the replacement for the decennial census long form." *Id.* at pp. 4-5. It provides sample data on citizenship, no different from such sample data on citizenship reported during the regular Census year of 2000 for example. *Id.* Social scientists and governments across the United States rely on data from the ACS. *Id.* The Census report stated, "Information from the survey generates data that help determine how more than $400 billion in federal and state funds are distributed each year."[1] *Id.*

**RESPONSE: Plaintiffs admit that Mr. Lichtman's report contains the cited information.**

56. According to the 2005-2009 ACS data, available to the state in the Spring of 2011, the Latino citizen voting age percentage (or what is referred to as CVAP) across the state

---

1 "Citizen Voting Age Population (CVAP) Special Tabulation From the 2005-2009 5-Year American Community Survey," p. 1, http://www.census.gov/rdo/pdf/CVAP_Documentation_Version2.pdf.

of Illinois was 8.2 percent. *Id.* At the level of the state of Illinois, where there is little sampling error, ACS data is highly reliable within an error margin of just of few tenths of one percent. According to Dr. Liu's methodology, this percentage translates into 9.68 seats for Hispanics in the 118-seat State House of Representatives. *Id.* at p. 5. Thus with 10 unchallenged effective Latino opportunity House districts the state of Illinois was well within the bounds of "rough proportionality." *Id.*

**RESPONSE:  Plaintiff's object to any legal arguments and conclusions contained in Defendants' purported Statement of Facts, specifically the use of the terms "rough proportionality" and "highly reliable" in paragraph 56. Rule 56.1 Statements of Fact may not allege legal arguments and conclusions. *Malec v. Sanford,* 191 F.R.D. 581, 583 (N.D. Ill. 2000). (such practice "wastes the judicial time that summary judgment was intended to save"). Without waiving said objections, Plaintiffs admit the first two sentences of paragraph 56. Plaintiffs deny the remaining allegations of paragraph 56. Defendants incorrectly assert that according to Dr. Liu's methodology, there should be 8.68 seats for Hispanics. Contrary to Defendants' characterization, Dr. Liu does not use CVAP to determine proportionality but, rather, voting age population or VAP. *See* DSOF Ex. P, Liu Report at p. 8. Pursuant to Dr. Liu's methodology, there should be 15.86 seats for Hispanics. *Id.* As outlined in response to paragraph 54, Defendants' characterization that Dr. Liu's report states that there are "10 unchallenged effective Latino opportunity districts for the State House" is inaccurate.**

57.     Since adoption of the state legislative plan, the US Bureau of the Census has released in 2010 citizenship data. *Id.* This data is little changed from the 2005 to 2009 data. *Id.* For 2010, the Latino citizen voting age percentage across the state of Illinois was 8.7 percent,

with once again an error margin of only a few tenths of a percent. *Id.* According to Dr. Liu's methodology, this percentage translates into 10.27 seats for Hispanics in the 118-seat State House of Representatives, still placing the state of Illinois well within "rough proportionality." *Id.*

**RESPONSE: Plaintiff's object to any legal arguments and conclusions contained in Defendants' purported Statement of Facts, specifically the use of the terms "rough proportionality" and "little changed" in paragraph 57. Rule 56.1 Statements of Fact may not allege legal arguments and conclusions. *Malec v. Sanford,* 191 F.R.D. 581, 583 (N.D. Ill. 2000). (such practice "wastes the judicial time that summary judgment was intended to save"). Without waiving said objections, Plaintiffs admit the first three sentences of paragraph 57. Plaintiffs deny the remaining allegations of paragraph 57 for the reasons stated regarding Dr. Liu's methodology in response to the allegations of paragraph 56. According to Dr. Liu, the proportionate number of Hispanic seats is 15.86, not 10.27. In fact, Dr. Liu found that "there are only 10 Hispanic MMDs, which is about 8.48 % of 118 house districts" which constitutes a "high level of disproportionality." *See* DSOF Ex. P, Liu Report at p. 8.**

### RD 23: Gingles Prong 3

58.     As Plaintiffs' expert, Dr. Liu, recognizes in his report, to meet the requirements of *Gingles* Prong 3, analysis must demonstrate that in challenged districts of any redistricting plan there is a usual pattern of polarized voting, and secondly, that polarized voting if it exists is sufficiently strong to usually defeat the Latino candidates of choice within challenged districts. See Exh. P, Liu Report, p. 3.

