IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTINE RADOGNO, in her official capacity )
as Minority Leader of the Illinois Senate, )
THOMAS CROSS, in his official capacity as )
Minority Leader of the Illinois House of )
Representatives, ADAM BROWN, in his official )
capacity as a state representative from the 101st )
Representative District and individually as a )
registered voter, VERONICA VERA, ANGEL )
GARCIA, EDWIN TOLENTINO, and THE )
ILLINOIS REPUBLICAN PARTY (Intervening )
Plaintiff), )          NO.     1:11-cv-04884
                                             )
              Plaintiffs,                    )     Judges Elaine E. Bucklo
                                             )     Diane S. Sykes and Philip P. Simon
         vs                                  )
                                             )     Magistrate Geraldine Soat Brown
ILLINOIS STATE BOARD OF ELECTIONS, )
RUPERT BORGSMILLER, Executive Director of )
the Illinois State Board of Elections, HAROLD D. )
BYERS, BRYAN A. SCHNEIDER, BETTY J. )
COFFRIN, ERNEST C. GOWEN, WILLIAM F. )
McGUFFAGE, JUDITH C. RICE, CHARLES W. )
SCHOLZ, and JESSE R. SMART, all named in )
their official capacities as members of the Illinois )
State Board of Elections, AFRICAN AMERICANS )
FOR LEGISLATIVE REDISTRICTING )
(Intervening Defendant), UNITED NEIGHBOR- )
HOOD ORGANIZATION (Intervening Defendant), )
COLOMBIANOS UNIDOS PARA UNA LABOR )
ACTIVE (Intervening Defendant), HISPANIC )
AMERICAN CONSTRUCTION INDUSTRY )
ASSOCIATION (Intervening Defendant), and )
FEDERACION JALISCIENSE DEL MEDIO )
OESTE DE LOS ESTADOS UNIDOS (Intervening )
Defendant), )
                                             )
              Defendants.                    )

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## POINTS AND AUTHORITIES

**PAGE**

STANDARD OF REVIEW ................................................................. 4

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ................................................ 4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, (1986) ............................ 4

*Griffin v. Thomas*, 929 F.2d 1210 (7th Cir. 1991) .................................... 4

**ARGUMENT**

**I.     PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE
        TO PROCEED TO A TRIAL ON THE MERITS** ................................... 4

*Miller v. Johnson*, 515 U.S. 900, (1995) .................................................. 4

*Shaw v. Reno,* 509 U.S. 630 (1993) ......................................................... 5, 9

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ................................................ 5, 7, 9

*Prejean v. Foster*, 227 F.3d 504 (5th Cir. 2000) ...................................... 5

*Easley v. Cromartie*, 532 U.S. 234 (2001) .............................................. 10

*Lawyer v. Dept. of Justice*, 521 U.S. 567 (1997) ..................................... 10

*Cano v. Davis,* 211 F. Supp. 2d 1208 (C.D. Cal. 2002) ........................... 10

**II.    PLAINTIFFS' EXPERT REPORT SHOWS COMPLIANCE
        WITH THE THIRD *GINGLES* PRON**G ..................................... 11

*Thornburg v. Gingles,* 478 U.S. 30 (1986) .............................................. 11

*Barnett v. City of Chicago*, 969 F. Supp. 1359 (N.D. Ill. 1997) ................ 12

Grofman, Handley & Neimi, *Minority Representation
and the Quest for Voting Equality* ............................................................. 12

*United States v. Charleston County,* 365 F.3d 341 (4th Cir. 2004) ........... 12

*Jenkins v. Manning,* 116 F.3d 685 (3d Cir. 1997) ................................... 13

i

## POINTS AND AUTHORITIES Cont'd

**PAGE**

*Little Rock School Dist. v. Polaski County Special School Dist.*
56 F.3d 904 (8th Cir. 1995) ....................................................................... 13

*Neal v. Coleburn,* 689 F. Supp. 1426 (E.D. Va. 1988) ................................ 13

*Williams v. State Bd. of Elections,* 718 F. Supp. 1324 (N.D. Ill. 1989) ..................... 13

*Milwaukee of the N.A.A.C.P. v. Thomas,* 116 F.3d 1194 (7th Cir. 1997) ................. 13

*Askew v. City of Rome,* 127 F.3d 1355 (11th Cir. 1997) ............................................ 13

*Morris v. City of Houston,* 894 F. Supp. 1062 (S.D. Tex. 1995) ............................... 13

*Campos v. City of Houston,* 113 F.3d 544 (5th Cir. 1997) ........................................ 13

**III.    PROPORTIONALITY IS NOT DISPOSITIVE UNDER
            THE TOTALITY OF CIRCUMSTANCES** ............................................. 15

*Johnson v. De Grandy,* 512 U.S. 997 (1994) ............................................... 15, 16

*League of United Latin American Citizens
v. Perry,* 548 U.S. 399 (2006) ................................................................... 17, 23

*Gil v. Reed,* 381 F.3d 649 (7th Cir. 2004) ................................................... 18

*Barnett v. City of Chicago,* 969 F. Supp. 1359 (N.D. Ill. 1997) ............................. 20

*Griffin v. Thomas,* 929 F.2d 1210 (7th Cir. 1991). ................................................. 20

*Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir. 1984) ................................................... 20

*Rybicki v. State Bd. of Elections,* 574 F. Supp. 1147 (N.D. Ill. 1983) ..................... 20

*United States v. Cicero,* 2000 WL 34342276 (N.D. Ill. Mar. 15, 2000) .................... 20

*Jamison v. Tupelo, Mississippi,* 471 F. Supp. 2d 706 (N.D. Miss. 2007) ................. 22

*Sanchez v. State of Colorado,* 97 F.3d 1303 (10th Cir. 1996) .................................. 22

*Magnolia Bar Ass'n, Inc. v. Lee,* 793 F. Supp. 1386 (S.D. Miss. 1992) .................... 22

*Thornburg v. Gingles,* 478 U.S. 30 (1986) ................................................... 22

## <u>POINTS AND AUTHORITIES</u> Cont'd

<u>PAGE</u>

*N.A.A.C.P. v. Fordice,* 252 F.3d 361 (5th Cir. 2001) ................................................. 23