**RESPONSE:  Plaintiff's object to any legal arguments and conclusions contained in Defendants' purported Statement of Facts, specifically the use of the terms "usual" pattern of polarized voting in paragraph 58.  Rule 56.1 Statements of Fact may not allege legal arguments and conclusions.  *Malec v. Sanford,*  191 F.R.D. 581, 583 (N.D. Ill. 2000).  (such practice "wastes the judicial time that summary judgment was intended to save").  Without waiving said objections, Plaintiffs deny that Dr. Liu recognized that *Gingles* Prong 3 involves polarized voting.  However, Dr. Liu did find that there was racial polarization sufficient to enable whites to usually defeat the Hispanic's candidates of choice as set forth in Section VI of his report, pp. 7-8.  *See*  DSOF Ex. P, Liu Report at pp. 7-8.**

59.     Dr. Liu's results, as reported in Table 13 show that non-Latino bloc voting by whites and blacks in this district was not usually sufficient to defeat the candidate of choice of Latino voters.  See Exh. Q, Affidavit of Allan J. Lichtman, p. 6.  To the contrary, Dr. Liu's results show that a white candidate would have prevailed in Adopted RD 23 only in one of four elections, which means that a Latino candidate preferred by Latino voters would have prevailed in three elections in challenged RD 23, for a win rate of 75 percent.  *Id.*

**RESPONSE:  Plaintiffs deny the allegations or paragraph 59. Table 13 of Dr. Liu's report establishes that white candidates would win three of four elections if the vote was not split.  *See* DSOF Ex. P, Liu Report, Table 13.**

60.     The findings that Dr. Liu presents in Table 13 demonstrate that the Latino candidate preferred by Latino voters in Adopted RD 23 would have lost only in the 2010 primary for Lieutenant Governor, where there is a lack of cohesion by Latino voters.  *Id.*  Dr. Liu finds that only 51 percent of Latino voters backed the Latino candidate in that primary.  *Id.*

**RESPONSE: Plaintiffs deny the first sentence of paragraph 60. Table 13 of Dr. Liu's report establishes that white candidates would win three of four elections if the vote was not split.** *See* **DSOF Ex. P, Liu Report at Table 13. Plaintiffs admit that Dr. Liu found that only 51% of Latino voters backed the Latino candidate in that primary.**

Respectfully submitted,



/s/--------Phillip A. Luetkehans---------------------
One of the Attorneys for Plaintiffs Christine
Radogno, Veronica Vera and Edwin
Tolentino

/s/ --------Andrew Sperry-----------------------------
One of the Attorneys for Plaintiffs Thomas Cross,
Adam Brown and Angel Garcia

/s/--------Thomas M. Leinenweber------------------
One of the Attorneys for Plaintiffs Thomas Cross,
Adam Brown and Angel Garcia

E-filed: November 23, 2011

Phillip A. Luetkehans, 06198315
pluetkehans@slg-atty.com
Brian J. Armstrong, 06236639
barmstrong@slg-atty.com
Stephanie J. Luetkehans, 06297066
sluetkehans@slg-atty.com
SCHIROTT, LUETKEHANS & GARNER, P.C.
105 East Irving Park Road
Itasca, IL 60143
630-773-8500

Thomas M. Leinenweber, 6208096
thomas@landb.us
Peter Baroni, 6236668
peter@ilesq.com
Leinenweber Baroni & Daffada LLC
203 N. LaSalle St., Suite 1620
Chicago, IL 60601
(866) 786-3705

Andrew Sperry, 6288613
asperry@laroseboscolaw.com
LaRose & Bosco, Ltd.
200 N. LaSalle St., Suite 2810
Chicago, IL 60601
(312) 642-4414

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of November, 2011, I electronically filed Plaintiffs'
L.R. 56.1(b)(3) Response to Defendants' Statement of Material Facts Pursuant to Local Rule
56.1(a)(3) with the Clerk of the U.S. District Court, Northern District of Illinois, Eastern
Division using the CM/ECF system which will send notification of such filing to the following:

asperry@laroseboscolaw.com

thomas@landb.us

bstratton@atg.state.il.us

dellis@hds.ilga.gov

mlayden@rjpltd.com

rprendergast@rjpltd.com

mjkasper60@mac.com

peter@ilesq.com

emadiar@senatedem.ilga.gov

fogartyjr@gmail.com

mike.persoon@gmail.com

kennethjohnsonlaw@earthlink.net

courtneynottage@aol.com

htristan@tristancervantes.com

pcervantes@tristancervantes.com

kreidy@trisancervantes.com

lmishkin@sandmlegal.com

wharte@williamharteltd.com

jmannix@williamharteltd.com

and I hereby certify that I mailed by U.S. Postal Service the document(s) to the following non-

registered attorneys and interested parties:  NONE.


/s/_____Phillip A. Luetkehans_____
One of the Attorneys for Plaintiffs
Christine Radogno, Veronica Vera
and Edwin Tolentino


Phillip A. Luetkehans, 06198315
pluetkehans@slg-atty.com
Brian J. Armstrong, 06236639
barmstrong@slg-atty.com
Stephanie J. Luetkehans, 06297066
sluetkehans@slg-atty.com
Schirott, Luetkehans & Garner, P.C.
105 East Irving Park Road
Itasca, IL 60143
630-773-8500

Thomas M. Leinenweber
thomas@landb.us
Peter G. Baroni
peter@ilesq.com
Leinenweber Baroni & Daffada LLC
203 N. LaSalle St., Suite 1620
Chicago, IL 60601
(866) 786-3705

Andrew Sperry, 6288613
LaRose & Bosco, Ltd.
200 N. LaSalle St., Suite 2810
Chicago, IL 60601
(312) 642-4414
asperry@laroseboscolaw.com