*Jenkins v. Red Clay Consol. School Dist.*
*Bd. of Educ.,* 4 F.3d 1103 (3d Cir. 1983)................................................................... 23

*Large v. Freemont County, Wyo.,*709 F. Supp. 2d 1176 (Dist. Wyo. 2010) ............. 23

*Rogers v. Lodge,* 458 U.S. 613 (1982)....................................................................... 23

*Harper v. City of Chicago Heights,* 824 F. Supp. 786 (N.D. Ill. 1993)..................... 23

## INTRODUCTION

On May 27, 2011, the Redistricting Plan was adopted by both the House and Senate of the State of Illinois based upon a partisan roll call (the "Adopted Plan").  Plaintiffs sued on the basis that the creation of Representative Districts 1, 2, 21, 22, 23, and 24 (the "South Side Latino Districts") violated Section 2 of the Voting Rights Act.  Further, Representative District 96 violates the Equal Protection Clause by subordinating traditional redistricting principles to the racial classification of voters.

Defendants' Motion for Summary Judgment comes at the apex of discovery in this matter. The parties have recently exchanged thousands of documents, expert reports and affidavits that highlight the numerous factual disputes regarding Plaintiffs' claims.  The parties still have numerous fact and expert dispositions to take which will undoubtedly unearth even more disputed facts.  Nonetheless, there is sufficient evidence already in the record to support Plaintiffs' claims and must be heard at a trial on the merits.  Defendants' Motion for Summary Judgment should be denied.

## STATEMENT OF FACTS

### *REPRESENTATIVE DISTRICT 96*

Representative District 96 was first introduced to the General Assembly by the Defendant-Intervenors African-Americans for Legislative Redistricting ("AALR").  SOF, ¶ ¶ 3, 9.  As Mr. Lawrence Hill, Co-Chair of AALR, testified, his primary purpose for creating Representative District 96 was to combine the substantial African-American populations of Springfield and Decatur.  SOF, ¶ 3.  Mr. Hill felt that creating such a district was particularly important given that some African-Americans had moved from the City of Chicago to the Springfield area.  SOF, ¶ 5.  Mr. Hill testified that in order to join these African-American

communities together, he deliberately ignored the boundaries of previous districts, the political history of the entire area and the neighborhood communities of interest. SOF, ¶ 4. In gathering input on his proposal to join the African-American communities in Springfield and Decatur, Mr. Hill did no research into the communities other than to gather anecdotal evidence from one individual in Springfield and another in Decatur. SOF, ¶ 6. He did, however, upon the advice of counsel, study a law review article which laid out a road map for defeating claims of racial gerrymandering. SOF, ¶ 7.

Mr. Hill testified that his proposed district joining the two separate African-American communities together was adopted by the General Assembly in substantially the same form. SOF, ¶ 8. Indeed, the Representative District 96 that appeared in the final version of the map was similar to the AALR proposal. SOF, ¶ 19. It stretches and bends south and east to grab the African-American communities located some 40 miles away. SOF, ¶¶ 17, 21. Unlike the AALR proposal, which was the shape of a dumbbell, the General Assembly looped around the African-American communities in Springfield and Decatur and snaked south of I-72 to grab sparsely populated areas of Christian, Macon and Sangamon Counties. SOF, ¶¶ 16-18. In doing so, the General Assembly mixed two large far-flung African-American communities with farmland inhabited by voters with politically different interests. SOF, ¶¶ 16-18. In doing so, Representative District 96 conjures up images of the 12th North Carolina Congressional District that was found grossly non-compact by the Supreme Court in *Shaw v. Reno* 517 U.S. 899, 918 (1996). SOF, ¶ 16. The irregular shape of Representative District 96 also results in a severing of the core constituencies of five previous representative districts and lumps some of those voters into Representative District 96. SOF, ¶ 23. The meandering district lines also split 14 different townships, five municipalities and three counties, including the two major population centers in

central Illinois.  SOF, ¶ 23.  Representative District 96 also disrupts the incumbent-constituent relationship of three representative districts in the area.  SOF, ¶ 24.

Despite being corralled into the same representative district, in economic terms, the cities of Springfield and Decatur are very different.  The largest employer in Springfield is the State of Illinois with 21,600 residents working for the State of Illinois.  SOF, ¶ 26.  However, in Decatur, less than 1,200 people are employed by the State of Illinois.  SOF, ¶ 26.  In Decatur, the major industry is manufacturing with 35% of the workforce employed at companies like Archer Daniels Midland and Caterpillar.  SOF, ¶ 27.  Conversely, only about 10% of the workforce in Springfield is employed by the manufacturing industry.  SOF, ¶ 27.  The median home price in Decatur is $76,500 compared to Springfield at $109,300.  SOF, ¶ 31.

These stark contrasts were echoed by many residents of the area who testified before the House and Senate Redistricting Committees.  Mr. Eddie Price, a deacon at Union Baptist Church in the Springfield area, testified in opposition to Representative District 96 that linking the communities "made no sense" because "those communities are so different."  SOF, ¶ 32.  At a separate hearing, Mr. Jerry White, a local real estate agent and member of the Sangamon County Board of Review, also advocated for keeping the City of Springfield together noting that "the City of Decatur is not at all like Springfield.  It is more blue collar workers, a different kind of environment."  SOF, ¶ 36.  At that same hearing, Springfield Alderman Sam Cahnman stressed the importance of keeping the City of Springfield as one district separate from other areas due to the capitol city's unique commonality of interest.  SOF, ¶ 35.  Alderwoman Turner, who advocated for Representative District 96 primarily because it benefits the African-American communities in Springfield and Decatur, even conceded that the African-American community

in Springfield and the rural areas that were linked up with the African-American community in Decatur were "very different."  SOF, ¶¶ 33-34.

According to the purported architect of the representative districts in the Adopted Plan, the overriding concern was to create a Representative District 96 that maximized Democratic competitiveness.  SOF, ¶¶ 9-10 .  Despite this stated reason, Representative District 96 could have been drawn in a manner that better maximized Democratic competitiveness while splitting less townships, municipalities and counties.  SOF, ¶ 11.

## STANDARD OF REVIEW

Summary judgment is appropriate only when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *Fed. R. Civ. P. 56(c); See also Hunt v. Cromartie,* 526 U.S. 541, 549 (1999)*.*  When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the opposing party. *Hunt,* 526 U.S. at 553; *See also Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991).  Summary judgment is inappropriate, even when a legislative redistricting plan is being challenged, if reasonable inferences can be drawn from the undisputed facts in the record. *Id.* at 552 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) "Credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts are jury functions.")

## ARGUMENT

## I.     PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO PROCEED TO A TRIAL ON THE MERITS ON COUNT 5

When engaging in redistricting, a state legislature may not separate voters into districts based predominantly on their race.  *Miller v. Johnson*, 515 U.S. 900, 911 (1995).  Although accepting that awareness of race as a component of the redistricting process, the court cautioned

that when the legislature assigns voters on the basis of race, it "engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller*, 515 U.S. at 912 quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993). In order to prevail on a claim for racial gerrymandering, Plaintiffs must demonstrate that the legislature subordinated all traditional redistricting principles to the racial classification of certain voters. *Miller,* 515 U.S. at 913, 916. Plaintiffs may prove such racial motivation through direct or circumstantial evidence, including the bizarre or irregular shape of the district, incongruous boundaries, disregard for political subdivisions and communities of interest and lack of commonality between disparate communities. *Shaw,* 509 U.S. at 647; *see also Hunt v. Cromartie*, 526 U.S. 541, 546-550 (1999).

Assessing the General Assembly's motivation in creating Representative District 96 is inherently a factual question requiring a "sensitive inquiry" into all of the direct and circumstantial evidence available. *Hunt*, 526 U.S. at 546, 549 The plaintiffs in *Hunt* submitted circumstantial evidence of the district's unusual shape and disregard for several traditional redistricting principles to demonstrate the legislature's intention. *Id.* at 547-548. The defendants countered with an affidavit stating that Democratic competitiveness, and not race, was the overriding legislative motivation in creating the district. *Id.* at 549-550. Defendants also submitted affidavits from two state legislators stating that they attempted to adhere to traditional redistricting principles. *Id.* In reversing the lower court's finding of summary judgment, the Supreme Court stated that the evidence presented *in toto* supports a reasonable inference that the legislature's primary motivation could have been either race or politics. *Id.* at 552 (directing the lower court to conduct a trial on the merits) ; *see also Prejean v. Foster*, 227 F.3d 504, 509 (5th

Cir. 2000) (reversing summary judgment for defendants despite affidavit from the architect of the map indicating that race was not predominant factor).

In this case, the Plaintiffs have put forth considerable evidence that the General Assembly's sole motivation in creating Representative District 96 was to join the African-American populations on the east side of Springfield and the west side of Decatur. The origins of Representative District 96 help illuminate the General Assembly's motivation. The proponent of Representative District 96 made clear in his testimony that his primary goal was to loop the African-American communities of Springfield and Decatur together into one representative district. SOF, ¶ 3. In furthering his racial gerrymander, he completely ignored the boundaries of the previous districts, the incumbent-constituent relationships in neighboring districts, the political history of the entire area and neighborhood communities of interest. SOF, ¶ 4. The proposal by the AALR was similar to the district in *Shaw* in that it snaked along the I-72 corridor and then swelled on the east and west ends to gobble up the African-American communities in Springfield and Decatur. SOF, ¶¶ 16-19. It appears that the General Assembly agreed with Mr. Hill's goal. Indeed, Representative District 96 bears a striking resemblance to the proposal submitted by AALR. SOF, ¶ 19.

Based on a visual inspection, it appears that the General Assembly took the AALR proposal and merely extended its reach south of the I-72 corridor further into the rural portions between Springfield and Decatur in an obvious attempt to cover up the AALR proposal's problematic comparison to the district *Shaw*. SOF, ¶¶ 17, 19. It stretches and bends south and east to grab the African-American communities located some 40 miles away along with the sparsely populated areas of Christian, Macon and Sangamon Counties. SOF, ¶¶ 17, 21. Given that average distance east to west of all representative districts in the Adopted Plan was only 28

miles, Representative District 96 has to be considered one of the most egregious attempts to link far-flung communities in the entire map. SOF, ¶ 20.

Defendants' compactness expert, Dr. Gerald Webster, rests his conclusion solely on how Representative District 96 rates on two measures of compactness and an arbitrary cutoff from a law review article. Reock and Polsby-Popper. Defs' Br., pp. 13-14, SOF, ¶ 13-14. However, any measure of compactness must take into account how the district combines and divides individuals and communities based on political and demographic data. SOF, ¶ 13-14. When viewed in this context, Representative District 96 fails this measure of compactness. Almost 82% of the population of Representative District resides over 40 miles apart from one another in two separate cities with two different sets of needs. SOF, ¶¶ 21, 26-36.

In creating Representative District 96, the General Assembly completely disregarded many of the other traditional redistricting principles that help ensure fairness in the process. *Shaw*, 509 U.S. at 647-648. Representative District 96 severs the core constituencies of five previous representative districts and lumps some of those voters into Representative District 96. SOF, ¶ 23. The meandering district lines also splits 14 different townships, five municipalities and three counties. SOF, ¶ 23. Most importantly, Representative District 96 splits up the two major metropolitan areas in central Illinois (Springfield and Decatur) into at least two different representative districts. SOF, ¶¶ 21, 23. Representative District 96 also disrupts the incumbent-constituent relationship of three representative districts in the area. SOF, ¶ 24.

The erratic shape of Representative District 96 and its complete disregard for traditional redistricting principles creates more than a reasonable inference that the General Assembly sought to draw district lines based solely on the racial makeup of the African-American communities within Springfield and Decatur. *Hunt* 526 U.S. at 552. Defendants' *post hoc*

attempts to justify this racial gerrymander with arbitrary facts and figures and conclusory affidavits can't overcome this powerful inference.

Defendants' contention that "the urban centers of Decatur and Springfield have much in common," simply cannot withstand scrutiny – unless the common factor in question is race. Defs' Br., pp. 12-14. As House Resolution 385 (HR 385) makes plain, the purpose of Representative District 96 was to "unite[] the only two significant African American communities of interest in the region." SOF, ¶ 22. Furthermore, the attempts by Defendants to link the two communities by race-neutral criteria are belied by the stark contrast in socio-economic characteristics between Springfield and Decatur. SOF, ¶¶ 25-36. Given that Springfield is home to the Illinois capitol, the primary economic engine is the state government. SOF, ¶ 26. The state government employs nearly a quarter of all residents of Springfield, including those residing in the eastern portion of the city, not to mention supporting countless businesses in the services industry. SOF, ¶ 26. By contrast, the economic foundation of Decatur is the manufacturing industry with major companies like Archer Daniels Midland and Caterpiller, employing residents from all over Decatur and the surrounding area. SOF, ¶ 27. The wants and needs of those particular industries are important to every resident of Decatur and Springfield, regardless of race. The General Assembly chose to ignore the representational needs of those unique economic interests and instead elevated the racial makeup of the residents as the primary motivation driving the creation of Representative District 96. .

The General Assembly also ignored obvious differences in social needs in constructing Representative District 96. Defendants' assertion that Springfield and Decatur share problems such as "crime, unemployment, and educational challenges" collapses in light of the jurisdictional discrepancies between the two communities. As regards to crime, for instance, the

two communities function in different courthouses with different prosecutors. SOF, ¶ 29. As regards to education, the General Assembly's plan would force one state representative to lobby two different Regional Superintendents regarding the allegedly similar educational challenges that the communities share. SOF, ¶ 30. Try as they might, Defendants cannot ignore the obvious social and economic differences between the Cities of Springfield and Decatur. Linking communities together with very little in common but their race gives rise to an inference that the race of the voters in Springfield and Decatur was the driving force behind the creation of Representative District 96. *Shaw*, 509 U.S. at 647.

Furthermore, the General Assembly completely ignored the testimony of many Springfield area residents that resisted the General Assembly's efforts to group the African-American communities of Springfield and Decatur with one state representative. As Messrs. Price and White and Alderman Cahnman made clear, Springfield and Decatur are two very different cities with very different representational needs. SOF, ¶¶ 32-36. Representative District 96, which carves up the two largest metropolitan cities in central Illinois in order to combine their African-American communities, will hamper its state representative's ability to advocate for all of the unique problems that Decatur and Springfield face. SOF, ¶ 17. Slicing Decatur and Springfield into two representative districts raises serious concerns, for example, as to whether those state representative can effectively press city government for more city services when they represent only parts of each city. SOF, ¶ 21. The General Assembly ignored these facts and chose to unite African-American communities over 40 miles away from each other. SOF, ¶¶ 17, 25-36.

Defendants also contend that the General Assembly was more motivated by the advancement of Democratic candidates than race. Defs' Br., pp. 11-12. As Mr. Timothy Mapes

testified in his deposition, his goal was to take the AALR proposal and maximize Democratic competitiveness in the area to make sure it included all of the "Democratic performing precincts."  SOF, ¶¶ 9-10.  However, as demonstrated by the map in Ex. 6, Mr. Mapes deliberately left a significant amount of Democratic performing precincts out of the final plan that would have increased Democratic competitiveness by at least 4%.  SOF, ¶ 11.  Not only would the hypothetical district have maximized Democratic competitiveness in the district, it would have split less townships, counties and municipalities.  SOF, ¶ 11. Given Mr. Mapes' particular attention to the politics of the district, it is hard to believe that he would have missed out on an opportunity to maximize Democratic competitiveness.  SOF, ¶ 10.  The only explanation for this oversight must be that the primary motivation for Representative District 96 was the racial makeup of the African-American communities of Springfield and Decatur and not Democratic preferences of all precincts.

Defendants falsely assert that "no court has ever invalidated a district under *Shaw* where the racial group allegedly targeted for success consisted of less than half of the districts VAP." Defs' Br., pp. 8.  The minority population in the congressional district at issue in the *Cromartie* line of cases constituted less than 50% of voting-age population ("VAP").  *Hunt* at 544; *see also Easley v. Cromartie*, 532 U.S. 234, 240 (2001).  That district was invalidated at the summary judgment stage and again at the three-judge panel trial held on remand.  *Id.* at 545; *Easley,* 532 U.S. at 239-240.  Defendants' citations to *Lawyer* and *Cano* are equally unavailing.  Defs' Br., pp. 8-9.  In neither of those cases did the deciding courts consider the minority's proportion of overall VAP to be the dispositive factor.  *Lawyer v. Dept. of Justice*, 521 U.S. 567, 574-575 (1997); *Cano v. Davis,* 211 F. Supp. 2d 1208, 1217-1218 (C.D. Cal. 2002) *aff'd*, 537 U.S. 1100 (2003)..

Viewing all of the Plaintiffs' evidence *in toto*, it becomes clear that the General Assembly's true motivation in creating Representative District 96 was to adopt Mr. Hill's racial gerrymander. At the very least, a triable issue of fact remains on this question. Defendants' Motion for Summary Judgment should be denied.

## II. PLAINTIFFS' EXPERT REPORT SHOWS COMPLIANCE WITH THE THIRD *GINGLES* PRONG

Under *Thornburg v. Gingles,* 478 U.S. 30, 49-51 (1986), a three prong test must be met in order to satisfy the initial threshold of a § 2 claim:

Prong One: The group is sufficiently large and geographically compact to constitute a majority in single-member districts.

Prong Two: The group is politically cohesive.

Prong Three: The white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority candidate running unopposed* * *- usually to defeat the minority's preferred candidate.

In an attempt to avoid the entirety of Plaintiffs' expert Dr. Liu's report showing that the Plaintiffs meet all three prongs of the *Gingles* test, Defendants cite to a single table (Table 13) in Dr. Liu's report. First of all, Defendants do not ever dispute the methodology or the facts raised in Dr. Liu's report. Defs' Ex. Q, ¶ 6. However, Defendants' failure to take all of Dr. Liu's report into account dooms its Motion for Summary Judgment as to Count I.

What Table 13 and the rest of Dr. Liu's report actually show is that white voters vote sufficiently as a bloc to usually defeat Latino candidates in Representative District 23. SOF, ¶ 37. Table 13 in Dr. Liu's original report, also set forth as Exhibit A to Dr. Liu's Affidavit, shows reconstituted election results for hypothetical elections in Representative District 23 under the Adopted Plan. SOF, ¶38. Defendants focus on the last column entitled "White Winner." However, in three of those four elections, one Latino was running against, *inter alia*, multiple

11

white candidates. SOF, ¶ 40. Table 13 shows that when you aggregate all of the votes for a particular ethnicity, whites actually win three out of the four elections. SOF, ¶ 38. Hence, Prong 3 of the *Gingles* test is met because the white majority is voting sufficiently as a bloc to usually defeat the minority's preferred candidate.

Defendants argue that this is irrelevant because "neither whites nor candidates of any other race run as a group." Mot. for Summ. J. Mem., p. 20. However, Defendants miss the point of Table 13. In three of those four elections in Table 13, enough white voters voted for white candidates that the Latino candidate would have lost those elections in this newly created district. SOF, ¶ 38. Failure to look at the combined election data by ethnicity results in a misleading analysis. *Barnett v. City of Chicago*, 969 F. Supp. 1359, 1424 (N.D. Ill. 1997), *reversed in part on other grounds*, 141 F.3d 699 (7th Cir. 1998). *See also* Grofman, Handley & Niemi, *Minority Representation and the Quest for Voting Equality*, p. 99. While *Barnett* was looking at this question related to the issue of Prong 2, it is equally applicable to the evaluation of Prong 3 where multiple white candidates split the white vote. SOF, ¶¶ 38-43. In fact, Defendants' own expert, Dr. Lichtman, admitted in his deposition that he has performed and relied upon this exact same type of analysis (comparing total white candidate votes versus total minority votes) in analyzing both Prong 2 and Prong 3 under *Gingles*. SOF, ¶ 44. This is especially important when looking at exogenous elections such as set forth in Table 13, ¶¶ 38-43.

In fact, courts throughout the country have recognized this problem when analyzing elections where multiple white candidates split the vote and the minority candidates win with only a plurality. The courts have determined that those types of elections where multiple Anglo candidates split the vote are actually "special circumstances" under Prong 3 of *Gingles*. *See United States v. Charleston County,* 365 F.3d 341, 352 (4th Cir. 2004) (a split among several

white candidates is found to be special circumstances under Prong 3); *Jenkins v. Manning,* 116

F.3d 685, 694 (3d Cir. 1997) (plurality election discounted as special circumstance under Prong 3

where minority elected by plurality in race against five white candidates); *Little Rock School*

*Dist. v. Polaski County Special School Dist.,* 56 F.3d 904, 911 (8th Cir. 1995) (African-American

running in a plurality race against several white candidates found to be special circumstances

under Prong 3); *Neal v. Coleburn,* 689 F. Supp. 1426, 1436 (E.D. Va. 1988) (special

circumstances found under *Gingles* Prong 3 when black elected with 39.5% of the vote only

because the two strong white candidates had split the white majority vote).

This grouping of candidates and votes by ethnicity is particularly relevant when looking

at representative districts in Illinois because it predicts the most likely outcome of elections

where a single Latino candidate is not running against multiple white candidates. SOF, ¶¶ 39-42.

In the past 10 years, a lone Latino candidate has never run against multiple white candidates in a

Representative District election in the State of Illinois. SOF, ¶ 41. Further, no Latino has ever

won a representative or legislative election for the past decade in this area without running in a

majority Latino VAP district. SOF, ¶ 43. On the other hand, a white candidate has won election

to the House of Representatives in a majority-minority district that overlaps this particular area

because of racially polarized voting. SOF, ¶¶ 45-46.

Defendants rely upon four cases to argue that Dr. Liu's Analysis/Report fails to meet

*Gingles* Prong 3. *Williams v. State Bd. of Elections,* 718 F. Supp. 1324, 1328 (N.D. Ill. 1989);

*Milwaukee of the N.A.A.C.P. v. Thomas,* 116 F.3d 1194 (7th Cir. 1997); *Askew v. City of Rome,*

127 F.3d 1355 (11th Cir. 1997); *Morris v. City of Houston,* 894 F. Supp. 1062 (S.D. Tex. 1995),

*aff'd sub nom; Campos v. City of Houston,* 113 F.3d 544 (5th Cir. 1997). However, all of the

cases cited by the Defendants deal with Prong 3 by only reviewing endogenous elections in areas

13

that are coterminous with the district at issue. Due to the fact that representative districts change every 10 years due to population changes, it is impossible to recreate these exact endogenous elections at the Representative District level in Illinois. Accordingly, these cases cited by Defendants dealing with endogenous elections with coterminous boundaries provide this Court with no assistance in determining whether the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, to usually defeat a minority's preferred candidate. As Dr. Lichtman agrees, usually there are not enough endogenous elections to draw a conclusion based on endogenous elections alone. SOF, ¶ 44.

Hence, Dr. Liu analyzed reconstituted elections under Representative District 23. SOF, ¶ 38. In three of the four elections Dr. Liu utilized, multiple white candidates ran against a single Latino candidate. SOF, ¶ 40. Dr. Liu found that the white majority voted as a bloc for white candidates. SOF, ¶ 37. Due to the fact that at no time in the last decade has a single Latino candidate run against multiple white candidates in an Illinois Representative District, Dr. Liu properly aggregated the white bloc vote for the white candidates and determined that, under the reconstituted elections, Latinos would lose three of the four elections. SOF, ¶¶ 38-43 Hence, Dr. Liu found that *Gingles* Prong 3 had been satisfied. None of the cases cited by Defendants in their opening memorandum dispute that Dr. Liu's methodology of aggregating the white bloc voting is proper.

Further, Dr. Liu specifically relies upon the 2010 Representative District 23 election under the previous map in his Report and Affidavit. SOF, ¶¶ 45-46. Representative District 23 under the previous map is an endogenous election that overlaps with four of the new districts in the Adopted Plan in this Latino south side area. SOF, ¶ 45. In that 2010 Representative District 23 election, one white candidate ran against three Latino candidates, and the white bloc voting of

14

80.5% of the white voters provided a victory for the white candidate, Dan Burke, in a highly racially polarized endogenous election. SOF, ¶¶ 45-46. Further, at no time has a Latino candidate in a Representative District been elected in this area without running in a majority-minority Latino district. SOF, ¶ 43.

Against that backdrop, Dr. Liu properly aggregated the white votes in considering multiple candidate races. Hence, Dr. Liu's conclusion shows that Plaintiffs' claim satisfies *Gingles* Prong 3. Accordingly, Defendants' Motion for Summary Judgment must be denied.

## III. PROPORTIONALITY IS NOT DISPOSITIVE UNDER THE TOTALITY OF CIRCUMSTANCES

Defendants disingenuously argue that Plaintiffs must meet a "critical threshold" of showing disproportionality to survive summary judgment. Defendants are plainly incorrect because, far from being a threshold, the Supreme Court has repeatedly stated that proportionality is merely one factor to be evaluated in the totality of circumstances; it is not by itself dispositive of a § 2 claim. Thus, Plaintiffs need not show a lack of proportionality to survive Defendants' summary judgment motion.

In *Johnson v. De Grandy*, 512 U.S. 997 (1994), the Supreme Court made clear that proportionality is not dispositive of a § 2 claim but is merely one of several factors in the totality of circumstances which courts must evaluate in determining whether a redistricting plan violates § 2. Following a trial, the district court found that Latinos' votes were diluted in violation of § 2. *Id.* at 1009. The Supreme Court reversed because the district court "failed to ask whether the totality of facts, including those pointing to proportionality, showed that the new scheme would deny minority voters equal political opportunity." *Id.* at 1013-14. The court then identified several ways in which the district court failed to properly evaluate or make factual findings regarding the totality of the circumstances, including that the district court incorrectly

15

determined that § 2 required that the plan maximize the number of Latino districts. *Id.* at 1015-16.

The court instructed that district courts "must also examine other evidence in the totality of the circumstances, including the extent of opportunities minority voters enjoy to participate in the political processes" (*Id.* at 1012) and are "required to assess the probative significance of the *Gingles* factors critically after considering the further circumstances with arguable bearing on the issue of equal political opportunity." *Id.* at 1013.

Moreover, the court expressly rejected the argument that Defendants make here. In *De Grandy*, the State argued that, as a matter of law, no dilution could occur where the percentage of single-member districts in which minority voters form an effective majority mirrors the minority voters' percentage of the relevant population. *Id.* at 1017. The court rejected this argument and held such a safe harbor "would be in derogation of the statutory text and its considered purpose* * *." *Id.* at 1018. *De Grandy* instructs that, assuming the *Gingles* factors are met, evaluation of the totality of the circumstances analysis, including proportionality, involves a question of fact which cannot be decided on summary judgment:

> It is enough to say that, while proportionality in the sense used here is obviously an indication that minority voters have an equal opportunity, * * *the degree of probative value assigned to proportionality may vary with other facts. No single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength.

*Id.* at 1020-21. In short, the court made clear that proportionality, in and of itself, is not dispositive of a § 2 violation; its probative value depends on other facts in the case. *Id.* In her concurring opinion, Justice O'Connor recognized and confirmed that proportionality is "*always* relevant evidence in determining vote dilution, but is *never* itself dispositive. * * *

Proportionality is not a safe harbor for the states; it does not immunize their election schemes from § 2 challenge." *Id.* at 1025-26.

If *De Grandy* was not clear enough, the court in *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ("LULAC") reiterated that proportionality is merely "a relevant fact in the totality of the circumstances. [citation] It does not, however, act as a 'safe harbor' for states in complying with § 2." *Id.* at 435. Proportionality must be examined in light of all the remaining factors and only "provides some evidence of whether the political processes leading to nomination or election in the state or political subdivision are not equally open to participation." *Id.* at 437. The court again noted that the degree of probative value assigned to proportionality varies with other facts and, in fact, examined those other facts to determine whether a § 2 violation occurred in Texas. *Id.* at 438.

*De Grandy* and *LULAC* make clear that even if the Illinois Adopted Plan is proportional with respect to Latino voters, that, in and of itself, does not foreclose Plaintiffs' vote dilution claim. Even Defendants' own expert, Dr. Lichtman, admitted that proportionality is not dispositive. SOF, ¶ 53. The effect of proportionality or disproportionality, therefore, must necessarily be fact-specific and fact-dependent. It bears repeating that the court in *De Grandy* reversed following a trial; thus, all facts regarding the totality of the circumstances were before it.

Further, Dr. Lichtman's reasoning is illogical. On the one hand, he insists that one should use the American Community Survey's (the "ACS") CVAP data, rather than census VAP data, to compute the seats for Latinos. On the other hand, he attempts to state that the Adopted Plan has 10 so-called "unchallenged effective Latino opportunity House districts." Defs' SOF, ¶ 56.

The citizen issue of a Latino racial group is the reason why one needs to draw districts with a higher level, not a lower level, of Latino concentration, which is at the core of this lawsuit concerning the south side of Cook County, especially District 23 of the Adopted Plan. Moreover, some of the so-called "10 unchallenged effective Latino opportunity House districts" in the Adopted Plan may have too few Latinos in them. No one knows what the actual CVAP is in those districts or even whether they are majority Latino CVAP or not. SOF, ¶ 55. Even the highest Latino VAP district in the Adopted Plan (District 24), which has a Latino VAP of 69.9%, would not create a majority Latino CVAP district when utilizing Dr. Lichtman's statewide CVAP (45.1% Hispanic CVAP).[1] SOF, ¶ 55.

Dr. Lichtman is comparing two different levels of population (CVAP v. VAP) when he argues that the Adopted Plan is roughly proportional. This is like comparing apples to oranges. On the other hand, Dr. Liu's methodology of using VAP data to compute not only the number of seats in the House based on proportionality but also the level of Hispanic concentration in the districts drawn is logically consistent.

Defendants would have this Court decide the § 2 claim without all the facts before it. This Court is obligated to examine the other facts in the totality of the circumstances in determining whether a § 2 violation occurred. These inquiries are necessarily issues of fact which preclude summary judgment. Moreover, Plaintiffs need not prove their case at the summary judgment stage. *Gil v. Reed,* 381 F.3d 649, 657 (7th Cir. 2004). Thus, Plaintiffs need not establish that the totality of the circumstances establishes vote dilution to withstand Defendants' summary judgment motion. Accordingly, Defendants' motion for summary judgment must be denied.

---

[1]Note that the 2010 Latino VAP in Illinois is 13.5%, while the CVAP is 8.7%. Thus, VAP is 1.55 times higher than the CVAP. Accordingly, the 69.9% Latino VAP in the Adopted Plan District 24 should translate to about 45.1% Latino CVAP.

However, Plaintiffs can and will show that the totality of the circumstances support creating more § 2 districts on behalf of Latinos. While Plaintiffs would agree that there is no duty to maximize the number of Latino districts, as shown above, proportionality is not dispositive. The remaining factors that must be considered under the totality of circumstances are:

Senate factors

**1.** The extent of any *history of official discrimination* in the state or political subdivision that touches the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

**2.** The *extent* to which voting in the elections of the state or political subdivision is *racially polarized;*

**3.** The extent to which the state or political subdivision has used *unusually large election districts,* majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

**4.** If there is a candidate *slating process,* whether the members of the minority group have been denied access to that process;

**5.** The extent to which members of the minority group in the state or political subdivision bear the effects of *past discrimination* which hinders their ability to participate effectively in the political process;

**6.** Whether *political campaigns* have been characterized by overt or subtle *racial appeals;*

**7.** The *extent* to which members of the minority group have been *elected* to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

**8.** Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

**9.** Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

19

*Barnett v. City of Chicago,* 969 F. Supp. 1359, 1411 (N.D. Ill. 1997), *reversed in part on other grounds,* 141 F. 3d 699 (7th Cir. 1998)

Defendants do not even attempt to show that the totality of circumstances (rough proportionality) support their position. Instead, they rely only on one part of the totality of circumstances and never discuss the remaining factors. On the other hand, Dr. Liu's report specifically looks at the Second Senate Factor - the extent of polarized voting. SOF, ¶ 48. In fact, Dr. Lichtman did not dispute that finding in his affidavit. Def Ex. Q. This conclusion by Dr. Liu, in and of itself, is enough to create a question of fact as to the totality of circumstances at this stage of the litigation. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir. 1991). Further, the facts will show that numerous other factors in the totality of circumstances test are met in Illinois.

One of these factors is Senate Factor 1 - the "history of official discrimination." There are numerous examples of violations of minority's voting rights by governmental entities whose jurisdictions include all or part of the areas in question. *Ketchum v. Byrne,* 740 F.2d 1398, 1408 (7th Cir. 1984) (dilution of Latino voting strength through manipulation of the City of Chicago ward boundaries); *Rybicki v. State Bd. of Elections,* 574 F. Supp. 1147, 1151 (N.D. Ill. 1983) (preservation of white incumbents was intertwined with, and dependent on, racial discrimination); s*ee also United States v. Cicero,* 2000 WL 34342276 (N.D. Ill. Mar. 15, 2000) (granting preliminary injunction to stop the certification of election results where an 18-month residency requirement was adopted "at least in part with the racially discriminatory purpose of targeting potential Hispanic candidates").[2] Clearly, there is a "history of official discrimination" in this area of the State.

---

[2]The boundaries of Chicago overlap with Districts 1, 2, 21, 22, and 24 in the Adopted Plan, and the boundaries of the Town of Cicero overlap with Representative Districts 21, 23 and 24 in the Adopted Plan. SOF, ¶¶ 56-57.

The second Senate Factor, the extent to which the voting is racially polarized, is also relevant to this case. Dr. Liu clearly found that voting was racially polarized in the area in question. SOF, ¶¶ 37, 48. In fact, he found that both whites and Latinos voted in a racially polarized manner 78.4% of the time under his analysis. SOF, ¶ 48. Accordingly, Senate Factor 2 is met by Dr. Liu's testimony.

Another of the factors under totality of circumstances relates to the extent to which members of the minority group bear the effects of past discrimination so as to hinder their ability to participate effectively in the political process (Senate Factor 5). In Illinois, Latinos still bear the ramifications of historical discrimination. The 2010 data from the ACS clearly shows that education levels are much lower in Cook County for Latinos than they are for whites.[3] SOF, ¶ 49. The ACS data shows that only 60.8% of Latinos in Cook County have graduated from high school. *Id.* On the other hand, 92.8% of whites have graduated from high school. *Id.* Further, the median income for Latinos was $52,254 versus $95,285 for whites. *Id.* Also, the poverty levels and unemployment levels are much higher for Latinos than they are for whites. Latinos have a 20.8% poverty level while the poverty level for whites is only 8.0%. *Id.* Likewise, the unemployment level for Latinos is over 45% higher than for whites. *Id.*

The Senate Report addressed the correlation between socioeconomic status and participation in the political process as follows:

> The courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown and where the level of [minority] participation in politics is depressed, plaintiffs need not prove any further causal nexus between the disparate socioeconomic status and the depressed level of political

---

[3]As Dr. Lichtman stated: "[s]ocial scientists and governments across the United States rely on data from the ACS. Def. Ex. Q , ¶ 10.

participation. S. Rep. 417 at 29 n. 114, reprinted in 1982 U.S.
Code Cong. * * * Admin. News at 207 n. 114.

In the case before this Court, voter turnout among whites is more than three times higher than that of Latinos. SOF, ¶ 50. Due to these disparities in socioeconomics, people of lower income levels often are unable to financially support a candidate's campaign and often have greater difficulty in getting to the polls. *Jamison v. Tupelo, Mississippi,* 471 F. Supp. 2d 706, 714-15 (N.D. Miss. 2007). *See also Sanchez v. State of Colorado,* 97 F.3d 1303, 1323-24 (10th Cir. 1996) (education, age, income and employment impede Hispanic participation in the political process); *Magnolia Bar Ass'n, Inc. v. Lee,* 793 F. Supp. 1386, 1409 (S.D. Miss, 1992) (person with less education is less likely to vote than one with more education, and the person with less money is less likely to own a car and go to polls to vote or to the courthouse to register); *Thornburg v. Gingles,* 478 U.S. 30, 69-70 (1986) (if minorities earn less than whites, they will not be able to provide the candidate of their choice with the same level of financial support that whites can provide to theirs). Likewise, Defendants' expert, Dr. Lichtman, has previously testified that these types of socio-economic factors, such as differences in education and income, can hinder a minority's ability to participate effectively in the political process due to its effect on his or her ability to make contributions or to recruit candidates. Ex. 14, Deposition of Allan Lichtman, pp. 41-44. Accordingly, Senator Factor 5 weighs in favor of the Plaintiffs.

Another factor under the totality of circumstances that will be of issue in this case is Senate Factor 7 - the extent to which members of the minority group have been elected to public office. The facts will show that Latinos are much less likely to obtain public office in the State of Illinois than their white counterparts. SOF, ¶¶ 51-52. Throughout the State of Illinois, Latinos are rarely elected to local offices. SOF, ¶ 52. In fact, at least since 1972, no Latinos have been a United States Senator or held a statewide constitutional office in Illinois. SOF, ¶ 51. Further,

there are very few elected Latinos throughout most levels of Illinois government; in fact, there are only approximately 98 locally elected Latino officials out of thousands of locally elected positions in Illinois.  SOF, ¶ 52.  These exogenous elections are entirely appropriate to consider when evaluating the Senate factors and the totality of circumstances in voting dilution claims. *N.A.A.C.P. v. Fordice,* 252 F.3d 361, 374 (5th Cir. 2001) (consideration of exogenous elections is unequivocally permitted); *Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.,* 4 F.3d 1103, 1134 (3d Cir. 1983) (approving the use of exogenous elections when viewing the totality of circumstances); *Large v. Freemont County, Wyo.,* 709 F. Supp. 2d 1176, 1206-07 (Dist. Wyo. 2010) (exogenous elections "are relevant in the totality of the circumstances analysis").  Accordingly, sufficient evidence exists to support a finding that Senate Factor 7 weighs in favor of the Plaintiffs.  Further, Defendants have provided this Court evidence of a "lack of responsiveness" to the Latino community as set forth in one of the "Additional Senate Factors." SOF, ¶¶ 58-60.

Against that backdrop, it is important to note that the Supreme Court has found that the finder of fact is to consider the "totality of circumstances" to determine whether the political process violates Plaintiffs' rights in vote dilution claims under Section 2.  *Thornburg v. Gingles*, 478 U.S. 30, 32, 79 (1986).  Such a determination is a question of fact that is "peculiarly dependent upon the facts of each case."  *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 497 (2006) quoting *Rogers v. Lodge,* 458 U.S. 613, 622, 627 (1982).  Courts are free to consider any or all of the Senate Factors in analyzing § 2 claims; accordingly, granting summary judgment in this case would be inappropriate given the factual nature of these types of cases and the issues of fact raised by Plaintiffs.  *See Harper v. City of Chicago Heights,* 824 F. Supp. 786,

803 (N.D. Ill. 1993) citing *Thornburg v. Gingles,* 478 U.S. at 79 (summary judgment inappropriate in light of the factual nature of vote dilution claims under § 2).

## **CONCLUSION**

In summary, Defendants' Motion for Summary Judgment must fail.  Plaintiffs have clearly presented a question of fact as to whether Representative District 96 subordinated traditional redistricting principals to the racial classification of voters.  Further, Plaintiffs fully satisfy the requirements of *Gingles* Prong 3 by showing that the white majority votes sufficiently as a bloc in Representative District 23, in the absence of special circumstances, to defeat the minority's preferred candidate.  Finally, Plaintiffs have presented significant facts under the "totality of the circumstances" to support a claim for vote dilution under § 2 of the Voting Rights Act.

Respectfully submitted,

/s/--------Phillip A. Luetkehans----------------------
One of the Attorneys for Plaintiffs Christine
Radogno, Veronica Vera and Edwin
Tolentino

/s/ --------Andrew Sperry-----------------------------
One of the Attorneys for Plaintiffs Thomas Cross,
Adam Brown and Angel Garcia

/s/--------Thomas M. Leinenweber------------------
One of the Attorneys for Plaintiffs Thomas Cross,
Adam Brown and Angel Garcia

E-filed: November 23, 2011

Phillip A. Luetkehans, 06198315
pluetkehans@slg-atty.com
Brian J. Armstrong, 06236639
barmstrong@slg-atty.com
Stephanie J. Luetkehans, 06297066
sluetkehans@slg-atty.com
SCHIROTT, LUETKEHANS & GARNER, P.C.
105 East Irving Park Road
Itasca, IL 60143
630-773-8500

Thomas M. Leinenweber, 6208096
thomas@landb.us
Peter Baroni, 6236668
peter@ilesq.com
Leinenweber Baroni & Daffada LLC
203 N. LaSalle St., Suite 1620
Chicago, IL 60601
(866) 786-3705

Andrew Sperry, 6288613
asperry@laroseboscolaw.com
LaRose & Bosco, Ltd.
200 N. LaSalle St., Suite 2810
Chicago, IL 60601
(312) 642-4414

### CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of November, 2011, I electronically filed Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment with the Clerk of the U.S. District Court, Northern District of Illinois, Eastern Division using the CM/ECF system which will send notification of such filing to the following:

asperry@laroseboscolaw.com

thomas@landb.us

bstratton@atg.state.il.us

dellis@hds.ilga.gov

mlayden@rjpltd.com

rprendergast@rjpltd.com

mjkasper60@mac.com

peter@ilesq.com

emadiar@senatedem.ilga.gov

fogartyjr@gmail.com

mike.persoon@gmail.com

kennethjohnsonlaw@earthlink.net

courtneynottage@aol.com

htristan@tristancervantes.com

pcervantes@tristancervantes.com

kreidy@trisancervantes.com

lmishkin@sandmlegal.com

wharte@williamharteltd.com

jmannix@williamharteltd.com

and I hereby certify that I mailed by U.S. Postal Service the document(s) to the following non-

registered attorneys and interested parties:  NONE.


/s/_____Phillip A. Luetkehans_____
One of the Attorneys for Plaintiffs
Christine Radogno, Veronica Vera
and Edwin Tolentino


Phillip A. Luetkehans, 06198315
pluetkehans@slg-atty.com
Brian J. Armstrong, 06236639
barmstrong@slg-atty.com
Stephanie J. Luetkehans, 06297066
sluetkehans@slg-atty.com
Schirott, Luetkehans & Garner, P.C.
105 East Irving Park Road
Itasca, IL 60143
630-773-8500

27